POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff the Employees'
Retirement System of the State of Hawaii
and Lead Counsel for the Class*

(*additional counsel on signature page*)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVEN A. MULLEN, Individually and on behalf of all others similarly situated,<br><br>Lead Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY, C. ALLEN PARKER, TIMOTHY J. SLOAN, JOHN R. SHREWSBERRY, PERRY PELOS, MARK MYERS, and KARA MCSHANE,<br><br>Defendants. | Case No.: 3:20-cv-07674-WHA<br><br>**CORRECTED CONSOLIDATED AMENDED COMPLAINT**<br><br><u>CLASS ACTION</u><br><br>Judge: Hon. William Alsup<br><br>Courtroom: 12 – 19th Floor |

## TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................ 1

II.   JURISDICTION AND VENUE ......................................................... 10

III.  PARTIES .......................................................................................... 11

IV.   SUBSTANTIVE ALLEGATIONS .................................................. 14

    A.    Background ............................................................................. 14

        1.    Wells Fargo's History of Improper Lending Practices ............................ 17

        2.    Wells Fargo's Vast Commercial Lending Business ................................. 20

    B.    Wells Fargo's Fraudulent Practices in Its Commercial Lending Business .......... 24

        1.    The *ProPublica* Article ...................................................... 24

        2.    The University of Texas Study .......................................... 29

            a.    Griffin Concluded That Multiple Sources of Data Showed Inflated Income in Commercial Loans ....................................... 31

            b.    Further Findings From Griffin's Analysis of Income Overstatement in Terms of Realized Income ................................ 34

            c.    Further Findings From Griffin's Analysis of Inflated Income for the Same Years Reported in Prior Loans ..................................... 35

            d.    Inflated Appraisals ..................................................... 36

        3.    *The Intercept* Confirms These Findings of Fraudulent Practices in Commercial Loans ....................................... 37

        4.    Ratings Agencies Corroborate This Analysis ........................................... 40

    C.    Wells Fargo's Pervasive Fraudulent Origination Practices ................................... 42

        1.    Griffin's Analysis Applies to the Basic Practices of Loan Originators .... 43

        2.    Additional Analysis by John Flynn ..................................... 44

            a.    WFCM 2016 BNK1 ..................................................... 46

            b.    WFCM 2016 C34 ..................................................... 55

            c.    WFCM 2017-C38 ..................................................... 58

            d.    The Pervasive Nature of Inflation of Key Financial Metrics in Commercial Loans That Wells Fargo Originated ......................... 61

        3.    A High-Level Wells Fargo Employee Observed Unusually Risky Commercial Loans ....................................... 62

        4.    Wells Fargo's Representations in CMBS Offering Materials ................. 65

        5.     Wells Fargo's Other Descriptions of Its Origination Practices ................ 69

        6.     Wells Fargo's "Financials Except Banks" Commercial Loans ............... 71

        7.     Wells Fargo Held Over $30 Billion of Commercial CLOs ..................... 73

    D.     Wells Fargo's Commercial Lending Business Suffered Devastating Losses Because of These Undisclosed Risks .................................................... 73

    E.     Defendants Profited From Their Sale of Wells Fargo Stock During the Class Period ......................................................................................... 76

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 78

    A.     The 2017 Statements ................................................................... 79

    B.     The 2018 Statements ................................................................... 81

    C.     The 2019 Statements ................................................................... 93

    D.     The 2020 Statements ................................................................. 102

VI.    THE TRUTH BEGINS TO EMERGE ............................................. 109

    A.     Disclosures From the First Quarter of 2020 ..................................... 110

    B.     Disclosures From the Second Quarter of 2020 .................................. 115

    C.     Disclosures From the Third Quarter of 2020 ................................... 119

VII.    ADDITIONAL SCIENTER ALLEGATIONS ................................... 122

VIII.    NO SAFE HARBOR ................................................................. 127

IX.    CLASS ACTION ALLEGATIONS ................................................ 127

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS ...................................... 129

XI.    COUNT I ............................................................................. 130

    Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ....................................................................................... 130

XII.    COUNT II ............................................................................ 132

    Violation of Section 20(a) of the Exchange Act Against The Individual Defendants.... 132

XIII.    PRAYER FOR RELIEF ............................................................ 133

XIV.    DEMAND FOR TRIAL BY JURY ............................................... 134

Lead Plaintiff, the Employees' Retirement System of the State of Hawaii ("Lead Plaintiff" or the "Retirement System"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, filings with the Securities and Exchange Commission ("SEC"), wire and press releases published by Wells Fargo & Company ("Wells Fargo" or the "Company"), analysts' reports and advisories about the Company, interviews of confidential witnesses, consultation with an expert in the commercial lending industry, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I.      INTRODUCTION

1.      This federal securities class action arises out of Defendants' false and misleading statements concerning the quality of loans in Wells Fargo's commercial lending business.  Lead Plaintiff brings this action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Wells Fargo common stock between October 13, 2017, and October 13, 2020, inclusive (the "Class Period").

2.      Wells Fargo has the largest commercial lending business in the country. In the years leading up to, and during, the Class Period, the Company made its commercial loans appear better than they were by inflating the financial performance of the properties that served as collateral for

---

[1] Emphases in this Consolidated Amended Complaint are added unless otherwise noted.

these loans. Wells Fargo also allowed commercial borrowers to take out larger loans than were allowed based on the loan-to-value ("LTV") ratios required by Wells Fargo's underwriting standards.

3.     These pervasive practices caused commercial borrowers to be able to take out substantially larger loans than their financial performance justified, or loans that they did not qualify for at all. Wells Fargo's inflation of borrowers' key income and cash flow metrics meant that borrowers were far less able to make their required loan payments than their loan files indicated. That, in turn, made these loans much riskier and subject to default, subjecting Wells Fargo to substantially greater losses than Defendants represented.

4.     These practices were part of Wells Fargo's strategy in the years after the Financial Crisis to vastly expand its commercial lending business. The size of that business has increased by hundreds of billions of dollars since 2009 and made Wells Fargo the largest commercial real estate lender in the country. In order to increase its business so much in the face of steep competition, Wells Fargo was forced to engage in improper practices that made its commercial loans larger and more attractive to borrowers.

5.     Defendants misrepresented these practices to investors. They warranted that Wells Fargo employed "conservative" and "disciplined" standards in its commercial lending business because it learned its lesson from the Financial Crisis—when Wells Fargo and other large banks engaged in the rampant and intentional misrepresentation of the quality of residential mortgages.

6.     Defendants specifically assured investors that because of its prudent practices in its dominant commercial lending business, Wells Fargo was well positioned for another economic downturn. They explained that while there is a significant amount of competition in the commercial lending industry, Wells Fargo did not lower its lending standards to meet that

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

competition. Defendant Sloan even expressly assured investors during the Company's earnings call for the third quarter of 2018 that Wells Fargo's balance sheet had "a much stronger mix in terms of credit quality, even if we would go into some sort of an economic downturn."

7.    In reality, the opposite was true. Former employees explain that Wells Fargo was extremely focused on increasing the size of its commercial lending business. For example, a former employee who was an Executive Vice President responsible for commercial lending in Arizona ("CW 1") observed that, in 2018 and 2019, Wells Fargo was making commercial loans in California that did not meet the Company's underwriting standards for loan-to-value ratios. This surprised the witness because it made these loans much risker than Wells Fargo's standards allowed. The witness explained that there was "pressure to do that because of the competition and because the economy was so good," particularly in California where the commercial real estate market was booming and the competition between banks was intense. This was a problem for Wells Fargo because, as the witness explained, it was "really trying to grow the bank" and "there was pressure to find a way to make deals happen."

8.    Many other sources confirm Wells Fargo's fraudulent practices in its commercial lending business. Several reports have emerged demonstrating, through rigorous analysis of thousands of commercial loans backing commercial mortgage-backed securities ("CMBS"), that there has been ***pervasive and intentional*** inflation of borrower income and cash flow figures at Wells Fargo since 2013. This analysis was conducted by John Flynn—an expert with decades of experience in the commercial lending industry, who filed a whistleblower complaint with the SEC and whose analysis was confirmed by multiple investigative publications—and Professor John Griffin, a renowned finance professor who confirmed and built on Flynn's analysis.

9.    Wells Fargo is one of the main banks at the center of Flynn's analysis. He found

that net operating income ("NOI") and net cash flow ("NCF") figures were consistently inflated in new loans as compared to what those figures were for the same historical year as reported by the servicer for prior loans. These income and cash flow figures reflect the amount of funds that borrowers have available to repay their loans. Such figures are therefore the key metrics that determine the riskiness and appropriate size of a commercial loan. By inflating these figures, Wells Fargo was able to make loans to borrowers that would not have otherwise qualified based on their financial performance. Just in the limited subset of commercial real estate loans that had data available for Flynn's analysis, he identified approximately $150 billion in inflated CMBS issued since 2013.

10.     For example, Flynn found in a CMBS issued by Wells Fargo that a loan for the Pacific Palisades Bowl Park, a 1950s-era trailer park in Los Angeles, reported sharply higher profits — *for the same years* — than it had in prior loans. The trailer park reported expenses that were about a third lower in its new loan disclosures when compared with earlier ones. As a result, its $1.2 million in net operating income for 2014 rose 28% above what had been reported for the same year under the old loan, with a similar discrepancy for 2013. Flynn found that for the $575 million Wells Fargo CMBS that contained this debt, about half of the loan pool appeared to have reported inflated profits when comparing the same years in different securities.

11.     Then, Griffin conducted a comprehensive analysis of Flynn's findings based on the review of a sample of 39,522 CMBS loans, issued by the largest banks in the industry. The loans that Griffin analyzed had a market capitalization of $650 billion and were underwritten between January 1, 2013, and December 31, 2019. In addition to confirming Flynn's findings of historical income figures being inflated in new loans, Griffin found that the income that properties reported after taking out their new loans consistently fell short of what was expected from the loan

underwriting process.

12.    After controlling for external factors, Griffin found that these practices were specific to individual banks and could not be explained by external factors such as specific loan characteristics. For example, Griffin found a high correlation between the amount of income inflation for a specific bank from the earlier time period that he analyzed to the later time period, with the inflation typically increasing over time. He also found that banks with higher levels of inflation typically had lower levels of deflation. These findings confirm that the income inflation that Griffin identified was "driven by cultural features of the originating banks rather than differences in underlying loan characteristics."

13.    Indeed, Griffin concluded that the pervasively poor underwriting quality that he observed was the result of intentionally deceptive practices by commercial loan originators because "[h]igher prices for loans with income overstatement, additional risk assessments by credit rating agencies, and inflations of past financials *point to originators knowingly inflating underwritten income*."

14.    This was particularly true for Wells Fargo, which is the largest commercial real estate lender in the country. Over 30% of commercial loans that it originated had NOI inflated as compared to the amount of NOI reported for the same year in a prior transaction. In addition, approximately 27% of loans that Wells Fargo originated had income overstated by over 5% when comparing the amount of NOI realized in the first year of the loan as compared to the underwritten NOI figure in the securitization materials.

15.    Flynn's and Griffin's analysis was limited to commercial real estate loans that serve as collateral for CMBS because those are the only types of commercial loans for which there is comprehensive and comparative loan-level data available. But they both make clear that their

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

analysis focuses on the origination practices of Wells Fargo and other banks, and therefore confirm systemic underwriting failures and inflation of income and cash flow figures throughout the Company's commercial lending business during the Class Period.

16.     Counsel for Lead Plaintiff has also consulted with Flynn specifically with respect to the allegations of wrongdoing in this Action. Flynn has confirmed that his analysis applies with equal force to commercial real estate loans that Wells Fargo originated.

17.     Moreover, Wells Fargo admits that the commercial real estate loans that it sells into CMBS are of the same quality as the loans that it originates and continues to hold on its books. Defendant Myers—who was the head of Wells Fargo's commercial real estate business— explained in an interview on January 20, 2020, that Wells Fargo approaches the CMBS business "very much from a traditional commercial bank perspective, which is we are a lender first**.** And even though we are originating a CMBS loan for sale, *we have to feel good that at the end that's a loan we will make and will be happy to own on our balance sheet.*"

18.     In addition, Wells Fargo explains in its annual reports and in the prospectuses for the many billions of dollars of CMBS that it deals in, that the commercial loans that the Company originates and sells into CMBS are originated by its main commercial lending business, not a separate securitization department.

19.     Wells Fargo was even further exposed to the income and cash flow inflation that was rampant in the commercial lending industry because—in addition to the over $140 billion in commercial real estate loans that the Company held—the largest portion of its separate commercial and industry loan portfolio was loans that it made to alternative asset managers that, in turn, used those funds to make precisely the type of commercial real estate loans that contain this inflation.

20.     In sum, all parts of Wells Fargo's massive commercial lending business were

exposed to the systemic income and cash flow inflation that Flynn and Griffin identified. Wells Fargo was therefore sitting on a time bomb. Its commercial loan portfolio might have passed under the radar when times were good. But when the coronavirus pandemic hit, that market stress brought out the pre-existing risks in Wells Fargo's commercial loans. Wells Fargo suffered devastating losses in its commercial lending business over the course of 2020. It took billions of dollars in allowances for credit losses in its commercial loans and categorized even more as criticized assets that were not expected to perform well. For example, in the first quarter of 2020, Wells Fargo allocated $2.24 billion for losses on commercial loans, its commercial nonaccrual loans increased by $621 million, Wells Fargo suffered $1.7 billion in unrealized losses on its CLO investments, and Wells Fargo recorded a $171 million provision expense for commercial debt securities.

21.    Then, just in the second quarter of 2020, Wells Fargo's allowance for credit losses ("ACL") for its commercial loans more than doubled to $11.669 billion total, due to a $6.4 billion increase in ACL for its commercial loan portfolio. This made Wells Fargo's ACL in its commercial loan portfolio increased from 0.93% of the portfolio to 2.27%. (An ACL is an estimate of the amount of a loan that a company is unlikely to recover. A loan is counted as an ACL when its anticipated losses are so severe that the company expects them to occur and therefore accounts for these losses on its balance sheet to avoid overstating its income. Wells Fargo accounted for ACL based on "management's estimate of credit losses inherent in the loan portfolio.")

22.    Wells Fargo also dramatically increased its commercial criticized assets in the second quarter of 2020 by $13.3 billion as compared to the prior quarter, including a $7.2 billion increase in criticized commercial and industrial loans and a $6.1 billion (or 140%) increase in criticized commercial real estate loans. (A criticized loan is one that falls into a regulatory classification below "pass" because of weaknesses in the loan that increase the likelihood that it

will suffer losses.[2]) This increased Wells Fargo's total commercial criticized assets to $38.2 billion, up an astounding 53% from the prior quarter. At this point, 7.4% of Wells Fargo's $513 billion of commercial loans outstanding were criticized.

23.    The Company's nonperforming assets also spiked in the second quarter of 2020, by 22%, due to a $1.4 billion increase in commercial nonaccrual loans. (A nonaccrual loan is one for which the full and timely collection of interest or principle is uncertain. These loans are no longer generating (and the lender should stop accruing) their stated interest because the borrower has stopped making payments and the loan is nonperforming.[3])

24.    Wells Fargo also had $1.1 billion in net charge-offs on loans and debt securities during the second quarter of 2020, mostly occurring in its commercial loan portfolio. This made Wells Fargo's net charge-offs as a percentage of average loans in the commercial portfolio skyrocket to 0.44%, compared to just 0.13% in the comparable prior-year period. (A net charge-off is the portion of a loan that a company determines it will not collect.)

25.    Even after these enormous impairments in the second quarter of 2020, Wells Fargo continued to suffer losses and writedowns in its commercial loans in the third quarter. The Company's allowance for credit losses in its commercial loan portfolio increased to 2.39% of the total portfolio. Wells Fargo also suffered a $113 million increase in commercial nonaccrual loans and its criticized assets for its commercial real estate loans totaled $12.7 billion, reflecting a $2.3 billion (or 22%) increase as compared to the prior quarter. To make matters worse, Wells Fargo's

---

[2] Wells Fargo categorized criticized loans "aligned to regulatory definitions of pass and criticized categories with criticized segmented among [1] special mention, [2] substandard, [3] doubtful and [4] loss categories."

[3] Wells Fargo categorized loans as nonaccrual loans when they were 90 days past due or the borrower was in bankruptcy, among other reasons that the full and timely collection of interest or principal has become uncertain.

losses would have been even larger if not for the government's short-term assistance and the Company's temporary borrower accommodations. Defendant Shrewsberry warned that "customer accommodations we've provided since the start of the pandemic could delay the recognition of net charge-offs, delinquencies, and non-accrual status," but that "future credit performance may deteriorate as stimulus effects that benefited recent credit performance come to an end."

26.     Wells Fargo's losses in its commercial lending business were significantly worse than those of its competitors. A comparison of Wells Fargo's allowance for credit losses to those of other big banks show that Wells Fargo's ACL vastly exceeded the ACLs of other banks in the second and third quarters of 2020. These losses also hit Wells Fargo harder because it was more dependent on its commercial lending business, which formed a larger portion of its overall business as compared to its competitors.

27.     Investors and analysts were very surprised by the extent of Wells Fargo's losses in its commercial lending business over the course of 2020. *CNN* noted that Wells Fargo's "quarterly provision for bad loans" in the second quarter of 2020 were the "highest . . . in the bank's history, topping even the fourth quarter of 2008." *CNN* noted that an analyst described Wells Fargo's numbers as "awful."

28.     Charles Scharf, Wells Fargo's CEO, admitted when discussing Wells Fargo's results for the second quarter of 2020 that Defendants were "extremely disappointed" in the Company's financial performance. He explained that "[w]hile the negative impact of the pandemic is unprecedented and many of our business drivers were negatively impacted, ***our franchise should perform better, and we will make changes to improve our performance regardless of the operating environment***." In other words, Wells Fargo's terrible performance was not the result of the pandemic because its portfolio should have been better able to withstand that "operating

environment."

29.    Griffin concluded that losses in commercial loans over the course of 2020 were the result of banks such as Wells Fargo inflating income figures of its commercial borrowers. He found a high correlation between the amount of income that each bank inflated in its loans and the amount of losses that those loans suffered. Griffin concluded that "[t]his significant relationship between originator's income overstatement and poor loan performance is present with a stricter measure of non-performing loans and in the pre-COVID period, indicating that COVID is accelerating existing origination weaknesses." Griffin explained that "[a]lthough few people predicted a virus shutting down large parts of the real economy, pre-COVID underwriting quality appears to play a large role in the ability of assets to withstand distress."

30.    Wells Fargo's stock declined significantly as the market learned the extent of the weakness in its commercial loan business. The Company's shareholders suffered billions of dollars in losses when Wells Fargo's stock fell as that previously unknown level of risk led to enormous losses in its commercial lending business over the course of 2020.

## II.    JURISDICTION AND VENUE

31.    Jurisdiction is conferred by Section 27 of the Exchange Act.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

32.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

33.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), because Defendant Wells Fargo maintains its corporate headquarters in this District. In addition, Wells Fargo conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this

District, including the dissemination of false and misleading statements into this District.

34.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.    PARTIES

35.    On March 15, 2021, this Court appointed the Employees' Retirement System of the State of Hawaii to serve as Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). (ECF No. 78).

36.    The Retirement System filed documents listing all of its Class Period transactions in Wells Fargo securities that are at issue in this litigation, in connection with its motion to be appointed as Lead Plaintiff in this action. (ECF Nos. 47-5, 71).

37.    Defendant Wells Fargo is a financial services and bank holding company headquartered in San Francisco, California.  The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "WFC."

38.    Defendant C. Allen Parker ("Parker") served as Interim Chief Executive Officer ("CEO") of Wells Fargo from March 2019 to October 2019, until the position was taken over on a permanent basis by Charles W. Scharf ("Scharf").  Defendant Parker previously served as the Company's General Counsel at all prior times during the Class Period, a position to which he returned in October 2019.  Defendant Parker left Wells Fargo in March 2020.

39.    Defendant Timothy J. Sloan ("Sloan") served as CEO of Wells Fargo from October 2016 until his resignation in March 2019. He worked at Wells Fargo since 1987, previously serving as a Director and President and Chief Operating Officer from November 2015 to October 2016, Senior Executive Vice President in charge of Wholesale Banking from May 2014 to November 2015, and Senior Executive Vice President and Chief Financial Officer (CFO) from February 2011

to May 2014, among other roles.

40.     Defendant Sloan left Wells Fargo in March 2019 as a result of Wells Fargo's multiple recent scandals, including its fake accounts scandal that came to light in 2016 (where Wells Fargo created fraudulent savings and checking accounts for customers without their consent).[4] Many commentators and public figures have argued that given Defendant Sloan's various roles as a top executive, "he should have known about the problems long before they became public and was thus ill-suited to lead the bank out of its mess."[5] Upon his departure, Senator Elizabeth Warren said it was "[a]bout damn time" and she called for the Justice Department and SEC to investigate his alleged role in the bank's "scams."[6]

41.     Defendant John R. Shrewsberry served as Wells Fargo's CFO and a Senior Vice President throughout the Class Period and since May 2014. Defendant Shrewsberry previously served in several senior roles at the Company since 2001. Wells Fargo announced his retirement in July 2020.

42.     Defendant Perry Pelos served as Wells Fargo's Senior Executive Vice President in

---

[4] *See* Ethan Wolff-Mann, *19 Wells Fargo Scandals That Surfaced During the Tim Sloan Era*, Yahoo Finance (Mar. 29, 2019), https://www.yahoo.com/now/wells-fargo-tim-sloan-list-scandals-141539802.html. For example, Senator Warren has questioned Defendant Sloan about the "nearly 50 statements Mr. Sloan made across 13 investor calls, where he directly or indirectly promoted Wells Fargo's success at cross-selling" and she "asked for more detailed disclosures about what Mr. Sloan knew when he made public comments denying the existence of any fake accounts problem." *See Warren Questions Wells Fargo CEO Tim Sloan about Fake Accounts Scandal, Letter from Elizabeth Warren to Timothy J. Sloan* (Oct. 11, 2017), *available at* https://www.warren.senate.gov/oversight/letters/warren-questions-wells-fargo-ceo-tim-sloan-about-fake-accounts-scandal.

[5] Jim Puzzanghera, *Wells Fargo CEO Tim Sloan steps down as bank struggles to get past scandals*, Los Angeles Times (Mar. 28, 2019), https://www.latimes.com/business/la-fi-wells-fargo-tim-sloan-ousted-20190328-story.html.

[6] *See* Spencer Kimball, *Elizabeth Warren on Tim Sloan leaving Wells Fargo: "About damn time,"* CNBC Politics (Mar. 28, 2019), https://www.cnbc.com/2019/03/28/elizabeth-warren-on-tim-sloan-leaving-wells-fargo-about-damn-time.html.

charge of Wholesale Banking from November 2016 until February 2020 and as Senior Executive Vice President and CEO of Commercial Banking from February 2020 to the present. Pelos also currently serves on Wells Fargo's Operating Committee. He has worked at Wells Fargo since 1987 and held senior positions in its corporate and commercial banking groups since 1998. From 2009 to 2015, Pelos headed Middle Market Banking, with responsibility for more than 25 divisions nationwide. Before that, he was a division manager for the Middle Market Central division. In 1998, he was appointed as the Head of the Corporate Banking division, and before that, he held several positions in Middle Market and Corporate Banking.

43.     In these roles, Defendant Pelos led Wells Fargo's commercial lending business for companies of all sizes. For example, as the Head of Commercial Banking Services starting in 2016, Defendant Pelos oversaw Wells Fargo's Business Banking (serving companies with $5 million to $20 million in annual sales), Middle Market Banking (serving companies with $20 million to $1 billion in annual sales), and Corporate Banking (serving large corporations with sales of $1 billion or more) businesses, among other departments. Similarly, Wells Fargo's Wholesale Banking segment included products and services for businesses with annual sales in excess of $5 million.

44.     Defendant Mark Myers served as Wells Fargo's Head of Commercial Real Estate and Executive Vice President from January 2011 to February 2020. As Head of Commercial Real Estate, Myers oversaw Wells Fargo's delivery of the Wells Fargo's platform of banking, financing, and servicing solutions for commercial real estate developers and investors, including balance sheet lending, CMBS origination, capital markets distribution, warehouse lending and loan servicing. Defendant Myers joined Wells Fargo in 1980 and during an almost 40-year career he has held a number of senior leadership positions in the Commercial Real Estate, Corporate, Capital Markets, and Special Situation Groups. He oversaw Wells Fargo becoming the largest commercial

real estate lender in the county in terms of market share in the years leading up to the Class Period.

45.     Defendant Kara McShane has served as Wells Fargo's Head of Commercial Real Estate since February 2020. She currently serves on the Wells Fargo Management Committee. Since joining Wells Fargo in 2010, Defendant McShane has held a number of senior leadership positions related to commercial real estate, including Head of Commercial Real Estate Capital Markets & Finance and Head of Structured Real Estate.

46.     Defendants Parker, Sloan, Shrewsberry, Pelos, Myers, and McShane are referred to herein as the "Individual Defendants." During the Class Period, the Individual Defendants ran the Company as hands-on managers, overseeing Wells Fargo's operations, business practices and finances, and made the materially false and misleading statements described herein. The Individual Defendants had intimate knowledge about core aspects of Wells Fargo's financial and business operations, including the Company's commercial debt activities. They were also intimately involved in deciding which disclosures would be made by the Company.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

47.     Wells Fargo is a global financial services company headquartered in San Francisco, California. The Company provides banking, investment and mortgage products and services, as well as other consumer and commercial financial services. It is one of the largest banks in the world as measured by both market capitalization and total assets.

48.     At the start of the Class Period, Wells Fargo had three operating segments: (i) Community Banking; (ii) Wholesale Banking; and (iii) Wealth and Investment Management. The Community Banking segment included products and services for individuals and small businesses, such as bank accounts, credit and debit cards, home mortgages, and student and auto loans. The Wholesale Banking segment included products and services for businesses with annual sales in

excess of $5 million. These business offerings included traditional commercial loans and lines of credit, asset-based lending, commercial real estate lending, trade financing, treasury management, and investment banking services.  The Wealth and Investment Management segment provided personalized wealth management and retirement products and services. For 2019, Wholesale Banking was responsible for $10.7 billion in net income, or 55% of the Company's total consolidated net income, making it Wells Fargo's most profitable operating segment.

49.     In February 2020, Wells Fargo announced that Community Banking would be split into two new operating segments: (i) Consumer and Small Business Banking (responsible for branch banking); and (ii) Consumer Lending (responsible for consumer loans).  Similarly, the Company announced that Wholesale Banking would be split into two new operating segments: (i) Commercial Banking (responsible for commercial lending and government and institutional banking); and (ii) Corporate & Investment Banking (responsible for capital markets, investment banking and the Company's commercial real estate portfolio).

50.     Although this transition is still ongoing, the reporting structure maintains the general divide between Wells Fargo's consumer products and services on the one hand and its commercial lending and capital market activities on the other. Both before and after this transition, Defendant Pelos led Wells Fargo's commercial lending business. Before Defendant Pelos was promoted to Head of Wholesale Banking in 2016, he served as Head of Commercial Banking Services and oversaw Business Banking (serving companies with $5 million to $20 million in annual sales), Middle Market Banking (serving companies with $20 million to $1 billion in annual sales), and Corporate Banking (serving large corporations with sales of $1 billion or more). Now, as CEO of Commercial Banking, Wells Fargo describes Defendant Pelos as "oversee[ing] teams dedicated to helping small, mid-sized, and large commercial and corporate companies succeed

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

financially. Commercial Banking teams include the business comprised of Core Market, Middle Market, and Specialized Industries, Treasury Management, and Wells Fargo Commercial Capital."

51.     At all times during the Class Period, Wells Fargo categorized its commercial loans into commercial real estate ("CRE"), commercial and industrial ("C&I") loans, and lease financing loans. CRE loans are loans that Wells Fargo makes as mortgages for the purchase, construction, or refinancing of commercial properties. C&I loans are loans that Wells Fargo makes to businesses to fund their operating expenses.[7] C&I and commercial real estate loans were Wells Fargo's dominant categories of commercial loans, comprising approximately $350 billion and $146 billion of Wells Fargo's total $513 billion of commercial loans as of June 30, 2020.[8]

52.     In addition to originating commercial loans, Wells Fargo bundled them into securitized financial products that it then sold to investors, becoming a leading participant, market maker and investor in the fast-growing collateralized commercial debt markets.

53.     Wells Fargo specialized in two such products in particular: CLOs and CMBS. Much like RMBS, CLOs and CMBS are fixed-income securities sold to investors in tranches that reference underlying debt. The difference lies in the collateral. Whereas RMBS consist of bundled home mortgages, CLOs consist of packaged commercial loans of all varieties and CMBS specifically reference commercial real estate mortgages.

54.     A key difference between RMBS and CMBS is that the size of the average commercial real estate loans is much larger. A typical CMBS includes under 100 commercial

---

[7] Wells Fargo further divided its CRE loans into CRE mortgage and CRE construction loans. CRE mortgage loans were the dominant category, with approximately $124 billion outstanding as of June 30, 2020.

[8] Wells Fargo also had approximately $17 billion in lease financing loans at that time, which comprised approximately three percent of its commercial loan portfolio.

properties, many times fewer than the hundreds, or even thousands, of mortgages included in a typical RMBS. Offering materials for CMBS therefore provide detailed information about each property at issue. In addition, because each individual commercial loan in CMBS is much more significant than an individual residential loan in RMBS, banks such as Wells Fargo pay much more attention to the details of each commercial loan.

### 1.    Wells Fargo's History of Improper Lending Practices

55.    Beginning in mid-2007, the bursting of the U.S. housing bubble caused the values of securities tied to U.S. real estate to plummet and precipitated an international banking crisis. The events culminated in the Global Financial Crisis and Great Recession (the "Financial Crisis"), one of the greatest wealth-destruction events in modern history, which wiped out trillions of dollars of wealth in the U.S. and around the world.

56.    A primary cause of the Financial Crisis was excessive risk taking by major banks and financial institutions such as Wells Fargo. These market participants fueled the significant growth of the subprime mortgage market and the increase in housing speculation that preceded the Financial Crisis by issuing and underwriting home mortgages to borrowers that posed a high risk of default. These low-quality home loans were then securitized and packaged into residential mortgage backed securities ("RMBS"), which were in turn marketed and sold to investors.

57.    A root cause of this latent, undisclosed risk was the fact that these products were built on a subprime mortgage market rife with fraud, abuse and excessive risk taking. Financial institutions systematically lent to borrowers who did not have the means to repay the loans, violated basic due diligence standards, and focused on growing mortgage balances without regard to the attendant risks because of the short-term fees and profits they could generate. This systematic breakdown in underwriting standards, risk controls and due diligence practices flooded the market with defective mortgages that risked default in the face of any significant market stress.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

58.    Wells Fargo played a central role in the activities that led to the Financial Crisis. The Company has paid billions of dollars in fines, penalties and restitution to regulators for its abuses.  For example, in August 2018, Wells Fargo agreed to pay $2.1 billion to the federal government after the U.S. Department of Justice found that the Company had originated and sold residential mortgages that it knew contained misstated income data and did not meet the quality that Wells Fargo had represented.  Wells Fargo packaged these defective loans into RMBS that later suffered billions of dollars in losses. Notwithstanding Wells Fargo's culpability in precipitating the Financial Crisis, it was rewarded with a $25 billion tax-payer funded bailout to prevent its collapse, while its investors suffered billions of dollars in losses.

59.    Wells Fargo claimed to have learned its lesson from the Financial Crisis. Defendants emphasized repeatedly that the Company no longer engaged in the type of risky lending practices that led to the collapse.

60.    For example, Defendant Sloan stated in the Company's August 1, 2018 news release discussing the 2018 DOJ settlement: "We are pleased to put behind us these legacy issues regarding claims related to residential mortgage-backed securities activities that occurred more than a decade ago."

61.    Similarly, as recently as June 2020, Wells Fargo agreed to a $20 million settlement with the state of Maryland to resolve a dispute over the Company's misleading investors during the Financial Crisis about the quality of loans in its RMBS. The Maryland Attorney General described Wells Fargo's actions as directly contributing to the Financial Crisis. Wells Fargo stated that "[w]hile we don't agree with the state's view on these matters, we are pleased to be able to put these legacy issues behind us."

62.    Defendants also reassured investors that Wells Fargo's commercial credit practices

were safe and more conservative than those of alternative asset managers, because the Company had learned its lessons from the Financial Crisis.

63.     For example, as described further in Section V below, Defendants told investors:

- "[I]t is a more benign environment" because "the average big bank . . . seems to have a much cleaner portfolio than 10 years ago." (*infra* ¶ 304);

- "I [Defendant Sloan] think the entire regulatory environment post the great recession has fundamentally changed the quality of assets on the balance sheets of the entire industry. And I'd love to tell you it's idiosyncratic to Wells Fargo which, by the way, I still think it is, but in addition to that, I think the balance sheets of the banks today are stronger than they've ever been." (*infra* ¶ 331);

- "[O]ne of the defining moments . . . of this recovery coming out of the Financial Crisis is how disciplined the debt lenders actually have been, pretty remarkable" (*infra* ¶ 381); and

- Regulations and banks not wanting "to be aggressive this late in the cycle" pushed poorer quality loans "where you want that credit, so it's not blowing up on the books of banks when the cycle turns." (*infra* ¶ 326).

64.     Defendant Sloan even expressly assured investors that Wells Fargo's balance sheet had "a much stronger mix in terms of credit quality, even if we would go into some sort of an economic downturn." (*Infra* ¶ 320).

65.     Defendants also made the many misstatements described in Section V below, representing to investors that Wells Fargo's commercial lending business employed "conservative" and "disciplined" lending standards and had solid or high credit quality.

66.     Unbeknownst to investors, however, despite these assurances, Wells Fargo was in fact engaged in many of the same types of abuses, control deficiencies, excessive risk taking and lax underwriting practices that had helped precipitate the Financial Crisis and caused such egregious harm to its investors.  This time, however, the hidden threat did not derive from the Company's consumer lending, but rather from its commercial credit portfolio.

### 2. Wells Fargo's Vast Commercial Lending Business

67.    As of December 2019, Wells Fargo was the third-largest U.S. bank by assets and the largest originator and servicer of mortgages in the country, driven by its commercial lending business, which is the largest among all U.S. banks.[9]

68.    Defendants consistently promoted Wells Fargo's status as the top commercial lender, focusing in particular on its commercial real estate business. For example, during the Company's earnings call for the fourth quarter of 2017, Defendant Sloan stated that "[w]e're the largest commercial real estate lender by far, and not only in total but in almost every product type."

69.    Similarly, during a January 20, 2020 interview on the podcast "Leading Voices in Real Estate," Defendant Myers reflected on his 40-year career with Wells Fargo and its becoming the number one commercial real estate lender over the course of the prior 10 years, during his leadership as Wells Fargo's Head of Commercial Real Estate.

70.    Wells Fargo's rapid expansion in commercial banking was spurred by the Company's acquisition in 2008 of Wachovia Bank. As of the end of 2008, Wells Fargo had just $180 billion in total commercial loans outstanding. That amount would more than triple by March 31, 2020.

71.    Prior to its merger with Wells Fargo, one of Wachovia Bank's primary business lines was the underwriting and origination of mortgage loans secured by commercial properties. Wachovia, however, was one of the worst perpetrators of the fraudulent lending practices that led to the Financial Crisis. It suffered nearly $24 billion in losses in the third quarter of 2008, its last

---

[9] *See* Trefis Team, *Which U.S. Bank Has A Larger Commercial Banking Business: Wells Fargo or Bank of America?*, Forbes (Dec. 19, 2019), https://www.forbes.com/sites/greatspeculations/2019/12/19/which-us-bank-has-a-larger-commercial-banking-business-wells-fargo-or-bank-of-america/?sh=1640c9531d52.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

quarter as a public company, before Wells Fargo bought it on the precipice of bankruptcy.[10] Wachovia's culture thus became incorporated into Wells Fargo's.

72.    Wells Fargo's organic growth in its commercial loan business continued unabated after its Wachovia acquisition. Since 2009, Wells Fargo has dramatically expanded its commercial lending activities, increasing the size of its commercial loan portfolio by hundreds of billions of dollars. Between December 31, 2009 and March 31, 2020, Wells Fargo's commercial loan balance increased by more than $200 billion (from $333 billion to $568 billion) or 71%.

73.    This growth was fueled by Wells Fargo's efforts to lend to businesses that posed a heightened risk of default. Wells Fargo systematically concealed these credit risks through the deceptive practices described in this complaint. For example, Wells Fargo artificially inflated the income and cash flow generated by borrowing businesses in loan and securitization documentation, and relaxed or failed to follow proper underwriting procedures.

74.    Wells Fargo employees confirm its strenuous efforts to expand its commercial lending business. As noted above, CW 1 explained that Wells Fargo relaxed its underwriting standards in California because it was "really trying to grow the bank" and "there was pressure to find a way to make deals happen."

75.    Other former employees attested to the pressure they felt to make commercial loans. This includes a former employee, who worked at Wells Fargo as a Commercial Loan Officer, and was a Vice President, from 2014 to December 2018 ("CW 2").[11] CW 2 worked in San Jose, California, and reported to a Business Banking Manager who, in turn, reported to Commercial

---

[10] *See* David Ellis, *Wachovia suffers nearly $24 billion loss*, CNNMoney.com (Oct. 22, 2008), https://money.cnn.com/2008/10/22/news/companies/wachovia_results/index.htm.

[11] CW 2 previously worked at Wells Fargo as a Business Banking Specialist and Store Manager from 2004 to 2009.

Banking Manager and Senior Vice President Denise Piper. CW 2 described how Commercial Loan Officers were required to meet a quota of $675,000 in monthly new business to receive a bonus, though this witness's supervisor required them to meet an even higher quota of $800,000. CW 2's supervisor expected the team to generate the same amount of total business after people left the team, putting a significantly larger burden on each loan officer. As CW 2 described, "[i]t was too much pressure. It was very, very stressful." Each day would start with a one-hour "drill" meeting where the supervisor sometimes made people cry. It seemed to CW 2 that the supervisor put this pressure on loan officers because of pressure coming from the supervisor's superior.

76.    Yet another former employee, who worked in the Company's commercial loan business from 2007 until June 2019 ("CW 3"), including as a loan document specialist, and reported to a Vice President Loan Administration Manager, explained that starting in 2012 or 2013, Wells Fargo "aggressively pushed" to become the number one Small Business Administration ("SBA") lender and that "[w]e had to be number one. That was for sure." This push to expand Wells Fargo's commercial loan business and become the top SBA lender translated into intense pressure in the commercial lending business. The quota of loans that CW 4 had to close every month was extremely taxing and difficult. Wells Fargo's loan officers also had huge loan quotas to meet each month, which made working with them difficult. According to CW 3, "[t]he loan officers, they were the worst. It was lots of yelling, 'Get it done!' It was chaotic. It really, really was crazy. I could not believe it." CW 3 left Wells Fargo in June 2019 because of this pressure to close loans more quickly and stated that the closing process is not as intense or hurried at other banks that the witness has worked at since leaving Wells Fargo. These other banks have a completely "different feel" than the culture of Wells Fargo.

77.    Wells Fargo's commercial lending business was particularly important to the

1
2

Company in comparison to the nation's other large banks because Wells Fargo had an unusually large focus on commercial lending as a proportion of its overall business.

3
4
5
6
7
8
9

78.     For example, in 2019, approximately 21% of Wells Fargo's net revenues came from net interest income in its Wholesale Banking division, which focused on commercial lending. In contrast, only 5.5% of JP Morgan's net revenues came from net interest income from its commercial banking division, 2.2% of Goldman Sach's net revenues came from its corporate lending segment, and 11.7% of Bank of America's net revenues came from net interest income from its Global Banking segment (which includes commercial lending and other businesses).[12]

10
11
12
13
14
15
16

79.     The risks that Wells Fargo faced associated with commercial lending were heightened by the intense competition in the commercial lending industry. Defendant Shrewsberry stated on the Company's earnings call for the second quarter of 2018 that "[t]he competition here is as broad as it's ever been with like companies, mortgage REITs, other asset management types of vehicles, sovereign wealth funds. Any pool of capital that's out there looking for a return has got its finger in the pot of commercial real estate finance."[13]

17
18
19
20

80.     Wells Fargo was at a disadvantage in this competitive environment because of its poor reputation from prior scandals. A Senior Relationship Manager that worked for Wells Fargo

21
22
23
24
25
26
27

[12] This analysis is based on business segments that each entity chose to report in their 2019 annual filings that include their commercial lending activities. The analysis focuses on net interest income for those segments to focus on the type of revenue associated with commercial lending (other than Goldman Sachs, which reported specifically its net revenue from corporate lending). In particular, Wells Fargo had approximately $17.7 billion in net interest income in Wholesale Banking and $85.1 billion in total net revenue, JP Morgan had approximately $6.6 billion in net interest income from Commercial Banking and $118.7 billion in total net revenues, Goldman Sachs had approximately $800 million in net revenue from Corporate Lending and $36.5 billion in total net revenue, and Bank of America had approximately $10.7 billion in net interest income from Global Banking and $91.2 billion in total net revenue.

28

[13] However, as described in Section V, Shrewsberry falsely reassured investors that the Company was being prudent in its lending standards in the face of this competition.

in Milwaukee, Wisconsin, from mid-2017 to December 2019, had 20 years experience as a banker ("CW 4"), and reported to a Business Banking Manager, explained that it was difficult to grow business because "the reputation of the bank wasn't one where you could say, 'I work for Wells Fargo. We're a great bank.'" This witness also explained that "[i]t was hard for my own reputation, representing a bank like that."

81.     Similarly, an employee that worked at Wells Fargo from October 2014 until December 2017 as a Business Development Officer in Boston for SBA lending ("CW 5"), who reported to the SBA Northeast Regional Sales Manager (a Senior Vice President who, in turn, reported to the SBA National Sales Manager, John Coad), stated that they left Wells Fargo because of the negative news coverage and perceptions resulting from its fake accounts scandal. These negative perceptions made it very difficult for CW 5 to generate business.

**B.     Wells Fargo's Fraudulent Practices in Its Commercial Lending Business**

**1.     The *ProPublica* Article**

82.     On May 15, 2020, *ProPublica* reported, in article titled "Whistleblower: Wall Street Has Engaged in Widespread Manipulation of Mortgage Funds," that "[s]ome of the world's biggest banks" and "other lenders have engaged in a systematic fraud that allowed them to award borrowers bigger loans than were supported by their true financials."[14]

83.     *ProPublica* is a non-profit publication whose mission is "[t]o expose abuses of power and betrayals of the public trust by government, business, and other institutions, using the moral force of investigative journalism to spur reform through the sustained spotlighting of wrongdoing." It has a team of over 100 journalists and has won six Pulitzer Prizes (among many

---

[14] Heather Vogell, *Whistleblower: Wall Street Has Engaged in Widespread Manipulation of Mortgage Funds*, *ProPublica* (May 15, 2020), https://www.propublica.org/article/whistleblower-wall-street-has-engaged-in-widespread-manipulation-of-mortgage-funds.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

other awards) since it began in 2008.

84.     This report was based on a previously unreported whistleblower complaint submitted to the SEC in 2019 by John Flynn. Flynn has worked in commercial real estate for decades, including at GMAC Commercial Mortgage and the ratings agencies Moody's and Fitch. The *ProPublica* article described him as a "veteran of the CMBS industry" with "deep experience in commercial real estate, banking and CMBS."

85.     The *ProPublica* article highlighted Wells Fargo as one of the primary banks that engaged in "widespread manipulation of mortgage funds." It also noted that Wells Fargo is one of the country's three biggest CMBS issuers, which Flynn's whistleblower complaint describes as "inflating historical cash flows, failing to report misrepresentations, changing names and addresses of properties and 'deceptively and inaccurately' describing mortgage-loan representations."

86.     The article compared these practices to the misrepresentations in mortgages that occurred during the Financial Crisis in 2008, explaining that "[w]hereas the fraud during the last crisis was in residential mortgages, the complaint claims this time it's happening in commercial properties like office buildings, apartment complexes and retail centers." Flynn's complaint focused on loans that are gathered into pools for CMBS "whose worth can exceed $1 billion."

87.     Flynn's complaint describes a pervasive problem of "lenders and securities issuers have regularly altered financial data for commercial properties 'without justification'" to "make the properties appear more valuable, and borrowers more creditworthy, than they actually are."

88.     *ProPublica* "closely examined" six loans from recent CMBS and corroborated Flynn's allegations. This independent review found that "[t]he historical profits reported for some buildings were listed as much as 30% higher than the profits previously reported for the same buildings and same years when the property was part of an earlier CMBS."

89.    In the loans that *ProPublica* examined, "the profit inflation seemed to be explained by decreases in the costs reported. Expenses reported for a particular year in one CMBS simply vanished in disclosures for the same year in a new CMBS."

90.    Flynn also noted (in a separate interview described below, *infra* ¶ 141), that often the inconsistent cash flow figures "being reported were made simultaneously as the loan was being sold into a new trust," where the new loan was made within a few months of the final set of figures reported in connection with the servicing of the prior loan. So inflated figures were being reported in the new loan even though the reporting for the prior loan "is only like months old. . . . So how does it change so drastically in that month? And it shouldn't change at all, because you're talking about the same time frame, same collateral, same circumstances."[15]

91.    The article quoted the Columbia law professor John Coffee, an "expert in securities regulation," as describing this practice of altering past profits with no apparent explanation as "highly questionable . . . I don't understand why you can do that."

92.    Flynn's whistleblower complaint "suggests widespread efforts to make adjustments" to borrowers' financial figures. As *ProPublica* explained, "[t]he result: Many properties may have borrowed more than they could afford to pay back — even before the pandemic rocked their businesses — making a CMBS crash both more likely and more damaging. 'It's a higher cliff from which they are falling,' Flynn said. 'So the loss severity is going to be greater and the probability of default is going to be greater.'" Indeed, *ProPublica* noted that Flynn discovered these pervasive problems and risks in commercial loans, and filed his complaint with the SEC, well before the pandemic, when "the skies looked clear for the commercial mortgage

---

[15] Flynn also noted that the figures for both the old and new loans were reported using the same industry standard practices for how to account for different types of expenses, so the discrepancies cannot be attributed to different accounting practices.

market" because investors were not aware of the misstated financials.

93.    *ProPublica* described Flynn as concluding that "the higher reported profits helped the properties qualify for loans they might not have otherwise obtained." His complaint explains that "[i]nflating historical cash flows creates a misperception of lower current and historical cash flow volatility, enables higher underwritten [net operating income/net cash flow], and higher collateral values, . . . and thereby enables higher debt." (Brackets in original).

94.    In addition, *ProPublica* noted, even "a minor increase in profits can lead to approval for a significantly higher mortgage. . . . For commercial borrowers, small bumps in a property's profits can qualify the borrower for millions more in loans. Shaving expenses by about a third to boost profit, for instance, can sometimes allow a borrower to increase a loan's size by a third as well — even if the expenses run only in the thousands, and the loan runs in the millions." That is because reducing expenses (or increasing revenue) by even a relatively small amount leads to *a large percentage increase* in a commercial property's profits. For example, if a property has $20 million in revenue and $16 million in expenses, reducing its expenses by $2 million will increase its profits by 50%, from $4 million to $6 million.

95.    Flynn also observed other pervasive practices that banks used to misstate borrowers' financial information. For example, *ProPublica* described his finding that "many properties changed their names, and even their addresses, from one CMBS to another. That made it harder to recognize a specific property and compare its financial details in two filings. As Flynn read more and more, he began to wonder whether the alterations were attempts to obscure discrepancies: These same properties were typically reporting higher net operating incomes in the new CMBS than they did for the same year in a previous CMBS."

96.    These conclusions were based on Flynn's comprehensive analysis of commercial

loans. Flynn identified thousands of loans as having inflated net operating income or net cash flow figures. He "ultimately collected and analyzed data for huge numbers of commercial mortgages. He began to see patterns and what he calls a massive problem: Flynn has amassed 'materials identifying about $150 billion in inflated CMBS issued between 2013 and today.'" This is a substantial portion of the $592 billion in outstanding CMBS (which are typically comprised of 10-year commercial real estate mortgages) at the time of the *ProPublica* article.

97.    *ProPublica* also explained how the pandemic made these risks that already existed throughout the commercial real estate market materialize. "With the economy being pounded and trillions of dollars already committed to bailouts, potential overvaluations in commercial real estate loom much larger than they would have even a few months ago. Data from early April [2020] showed a sharp spike in missed payments to bondholders for CMBS that hold loans from hotels and retail stores, according to Trepp, a data provider whose specialties include CMBS."

98.    Investors cannot be expected to have discovered the misstated financial information because they rely on the information provided by banks and credit rating agencies to describe the loans in CMBS. Kevin Riordan, a finance professor at Montclair State University and a former CMBS manager at TIAA-CREF (one of the country's largest managers of retirement funds), explained that if these disclosures are misstated, "you're dealing with garbage. Garbage in, garbage out." And even if investors did analyze loan-level information, they would not be expected to compare it to how borrowers reported comparable figures in prior loans. *ProPublica* therefore concluded that Flynn "revealed potential weaknesses not readily apparent to the average investor."

99.    *ProPublica* highlighted the pattern of inflated income by discussing "a CMBS issued by Wells Fargo, [in which] a 1950s-era trailer park at the base of a steep bluff along the coast in Los Angeles reported sharply higher profits — for the same years — than it previously

had." In a $12.9 million loan to the Pacific Palisades Bowl Park "from the bank in 2016. The park reported expenses that were about a third lower in its new loan disclosures when compared with earlier ones. As a result, the $1.2 million in net operating income for 2014 rose 28% above what had been reported for the same year under the old loan. A similar jump occurred in 2013." Flynn found "that for the $575 million Wells Fargo CMBS that contained the Palisades debt, about half of the loan pool appeared to have reported inflated profits at some point, when comparing the same years in different securities."

100.    In another Wells Fargo loan with inflated profits that *ProPublica* examined to confirm Flynn's analysis, this one for a building in downtown Philadelphia, "[w]hen the owner refinanced through Wells Fargo, the property's 2015 profit appeared 23% higher than it had in reports under the old loan. Wells bundled the debt into a mortgage-backed security in 2016."

### 2.    The University of Texas Study

101.    The fraudulent practices that John Flynn identified were confirmed by a study performed by Dr. John Griffin, a professor at the University of Texas, in a paper titled "Is COVID Revealing a CMBS Virus?," released on November 18, 2020.[16] *The Intercept* article discussed below describes Griffin as "a prominent professor of finance."

102.    Griffin described the *ProPublica* article as addressing the claim that "major lenders commonly inflate historical cash flows on CMBS loans compared to earlier financials." He described his research as "systematically examin[ing] such inflation and relat[ing] this historical inflation to the broader context of underwritten income overstatement."

103.    As Griffin observed, "[c]ommercial loans are experiencing rapid deterioration with

---

[16] John M. Griffin and Alex Priest, "Is COVID Revealing a CMBS Virus," https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3671162.

24.6% of securitized commercial loans experiencing some form of distress from April to September 2020"—exactly when Wells Fargo revealed massive losses in its commercial loan business. He analyzed the quality of commercial loans in CMBS that were purported to have been originated under "higher underwriting standards in the post-financial crisis period."

104.    Griffin analyzed loan-level data for "a sample of 39,522 CMBS loans with a market capitalization of $650 billion underwritten between January 1, 2013, and December 31, 2019."[17] He concluded that "CMBS loans hav[e] significantly lower-than-advertised origination quality."

105.    The Griffin article explains that a commercial property's expected net operating income ("NOI") is a key input into the value of the property because it reflects the business's expected cash flow and income-producing capability. This metric reflects the amount of income the borrower is expected to have for loan payments. NOI thus determines a commercial loan's debt service coverage ratio ("DSCR"), which, in turn, determines the loan's maximum size.[18]

106.    Griffin explains that during the origination and underwriting process, a property's expected NOI is calculated based on the business's NOI in prior years, with adjustments for significant changes to the property. The Commercial Real Estate Finance Council's standards state that this underwritten NOI is "derived based on facts regarding the market and the property rather

---

[17] This included "all loans in agency and non-agency commercial mortgage backed securities sold between January 1, 2013, and December 31, 2019" for which the relevant financial metrics were available. Even before the information could be analyzed, this involved the collection of vast amounts of data from subscription sources and often required the collection of certain figures by hand. Griffin then employed name matching algorithms and hand verification to identify properties that were involved in prior transactions to provide a basis for comparing NOIs. He also cross-referenced loan-level data against publicly reported transactions to analyze appraisal values.

[18] A DCSR of 1.0 indicates that the property will generate exactly enough income to be able to make the required loan payments. The higher the DSCR, the more cushion the borrower is expected to have in its ability to make these payments. A commercial loan becomes riskier as the DSCR decreases toward (or below) 1.

than speculative projections regarding the property's potential performance," so that NOI is "meant to reflect the stable and consistent net operating income of the property." This means that the underwritten NOI is based primarily on past performance, and any adjustments "usually result in cash flow decreases." As Griffin explains, "[u]nderwritten NOI thus strongly depends on historical NOI, and any attempt to overstate underwritten NOI would look more reasonable if past historical NOI were also inflated."

107.    Underwritten NOI is also a key input in the loan-to-value ("LTV") ratio of a commercial property because the NOI "figures prominently in appraisals of property values." The LTV ratio, in turn, is one of the most important factors that determines the riskiness of a loan because it reflects the value of the collateral backing up the loan.

### a.    Griffin Concluded That Multiple Sources of Data Showed Inflated Income in Commercial Loans

108.    Griffin examined several sources of data. First, he compared underwritten NOI to the NOI that properties actually realized in their first year under the loan. Griffin found, based on his robust sample, that "[o]verall, actual net operating income falls short of underwritten income by 5% or more in 28% of loans, even though underwritten income should be a stable and consistent measure." He controlled for other factors and found that this persistent income overstatement could not be explained by external factors (such as income volatility, property type, "or a host of observable loan characteristics," such as property type, year, and region).[19]

---

[19] For example, "[i]nconsistent with overstatement being driven by the volatility of property income, [Griffin found] that originators with the greatest proportion of overstated loans have much lower levels of understated loans." He also showed that the mean overstatement at the originator level was "highly correlated (0.97) with the proportion of loans overstated by at least 5%." In addition, "loans with income overstatement in the first year continue to exhibit income shortfalls in the next four years." Griffin also showed similar results for agency and non-agency loans (an agency loan refers to a loan that is backed by a government-sponsored enterprise); that "past overstatement practices of originators are highly predictive of future loan-level overstatement";

109.    Griffin also found a high level of correlation between the level of income overstatement for the 2013 to 2015 period, as compared to the 2016–2019 period, for individual originators (again controlling for individual loan characteristics). He concluded that this "indicat[es] persistent firm practices" within each specific lender that originators are aware of. In other words, Griffin found that income overstatement was "driven by cultural features of the originating banks rather than differences in underlying loan characteristics."

110.    In addition to analyzing income overstatement in terms of the amount of income actually realized, Griffin conducted an analysis similar to John Flynn's research described above. Griffin compared NOIs for the two years prior to the loan at issue as reported in the securitization materials versus the NOIs for those same prior years as reported for an earlier CMBS.

111.    Wells Fargo was one of the largest originators and underwriters that Griffin analyzed. Substantially more than 30% of commercial loans that Wells Fargo originated had NOI inflated as compared to the amount of NOI reported for the same year in a prior transaction. In addition, approximately 27% of loans that Wells Fargo originated had income overstated by over 5% when comparing the amount of NOI realized in the first year of the loan as compared to the underwritten NOI figure in the securitization materials.[20]

112.    Overall, Griffin concluded that "[t]he evidence is consistent with CMBS loans having significantly lower-than-advertised origination quality. Although CMBS and commercial real estate have generally performed well during the CMBS 2.0 era [*i.e.*, since the Financial Crisis],

_____

the analysis is the same whether overstatement is measured in terms of mean percent by which income is overstated as compared to the proportion of loans overstated by more than 5%; "there is a strong, persistent relation in the prevalence of income overstatement by originators[:] the correlation between the proportion of high overstatement loans by originator in early and late years is 0.908 and is statistically significant at the 0.01% level."

[20] Griffin focused on loans with overstatement greater than 5% to exclude less significant overstatements and because 5% is "a common threshold" for what is "economically material."

weaknesses in underwriting standards are typically revealed during times of stress; the current crisis seems to be no exception. Income overstatement and aggressive valuations are pervasive features in commercial loans and have material impacts on loan performance, particularly in the post-COVID era."

113.    Griffin's analysis went even further. He concluded:

Originator overstatement from 2013 to 2019 is highly correlated (0.908) with the proportion of loans that experience distress from April 2020 to September 2020. There is an economically and statistically significant relation between originator income overstatement and distress even after controlling for a rich set of loan and property characteristics and fixed effects for time-varying local economic and property conditions; loans from originators in the top tercile of income overstatement are 8.6 percentage points more likely to experience distress.

114.    This shows that when Wells Fargo's loans suffered disastrous losses over the course of 2020, it was not because of COVID. Rather, "[t]his significant relationship between originator's income overstatement and poor loan performance is present with a stricter measure of non-performing loans and in the pre-COVID period, indicating that COVID is accelerating existing origination weaknesses."

115.    Overall, Griffin determined "that originator overstatement practices predict the relative likelihood of distress even years after loan origination."[21] In other words, the massive losses that Wells Fargo's commercial loans suffered in 2020 are a result of its misrepresenting the credit quality of these loans, even if "distress among these loans is exacerbated" by COVID.

116.    Griffin concluded that "[a]lthough few people predicted a virus shutting down large parts of the real economy, pre-COVID underwriting quality appears to play a large role in the

---

[21] Griffin defines loans as being "distressed if they are on a servicer's Watchlist or are non-performing. Troubled loans are placed on a servicer's Watchlist for failing to meet criteria that often precede default including various forms of delinquency or failure to meet sufficient debt-service coverage ratios. Non-performing means that a loan has missed a payment, is in the process of foreclosure, is real estate owned, or has been placed into special servicing."

ability of assets to withstand distress. The performance gap is persistent and not explained by loan income volatility, property type, local economic conditions, or other loan characteristics."

117.    He also determined that this poor underwriting quality was the result of intentionally deceptive practices by commercial loan originators because "[h]igher prices for loans with income overstatement, additional risk assessments by credit rating agencies, and inflations of past financials point to originators knowingly inflating underwritten income."

118.    In addition, Griffin observed that "[t]here are substantial similarities between the decline in underwriting standards identified by the last financial crisis, such as income and appraisal overstatement in RMBS, and those observed in 2013–2019 CMBS 2.0 affecting performance today." These problems persisted "despite considerable regulation and discussions" aimed at addressing the industry's problems. They appear to be a manifestation of the "well-documented historical pattern . . . that overstatements and fraud thrive in boom periods and are revealed in busts."

### b.  Further Findings From Griffin's Analysis of Income Overstatement in Terms of Realized Income

119.    Griffin's analysis of actual, realized income in the first year of the loan as compared to the underwritten income in the loan documents also showed that "NOI overstatement has been gaining prevalence over time for most originators." This was the case for Wells Fargo, which showed substantially higher income overstatement in 2016–2019 (with significantly over 25% of loans overstated by more than 5%) as compared to 2013–2015 (when under 25% of loans showed similar levels of overstatement).

120.    In addition, Griffin found that "[l]oans with more overstatement have higher abnormal interest rates" after controlling for loan characteristics and different originators. "The fact that originators charge higher rates for loans beyond all observable loan characteristics for

loans that later have shortfalls in NOI indicates that originators are aware of underlying issues and charge borrowers accordingly."

### c. Further Findings From Griffin's Analysis of Inflated Income for the Same Years Reported in Prior Loans

121.    In addition to analyzing how a borrower's actual, realized income in the first year of the loan compared to the underwritten income in the loan documents, Griffin examined whether lenders inflated past NOI (as John Flynn reviewed in his analysis).

122.    Griffin looked, as an example, at a loan from a Wells Fargo deal (WFCM 2017-C38). "In the prospectus for the new 2017 CMBS, the Garden Inn had a reported income in 2015 and 2016 of over $1.9 million, substantially higher than the approximately $1.7 million the property had reported earning in the same years in the Investor Reporting Package of the previous securitization (WFRBS 2012-C7)." As Griffin explained, "[t]he reported higher income supports a higher underwritten NOI of $1.87 million, but 2017 NOI is realized at $1.67 million, which is almost identical to the 2015 and 2016 NOI reported by the previous securitization."

123.    Griffin also analyzed past income more systematically. Like Flynn, he found persistent inflation of past income for the same year in current as compared to past loans for the same property. Griffin determined that "[t]here are large differences in the propensity to inflate income in new securitizations across originators." One of the reasons that Griffin concluded these differences were originator specific, and cannot be explained by external factors, is that they are asymmetric, with originators with higher levels of inflation showing lower levels of deflation.[22]

124.    Wells Fargo was one of the originators in Griffin's analysis with the largest disparity between income inflation and deflation. He found that significantly more than 30% of

---

[22] Deflation is the opposite of inflation, as Griffin uses the term, where income for past years is more than 5% lower in the current loans as compared to what was reported in a prior loan.

Wells Fargo's loans showed inflation of over 5% when comparing figures for the same years in different loans, while just 5% (or less) of its loans showed a similar amount of deflation.

125.     Griffin also went a step further. He calculated the correlation between inflated NOIs (in terms of comparing NOIs for the same prior years in different loans) and NOI overstatement (in terms of realized NOI exceeding underwritten NOI). Griffin found a strong correlation between these two types of inflation, "indicating that originators who engage in the most NOI inflation are proportionally more likely to have income fall short of underwritten [income]." Even after controlling for external factors, "[h]igher levels of past NOI inflation are strongly related to underwritten NOI overstatement in the year of issuance."

126.     This comparison of past NOI inflation to overstatement of NOI in the year of issuance led to the conclusion that "[f]or deals that have underwritten NOI overstated by 5% or more in the first year, 71.2% of these loans have historical NOI figures in the underwriters' reports that are inflated from actual NOI figures. Overall, the findings suggest that overstated underwritten NOI figures are not accidental."

### d. Inflated Appraisals

127.     Lastly, Griffin analyzed valuations. Appraisals of property values determines the value in LTV ratios (and are based in large part on income and cash flow figures).

128.     Inflated appraisals were a key problem that led to more favorable LTV ratios that were at the heart of the Financial Crisis. Griffin found that this problem persists in the commercial real estate market. He determined that "92% of properties in the sample have an appraisal at or above the transaction price. Consistent with potentially inflated appraisals, 12% of properties have an appraisal exceeding the transaction price by at least 10%." Here too, "[t]hese properties are 4.7% more likely to become distressed from April 2020 to September 2020 after controlling for loan characteristics and a rich set of fixed effects."

129.    In contrast, "only 1.7% of loans have appraised values 10% or more below the purchase price." This asymmetry indicates that the appraisal inflation was intentional, in order to support stronger LTV ratios (which in turn support artificially inflated loans).

### 3.    *The Intercept* Confirms These Findings of Fraudulent Practices in Commercial Loans

130.    On April 20, 2021, *The Intercept* reported additional evidence of problems in Wells Fargo's commercial lending practices, in an article titled "The Bigger Short: Wall Street's Cooked Books Fueled the Financial Crisis in 2008. It's Happening Again." *The Intercept* is a non-profit award-winning publication that conducts deeply researched investigative journalism.[23]

131.    As this article explained, "evidence is accumulating that suggests that many financial institutions are skinny-dipping once more — via similar types of lending [as compared to those from the Financial Crisis] that could lead to similar disasters as the water recedes again due to the Covid-19 pandemic."

132.    *The Intercept* reviewed financial records that formed the basis of John Flynn's analysis and confirmed his assessment that there is "creative accounting on a startling scale in the commercial real estate market, in ways similar to the 'liar loans' handed out during the mid-2000s for residential real estate."

133.    Indeed, *The Intercept* showed that "[t]he overall delinquency rate for commercial mortgage-based securities shot up last year [i.e., in 2020] to the same level as the peak during the last economic collapse. And CMBS delinquencies for retail and lodging businesses reached

---

[23] The publication notes that it "gives its journalists the editorial freedom and legal support they need to expose corruption and injustice wherever they find it." This article was authored by Ryan Grim, *The Intercept*'s D.C. Bureau Chief who has led teams that were finalists for the Pulitzer Prize; and Jon Schwarz, who has contributed to publications such as *The New Yorker*, *The New York Times*, *The Atlantic*, *The Wall Street Journal*, and others.

unprecedented heights":



CMBS delinquency rates.

Image: Courtesy of Trepp

134.   *The Intercept* described Dr. Griffin's study discussed above as a "large-scale academic study" that "backs up [Flynn's] conclusion" that banks have "systematically reported erroneously inflated income data that compromises the integrity of the resulting securities."

135.   In addition, *The Intercept* noted that Griffin was focused on "studying intentional income overstatement." It quoted Alex Priest, Griffin's co-author, as explaining that "'we find that the direct inflation of past financials is common practice in the industry' and 'our tests demonstrate that this really doesn't seem to be a pattern that's driven by coincidence. . . . It's hard to argue that these originators are just naive,' making innocent mistakes." (Ellipses in original).

136.   *The Intercept* agreed with Griffin that, as in the Financial Crisis, the risks of

fraudulent lending practices are exacerbated in "a severe economic downturn like the one caused by the coronavirus pandemic. . . . That is, loans where the fundamentals were misstated are, unsurprisingly, more likely to go bad during this crisis. All these banks are swimming naked."

137.    In addition to discussing Griffin's analysis, *The Intercept* noted that Flynn's whistleblower complaint identifies "about $150 billion in inflated CMBS" issued since 2013 and named Wells Fargo specifically as one of three financial institutions that his complaint focuses on.

138.    The example from Flynn's analysis that *The Intercept* highlighted was from a securitization by the "shadow bank" Ladder Capital (LCCM 2017 LC26), containing 57 commercial real estate loans with a total balance of $625 million.[24] *The Intercept* corroborated Flynn's analysis, explaining that "[a]ccording to the documentation for a memo Flynn produced for journalists, he found notable problems with historical reporting for 12 of the 57 loans in LCCM 2017 LC26. The 12 loans were worth $189.5 million, or 30.2 percent of the total value of the trust's unpaid principal at the date of loan sale."

139.    Ladder Capital was able to make those loans because "it borrowed the money on a short-term basis from Wells Fargo."[25] This is exactly the type of commercial loan that caused Wells Fargo to suffer such enormous losses over the course of 2020.[26]

---

[24] The term "shadow bank" refers to financial institutions that make loans but are not subject to the same regulatory oversight as large banks such as Wells Fargo because they engage in a more limited set of activities.

[25] Ladder Capital also engaged in other problematic practices with the funds it borrowed from Wells Fargo. For example, "of the 57 loans, 23 of them, totaling $76.7 million, were made by Ladder Capital Finance LLC *to another Ladder subsidiary* in the real estate business," which allowed Ladder Capital "to make money coming and going."

[26] As described further below, the single largest category of Wells Fargo's commercial & industrial loans was to asset managers such as Ladder Capital that turned around and used the funds to make additional commercial loans. (*See infra* ¶ 243).

CORRECTED CONSOLIDATED AMENDED COMPLAINT – 3:20-CV-07674-WHA
39

140.    *The Intercept* also described the rigorous nature of Flynn's analysis. It explained that "[f]inding those problems took enormous legwork, not the type of diligence typically conducted by investors who acquire these securities." In addition to having to scour vast subscription-only offering materials, Flynn "had to engage in laborious detective work" because the names or addresses of borrowers were often changed from previous trusts. "In order to find previous loan documents to compare to current ones, Flynn often had to get creative. For instance, Flynn looked for matches between tenants or square footage of the property being purchased to determine that a loan in [a current trust] was the same as the one in a previous trust.'"

141.    Flynn explains that "changes in names and addresses when loans are moved out of old trusts and into new ones are not an accident but suggestive of deliberate obfuscation. 'The correlation of name and address changes with inflated numbers,' he says, 'is something like 95 percent.'" He also explained, in an interview with *The Intercept* connected to its article, that there could be legitimate reasons for changing the name of a building or address in specific instances, "[b]ut not on the systematic scale that I see in the data."[27]

### 4.    Ratings Agencies Corroborate This Analysis

142.    Fitch Ratings, one of the main rating agencies in the country, published a report on September 29, 2020, entitled "U.S. CMBS Coronavirus Loan Defaults Vs. Fitch Ratings' Expectations; August Update."[28] In this report, Fitch provided an update on the performance of commercial loans in CMBS from 2011 through 2020.

143.    Even as late as August 30, 2020, Fitch had not expected 30% of the defaults that

---

[27] Deconstructed, *The Whistleblower Trying to Stop the Next Financial Crisis*, The Intercept (Apr. 23, 2021), https://theintercept.com/2021/04/23/deconstructed-whistleblower-financial-crisis/

[28] *U.S. CMBS Coronavirus Loan Defaults Vs. Fitch Ratings' Expectations; August Update*, FitchRatings, (Sept. 29, 2020), https://www.fitchratings.com/research/structured-finance/cmbs-coronavirus-loan-defaults-vs-fitch-ratings-expectations-august-update-29-09-2020.

had occurred since June. Fitch attributed many of these unexpected defaults to "lower NOIs in 2019 compared to 2018." This was because Fitch's prior review, conducted in May 2020, "relied on 2018 NOIs, as it was completed prior to the receipt of the 2019 numbers. As a result, the properties backing the loans that unexpectedly defaulted were weaker at the beginning of the pandemic than their 2018 NOIs indicated."

144.    Fitch's analysis thus confirms Flynn's and Griffin's finding that losses that occurred in commercial loans in 2020 were caused by inflated NOIs that made the loans weaker even before the pandemic than their financial metrics indicated.

145.    In addition, Fitch noted that commercial loan performance in 2020 would have been even worse if not for the substantial government support that propped up the economy.

146.    Griffin similarly concluded that rating agencies underestimated the weakness in commercial loans because of misrepresented financial figures. He explains that the Kroll Bond Rating Agency "forms their own loan-level projections of cash flow by taking underwritten cash flows and adjusting them" based on property-specific factors to "reflect the sustainable income of a property." Griffin collected pre-sale reports from 240 CMBS deals rated by Kroll, representing 8,111 loans, and compared Kroll's cash flow projections to how the loans actually performed. This robust statistical analysis showed a strong "correlation between the proportion of loans by the originator with Kroll haircuts exceeding 5% and the proportion of loans with income overstatement exceeding 5%." Kroll was also able to detect the "varying quality by originator."

147.    But while Kroll was able to detect weaknesses in commercial loans, it was not able to assess the full extent of those problems. Griffin explains that although "the income projections from Kroll correlate with actual income overstatement, these findings do not speak to whether rating agencies fully reflect the risk of underwritten NOI shortfall in the deals."

148.    For example, Griffin cited a loan for Brookriver Executive Center, an office complex in Dallas, Texas, that had underwritten cash flows of $1.77 million. In its stress analysis, Kroll issued haircuts to these projections due to the property having above-average vacancy and below-average management fees, resulting in a lower projected net cash flow of $1.59 million. Even then, Kroll's underestimated the weakness of this loan because its actual realized NCF in 2017 was $1.53 million, "even lower than the more conservative projections of Kroll."

149.    Griffin concluded that "even though the Kroll projections are intended to be a conservative measure of property cash flows and bounded above zero by construction, their estimates are not conservative enough; Kroll projects a 5% income shortfall for only 25.1% of loans, but 32.2% of loans in the Kroll sample have actual income shortfalls exceeding 5%." He concluded that "[w]hile correlated with income overstatement, Kroll's methodology does not appear to adequately penalize loans with income overstatement."

150.    These conclusions are important for two reasons. First, they show that (as with the Financial Crisis) even the rating agencies were not able to detect originators' fraudulent practices in commercial loans.

151.    Second, Griffin points to these "additional risk assessments by credit rating agencies" as one of the factors that "point to originators knowingly inflating underwritten income." The fact that rating agencies were estimating cash flows significantly lower than what was reported in the loan documents should have alerted originators to the fact that the reported figures were wrong and to the many fraudulent origination practices that Flynn and Griffin identified.

## C.    Wells Fargo's Pervasive Fraudulent Origination Practices

152.    The fraudulent practices that Flynn and Griffin identified apply to Wells Fargo's origination practices for its entire commercial loan business. Flynn and Griffin were able to identify these practices in CMBS because banks make more fulsome loan-level disclosures in

connection with these large (often billion dollar) securitizations than they do for commercial loans that the banks continue to hold individually. CMBS are therefore the only place where analysts such as Flynn and Griffin have access to the relevant data that allows for analysis of the quality of Wells Fargo's commercial loans. The following sources show even further that the rampant fraudulent practices that Flynn and Griffin identified in loans in CMBS, reflect how Wells Fargo approached the origination and underwriting of commercial loans in its business as a whole.

### 1. Griffin's Analysis Applies to the Basic Practices of Loan Originators

153. Griffin's analysis focused on the intentional practices of loan originators. He explained that "large bank originators such as Wells Fargo . . . often move much of their originating inventory to their underwriting affiliate, tightly connecting the activities between origination and underwriting." Griffin also noted that "most loans backing CMBS are originated by banks affiliated with the underwriters." The loans in CMBS thus came from Wells Fargo's general "originating inventory."

154. Griffin also emphasized that post-Financial Crisis "reforms and improvements to quality and market structure were introduced in post-crisis CMBS." These reforms to the CMBS market made stricter standards apply to loans that went into CMBS. Any fraudulent practices that were rampant in commercial loans that went into CMBS would therefore exist to an even greater extent in other commercial loans that were not subject to these tighter reforms and improvements.

155. These reforms include "higher underwriting standards in the post-financial crisis period." In addition, "[c]ommonly touted post-crisis CMBS 2.0 features following Dodd-Frank include greater transparency, lower leverage, improved cash management provisions, increased rating agency scrutiny, and enhanced monitoring or risk-retention by lower tranche buyers."

156. For example, in the prospectus for Wells Fargo Commercial Mortgage Trust 2017-C38, Wells Fargo represented that it "will be required to retain its portion of the Vertical RR

Interest (or any portion thereof) for so long as retention thereof is necessary for it to remain in compliance with the Credit Risk Retention Rules."

157.    Griffin also noted that "[o]riginators and underwriters have at least three incentives to maximize the loan size, which is constrained by LTV and DSCR, and to make loans appear less risky: 1) to be more attractive to borrowers who wish to maximize leverage by obtaining larger loan sizes, 2) to collect more fees, which are often a proportion of loan size, and 3) to receive better pricing on the loans they sell."

158.    All of these motives apply to Wells Fargo's core commercial lending business. The practices at issue made its loans more attractive to borrowers; Wells Fargo could collect more fees on these loans (particularly because Wells Fargo was such a large player in the mortgage servicing industry); and Wells Fargo could receive better pricing if it ended up selling the loan into a securitization or elsewhere.

### 2.    Additional Analysis by John Flynn

159.    Counsel for Lead Plaintiff has consulted with John Flynn. In addition to the *ProPublica* and *The Intercept* articles themselves describing how Flynn's analysis applies to Wells Fargo's commercial lending business, Flynn has confirmed even further that his analysis applies to Wells Fargo's origination practices. He has reviewed multiple CMBS trusts that include loans that Wells Fargo originated and sold directly into the trusts. These commercial real estate loans are plagued with precisely the types of problems, such as inflated historical income and cash flow figures, and changes to identifying information (such as property names and addresses), that Flynn found as part of his comprehensive analysis for his SEC whistleblower complaint (which itself applies to Wells Fargo as one of the biggest banks in the commercial lending industry that originates and sells loans into securitizations, and provides funding for other originators (such as Ladder Capital (*see supra* ¶¶ 138-39)). Flynn also found the same pattern that Griffin identified,

that servicers were reporting properties' income and cash flow figures for their first year after the new loan's origination and sale, that were substantially lower than what was represented in the loan sale documents as historical and justified higher expected income and cash flow figures.[29]

160.    As a general matter, Flynn found that net operating income (NOI) and the related figure of net cash flow (NCF) were substantially inflated for between at least 15% to 55% of the principal balance of loan collateral in trusts that were securitized using Wells Fargo Commercial Mortgage ("WFCM," Wells Fargo's platform for securitizing commercial real estate loans). These inflated figures were typically based on general operating expenses and capital expenses being removed from the prior loan collateral (as described in the articles discussing Flynn's analysis).

161.    Net Operating Income (NOI) is total rent and other revenues minus general operating expenses like management, utilities, cleaning, repairs and maintenance. Net Cash Flow (NCF) is NOI minus replacement of capital items such as building and tenant improvements, and leasing commissions. Flynn focuses on NCF when calculating LTV ratios because that is the cash that is available to make loan payments.

162.    Consistent with his general findings, Flynn found that the loan collateral with inflated income and cash flow figures typically also had changes in identifying information, such as property names or addresses, as compared to prior loans for the same collateral. Flynn found a strong correlation between instances where key financial metrics are inflated and instances where identifying information is changed. This connection indicates an intent to thwart discovery of the

---

[29] The inflated financial figures and changes to identifying information appeared in multiple sources associated with the current loans, including offering materials (both prospectuses and backup data for each prospectus) and supporting loan documents such as insurance policies and appraisals. Because the servicer reports for past loans are available only in PDF, Flynn had to manually input that data before it could be compared to the information from the current loans.

manipulation of performance metrics.

163.    A substantial portion of the commercial real estate loans in the securitizations that Flynn analyzed are loans that Wells Fargo originated and sold into the trusts. These loans therefore fall squarely within the type of commercial loans that Wells Fargo had outstanding during the Class Period and reflect the credit quality of the Company's commercial loans during that time.

164.    Flynn compared the NOI and NCF for the same years by comparing the figures that Wells Fargo represented for past years in its capacity as the originator and seller of the current loans to the CMBS trusts, to figures that a mortgage servicer reported for these same properties in their servicing reports in the years after a prior loan was originated and before it matured. Wells Fargo was often also the servicer reporting these figures for the prior loan. As with Flynn's analysis in general, the mortgage servicer often reported historical figures as recently as within a few weeks or months of when the new loan was originated and sold with substantially inflated figures for those same years.

165.    The loans that Flynn analyzed are generally commercial real estate loans with a 10-year term to maturity, as is the standard duration for those loans in CMBS. Also consistent with Flynn's analysis in general, his review was, by necessity, focused on properties for which information for the same year is available for both current and past loans. That information is available when servicer reports for collateral securing a prior CMBS loan are completed for the same overlapping years as for loan-seller representations for a newly originated loan that is sold into a CMBS (such as in the case of a refinancing). Results from that analysis demonstrate remarkably consistent inflation of key performance metrics—a practice shown to be surprisingly pervasive across a large swath of Wells Fargo loans.

a.    **WFCM 2016 BNK1**

166.    Flynn analyzed loans in the securitization Wells Fargo Commercial Mortgage

("WFCM") 2016 BNK1. He found that the NOI and NCF was inflated in at least 36% of the loans in the trust, in which Wells Fargo originated and sold approximately 30% of the loans.

167.    For example, in a $60 million loan for the Renaissance Dallas hotel, for which Wells Fargo was also the master servicer for the prior loan, Wells Fargo inflated the NCF for 2015 by 33.2% and NOI by 17.6%, and the NCF and NOI for 2014 by 75.4% and 32.6%.

168.    The following chart shows Flynn's calculation of these figures based on comparisons of the revenue, expense, NOI, and NCF figures that were represented as historical performance in connection with the new loan (in the columns labeled "Lender Rep") to those same periods as reported by a servicer for the years following the prior loan (in the columns labeled "Servicer Rep"); and the figures that Wells Fargo calculated as the property's expected financial metrics for the year in which the loan was made (in the column labeled "Lender UW"):[30]

| Renaissance Dallas | % of Pool | 6.90% | WFCM 2016-BNK1 | | | 870,000,000 | % Inflated | 36.26% | |
|---|---|---|---|---|---|---|---|---|---|
| | Lender UW | Most Recent Period | | | 2nd Most Recent Period | | | 3rd Most Recent Period | |
| | | TTM 5/30/2016 | | | Actual 2015 | | | Actual 2014 | |
| | Securitisation | Lender Rep | Servicer Rep | Differ | Lender Rep | Servicer Rep | Differ | Lender Rep | Servicer Rep | Differ |
| Revenue | 34,611,583 | 34,836,603 | 33,631,403 | 3.6% | 33,631,403 | 33,631,403 | 0.0% | 24,633,644 | 24,633,644 | 0.0% |
| Expenses | 25,107,534 | 24,701,534 | 25,013,881 | -1.2% | 23,866,015 | 25,326,228 | -5.8% | 19,328,482 | 20,633,966 | -6.3% |
| NOI | 9,504,049 | 10,135,122 | 8,305,176 | 22.0% | 9,765,139 | 8,305,176 | 17.6% | 5,305,162 | 3,999,678 | 32.6% |
| NCF | 7,773,470 | 10,135,122 | 7,329,881 | 38.3% | 9,765,139 | 7,329,881 | 33.2% | 5,305,162 | 3,024,134 | 75.4% |
| NOI DSCR | 2.64 | 2.82 | 2.31 | | 2.71 | 2.31 | | 1.47 | 1.11 | |
| NCF DSCR | 2.16 | 2.82 | 2.04 | | 2.71 | 2.04 | | 1.47 | 0.84 | |

169.    The comparison of annual, periodic revenues, expenses, NOI, and NCF reported for the same historical time periods by the servicer for the old loan and in connection with the origination of the new loan, is based on the following tables from the loan files:

---

[30] As with other loans described below, when more direct observations are not reported for the first few months of 2016, Flynn used the most recent data reported for the old loan through 2015, consistent with standard underwriting practices.

**Old Loan**

## Trepp® Loan Detail Renaissance Dallas

Summary Loan Financials

| Financials | Most Recent | Full Year Historical Financials | | | | | | | | Securitization |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2008 | 2007 | |
| As Of Date | - | 12/2015 | 12/2014 | 12/2013 | 12/2012 | 12/2011 | 12/2010 | 12/2008 | 12/2007 | - |
| Revenues | - | 33,631,403 | 24,633,644 | 22,013,324 | 21,265,222 | 19,897,446 | 17,808,937 | 21,139,893 | 23,249,825 | 24,382,339 |
| Expenses | - | 25,326,228 | 20,633,966 | 18,683,290 | 18,515,498 | 17,833,125 | 16,519,560 | 19,299,858 | 19,852,349 | 18,734,620 |
| NOI | - | 8,305,176 | 3,999,678 | 3,330,034 | 2,749,724 | 2,064,321 | 1,289,377 | 1,840,035 | 3,397,476 | 5,647,719 |
| NCF | - | 7,329,881 | 3,024,384 | 2,354,740 | 1,774,430 | 1,089,027 | 314,083 | 864,741 | 2,422,182 | ^4,672,426 |
| DSCR (NOI) | - | 2.86 | 1.38 | 1.15 | 0.96 | 0.85 | 0.53 | 0.76 | 1.17 | - |
| DSCR (NCF) | - | 2.53 | 1.04 | 0.81 | 0.62 | 0.45 | 0.13 | 0.36 | 0.84 | ^1.61 |
| Debt Yield (NOI) | - | - | - | - | - | - | - | - | - | 13.77 |
| Debt Yield (NCF) | - | - | - | - | - | - | - | - | - | 11.40 |
| Occupancy | - | 63 | 58 | 61 | 62 | 63 | 59 | 60 | 61 | 64 |

^ Used for Reporting

**New Loan**

## Trepp® Loan Detail Renaissance Dallas

Summary Loan Financials

| Financials | Most Recent | Full Year Historical Financials | | Securitization | Secur Most Recent | Secur 2nd Most Recent | Secur 3rd Most Recent |
|---|---|---|---|---|---|---|---|
| | | 2017 | 2016 | | | | |
| As Of Date | 07/2017 - 06/2018 | 12/2017 | 12/2016 | - | 05/2016 | 12/2015 | 12/2014 |
| Revenues | 36,486,984 | 36,327,038 | 36,930,450 | 34,611,583 | 34,836,603 | 33,631,404 | 24,633,644 |
| Expenses | 24,669,971 | 24,717,934 | 25,363,346 | 25,107,534 | 24,701,481 | 23,866,015 | 19,328,482 |
| NOI | 11,817,013 | 11,609,104 | 11,567,104 | 9,504,049 | 10,135,122 | 9,765,389 | 5,305,162 |
| NCF | ^10,086,434 | 9,878,525 | 9,720,582 | 7,773,470 | 10,135,122 | 9,765,389 | 5,305,162 |
| DSCR (NOI) | 4.41 | 4.34 | 4.31 | 2.64 | - | - | - |
| DSCR (NCF) | ^3.77 | 3.69 | 3.62 | 2.16 | - | - | - |
| Debt Yield (NOI) | 19.70 | - | - | 15.80 | - | - | - |
| Debt Yield (NCF) | 16.81 | - | - | 13.00 | - | - | - |
| Occupancy | 67 | 66 | 67 | 66 | - | - | - |
| ADR | - | - | - | 157 | 157 | 156 | 138 |
| RevPar | - | - | - | 103 | 103 | 99 | 81 |
| Financial Ind | TN | - | - | - | - | - | - |
| NOI/NCF Indicator | CREFC | - | - | - | - | - | - |

^ Used for Reporting

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

170.    This comparison shows that for the same historical years, the property's expenses were decreased by approximately $1.46 million for 2015 (from $25.326 million for the old loan to $23.866 in the new loan) and by approximately $1.31 million for 2014 (from $20.634 million to $19.328 in the new loan). This, in turn, caused the property's NOI and NCF to be substantially inflated, as described in paragraph 167 above.

171.    As with Flynn's analysis in general, these inflated income and cash flow figures caused the property's key debt service coverage ratio ("DSCR") to be substantially inflated in the new loan and its LTV ratio to be substantially deflated. These key ratios determine the property's ability to make its loan payments (for DSCR) and the riskiness of the loan in terms of potential loss of value of the collateral (for LTV).

172.    The chart in paragraph 168 shows that the property's NCF DCSR was only 2.04 in 2015 based on the property's actual historical figures, as compared to 2.71 based on the inflated figures for the new loan. Similarly, the NCF DSCR was only 0.84 in 2014 based on actual figures, as compared to 1.47 based on the inflated figures. The NOI DSCRs are also substantially lower for 2015 and 2014 based on the actual figures (2.71 for 2015 and 1.47 for 2014) as compared to the NOI DSCRs based on the inflated figures (2.31 for 2015 and 1.11 for 2014). The DSCR figures based on the property's actual historical performance are also substantially lower than the NOI DSCR of 2.64 and the NCF DSCR of 2.16 that Wells Fargo calculated (based on its inflated historical figures) for the property's expected performance in connection with the new loan.

173.    Wells Fargo's use of inflated financial metrics to yield a higher DSCR allowed the borrower to qualify for a larger loan than they otherwise would have. As explained above, DSCR reflects how much cash a borrower has available after expenses to make its loan payments. A higher DSCR means that the borrower has more cash available and is therefore able to afford the

larger payments associated with a larger loan. A DCSR of 1.0 indicates that the property will generate exactly enough income to be able to make the required loan payments. A commercial loan therefore becomes riskier as the DSCR decreases toward 1.

174.    In fact, the servicer's most recent report for the prior loan on this property was that the loan was on the Watch List for poorly performing loans, because its NCF DSCR for 2014 fell below 1.10 and was less than 75% of its underwritten DSCR of 1.61. This directly contradicts the NCF DSCR of 1.47 for 2014 that Wells Fargo reported in connection with the new loan.

175.    Flynn also showed how the inflated historical metrics that Wells Fargo represented for the new loan caused the property's value to be inflated in its appraisal. A capitalization rate (or "cap rate") indicates the property yield, or rate of return, that the collateral is expected to generate. It is calculated by dividing a property's NCF or NOI by the property's value. Or, a property's NCF or NOI is divided by the property's cap rate to determine the property's value. This calculation is the core part of a property's appraisal for a commercial real estate loan.  Lower or more volatile NOI or NCF figures imply a higher cap rate for a given property, because the property has to yield a greater return to compensate for its worse NOI or NCF figures.

176.    The cap rates that Wells Fargo included for the appraisal in connection with the property's new loan are highly suspect because the key input in that calculation is the property's NCF or NOI, which were substantially inflated.

177.    The servicer for the old loan calculated the property's implied cap rate as of June 2016 to be 12% for NCF and 14% for NOI:

| Appraisal/LTV | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Source | Appraisal Date | Appraisal Amount | Appraisal / Unit | LTV | Last Updated | Implied Cap Rate (NOI) | Implied Cap Rate (NCF) |
| Most Recent | | 59,000,000 | 113,899.61 | 69.50 | 06/12/2016 | 0.14 | 0.12 |
| - | | 56,000,000 | 108,108.11 | 73.22 | 02/12/2013 | 0.04 | 0.02 |
| Securitization | 11/01/2007 | 59,000,000 | 113,899.61 | 69.50 | - | - | - |

This provides an especially helpful basis for comparison because it was reported by the servicer for the old loan as of June 2016, and therefore accounted for the property's actual historical NCF and NOI very close in time to when the new loan was originated. Flynn showed how applying those cap rates, based on the property's actual historical income and cash flow figures, instead of the 8.59% cap rate that Wells Fargo used in the new loan based on the property's inflated figures, yields a substantially lower value for the property, and a correspondingly higher loan-to-value ("LTV") ratio of 98.2% based on NCF and 101.14% based on NOI:

| Cap Rate (MR NCF/Appr Value) | | 8.59% | | Total Loan Amt | |
|---|---|---|---|---|---|
| Loan | $ | 60,000,000 | | $ 60,000,000 | |
| Appraised Value | $ | 118,000,000 | | | |
| Represented MR LTV | | 50.85% | | | |
| | | | | | |
| Adjusted Cap Rate | | 14.00% | 12.00% | Implied caprates in Old loan | |
| | | NOI Value | NCF Value | | |
| Adjusted Value | | 53,322,686 | 61,082,341.67 | | |
| Adjusted MR LTV | | 101.14% | 98.2% | | |

178.    As explained above, a commercial property's LTV ratio is the other key metric (along with DSCR) that determines the loan's riskiness and appropriate size. A higher LTV ratio makes the loan more risky because it means that the loan is a larger proportion of the property's value and it will therefore be more difficult for the lender to recoup the loan amount from the collateral property if necessary.

179.    By inflating the property's key financial metrics, Wells Fargo was able to artificially deflate the loan's LTV ratio to a very safe 50.85%, making it appear much safer than it actually was based on the extremely risky LTV ratio of approximately 100% based on the property's actual historical financial metrics.[31]

---

[31] The affect that the inflated historical NCF and NOI figures have on the DSCR and LTV ratios are explained in greater detail for this first example. These inflated NCF and NOI figures cause the DSCR and LTV ratios to be similarly misrepresented for all of the examples discussed in this

180.    In addition, the address for this property (the Renaissance Dallas hotel) was changed in the new loan, reported as 2222 North Stemmons Freeway, as compared to 2222 Stemmons Freeway in the old loan, making it harder to identify the files for the old loan that reveal the figures that Wells Fargo inflated in the new loan.

181.    Another example of a Wells Fargo loan from WFCM 2016 BNK1 is a $68 million loan for One Penn Center, an office building in Philadelphia for which $35 million was sold into this securitization and the remaining $33 million was sold into another securitization.

182.    Flynn found similarly inflated historical NCF, NOI, and DSCR figures when comparing the figures that Wells Fargo reported as the master servicer for the old loan through 2015 and what it reported as the originator and seller of the new loan:

| One Penn Center | % of Pool | 4.08% | WFCM 2016-BNK1 | | 870,000,000 | | % Inflated | 36.26% | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lender UW | Most Recent Period | | | 2nd Most Recent Period | | | 3rd Most Recent Period | | | 4th Most Recent Period (from Loan Summary) | | |
| | | TTM 4/30/2016 | | | Actual 2015 | | | Actual 2014 | | | Actual 2013 | | |
| | Securitization | Lender Rep | Servicer Rep | Differ | Lender Rep | Servicer Rep | Differ | Lender Rep | Servicer Rep | Differ | Lender Rep | Servicer Rep | Differ |
| Revenue | 12,747,817 | 13,322,631 | 13,794,993 | -3.4% | 13,550,121 | 13,794,993 | -1.8% | 13,574,507 | 13,482,246 | 0.7% | 13,177,574 | 13,121,026 | 0.4% |
| Expenses | 6,458,819 | 6,463,018 | 7,929,731 | -18.5% | 6,326,742 | 7,929,731 | -20.2% | 6,691,359 | 7,392,749 | -9.5% | 6,856,289 | 7,054,752 | -2.8% |
| NOI | 6,288,998 | 6,859,582 | 5,865,262 | 17.0% | 7,223,379 | 5,865,262 | 23.2% | 6,883,148 | 6,089,187 | 13.0% | 6,321,285 | 6,066,274 | 4.2% |
| NCF | 5,437,749 | 6,859,582 | 5,264,765 | 30.3% | 7,223,379 | 5,264,765 | 37.2% | 6,883,148 | 5,489,000 | 25.4% | 6,321,285 | 5,465,777 | 15.7% |
| NOI DSCR | 1.45 | 1.58 | 1.35 | | 1.67 | 1.35 | | 1.59 | 1.40 | | 1.46 | 1.40 | |
| NCF DSCR | 1.26 | 1.59 | 1.22 | | 1.67 | 1.22 | | 1.59 | 1.27 | | 1.46 | 1.27 | |

183.    The following tables report the property's historical figures in connection with the new and old loan:

Section for these same reasons. A property's NCF and NOI figures are the most important metrics used to determine the DSCR and LTV ratios. Inflating these key inputs therefore directly inflates DSCR and lowers LTV ratios, both of which make the loan appear much safer than it actually is.

**New Loan**

**Trepp®** Loan Detail One Penn Center

Summary Loan Financials

| Financials | | Full Year Historical Financials | | Securitization | | Secur | Secur | Secur |
|---|---|---|---|---|---|---|---|---|
| | Most Recent | 2017 | 2016 | Pro Forma | As Is | Most Recent | 2nd Most Recent | 3rd Most Recent |
| As Of Date | 01/2018 - 03/2018 | 12/2017 | 12/2016 | - | - | 04/2016 | 12/2015 | 12/2014 |
| Revenues | 3,497,513 | 13,963,864 | 13,250,365 | 12,747,817 | - | 13,322,631 | 13,550,121 | 13,574,507 |
| Expenses | 1,879,617 | 7,288,742 | 7,475,603 | 6,458,819 | - | 6,463,049 | 6,326,742 | 6,691,359 |
| NOI | 1,617,896 | 6,675,122 | 5,774,762 | 6,288,997 | - | 6,859,582 | 7,223,379 | 6,883,148 |
| NCF | 1,405,083 | 5,823,873 | 4,923,513 | 5,437,749 | - | 6,859,582 | 7,223,379 | 6,883,148 |

**Old Loan**

**Trepp®** Loan Detail One Penn Center

Summary Loan Financials

| Financials | | Full Year Historical Financials | | | | | | | | | Securitization |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Most Recent | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | |
| As Of Date | - | 12/2015 | 12/2014 | 12/2013 | 12/2012 | 12/2011 | 12/2010 | 12/2009 | 12/2008 | 12/2007 | - |
| Revenues | - | 13,794,993 | 13,482,246 | 13,121,026 | 12,792,916 | 13,158,548 | 12,620,944 | 13,140,645 | 12,723,945 | 12,525,846 | 12,487,609 |
| Expenses | - | 7,929,731 | 7,392,749 | 7,054,752 | 7,091,215 | 6,972,466 | 6,635,084 | 6,671,421 | 6,949,635 | 7,024,323 | 6,272,925 |
| NOI | - | 5,865,262 | 6,089,497 | 6,066,274 | 5,701,701 | 6,186,082 | 5,985,860 | 6,469,224 | 5,774,310 | 5,501,523 | 6,214,685 |
| NCF | - | 5,264,765 | 5,489,000 | 5,465,777 | 5,101,204 | 5,585,585 | 5,385,363 | 5,868,727 | 5,173,813 | 4,901,026 | ^5,614,188 |

184.    This comparison shows that expenses for 2015 in the new loan were approximately $6.327 million as compared to $7.930 million in the old loan, and for 2014 they were $6.691 million in the new loan as compared to $7.393 million in the old loan.

185.    In addition, the table for the new loan shows that the property's actual expenses in 2016 and 2017, after the new loan was originated in July 2016, increased dramatically to amounts

that were significantly above what Wells Fargo represented in the new loan that the property had achieved historically and was expected to achieve, and its NCF and NOI were therefore much lower than what Wells Fargo represented.

186.    Flynn also shows that, after making a conservative 2% adjustment to the cap rate associated with the new loan, to account for the property's lower actual historical DSCR and higher cash flow volatility, the LTV ratio for the new loan based on the property's most recent actual NCF increases dramatically from under 75% to an unheard of 123%:

| | This Trust | MSC 2016-BNK2 | Total Loan Amt | |
|---|---|---|---|---|
| Cap Rate (MR NCF/Appr Value | 7.54% | | | |
| Loan | $ 35,000,000 | $ 33,000,000 | $ 68,000,000 | |
| Appraised Value | $ 91,000,000 | | | |
| Represented MR LTV | 74.73% | | | |
| | | | | |
| Implied Cap Rate | 9.54% | to adjust for lower DSCR and higher volatility | | |
| | | | | |
| Adjusted Value | 55,197,775 | Value using MR actual NCF | | |
| Adjusted LTV | 123.19% | | | |

187.    The new loan for this property also contained an address change, reporting the address as 1601 John F. Kennedy Boulevard, as compared to 1601-29 JFK Boulevard in the old loan, making it harder to identify the files for the old loan that reveal the figures that Wells Fargo inflated in the new loan.

188.    These are just two examples of loans from WFCM 2016-BNK1, where Wells Fargo originated and sold approximately 30% of the loans and Flynn found that NOI and NCF was inflated in at least 36% of the loans. Flynn also found substantially inflated NOI and NCF figures for other Wells Fargo loans in this trust.

189.    For example, the Bonanza Square shopping center in Las Vegas had its NCF inflated by 20.55% and its NOI inflated by 10.93% for 2015, and its NCF inflated by 17.47% and its NOI inflated by 9.34% for 2014. Similarly, the Homewood Suites Del Mar near San Diego, California, had its NCF inflated by 13.96% in 2015 and its NCF inflated by 14.01% in 2014.

### b. **WFCM 2016 C34**

190.    Flynn made similar findings across many other Wells Fargo securitizations. For example, he found substantial inflation of historical income and cash flow figures in WFCM 2016 C34, in which at least 55% of the loans were inflated and Wells Fargo originated and sold 33% of the loans in the securitization.

191.    Wells Fargo inflated the historical NOI and NCF for a $45 million loan for the Hilton Hotel/Homewood Suites in Philadelphia by as much as 43% (as reported for the prior loan through June 2015, for which Wells Fargo was the master servicer), with corresponding inflation to DSCRs. The following analysis shows that Wells Fargo lowered the property's expenses in 2015 from $14.500 million as reported by the servicer for the old loan to $14.099 for the new loan; that it lowered expenses in 2014 from $14.931 million for the old loan to $14.648 million for the new loan; and that it lowered expenses in 2013 from $14.763 million for the old loan to $14.099 million for the new loan.

192.    The following chart shows that these reductions in historical expenses, as well as increases in historical revenue, caused the property's historical NCF to be inflated by between 22.0% and 43.4% and its historical NOI to be inflated by between 5.4% to 22.1%.

| Hilton & Homewood Suites Philadelphia | % of Pool | 6.37% | WFCM 2016 C34 | | 702,787,000 | % Inflated | 55.21% | | |
|---|---|---|---|---|---|---|---|---|---|
| | Lender UW | Most Recent (MR) Period | | | 2nd Most Recent (MR) Period | | | 3rd Most Recent (MR) Period | |
| | | Actual 2015 | | | Actual 2014 | | | Actual 2013 | |
| | Securitisation | Lender Repre | Servicer Rep't | Difference | Lender Rep | Servicer Rep't | Differ | Lender Rep | Servicer Rep't | Differ |
| Revenue | 20,476,107 | 20,212,909 | 19,623,332 | 3.0% | 20,406,425 | 20,394,735 | 0.1% | 20,212,909 | 19,770,212 | 2.2% |
| Expenses | 14,896,494 | 14,098,688 | 14,500,024 | -2.8% | 14,648,494 | 14,930,844 | -1.9% | 14,098,688 | 14,762,534 | -4.5% |
| NOI / Inflation (%) | 5,579,613 | 6,114,221 | 5,123,308 | 19.3% | 5,757,931 | 5,463,891 | 5.4% | 6,114,221 | 5,007,678 | 22.1% |
| NCF Inflation (%) | 4,760,568 | 6,114,221 | 4,378,602 | 39.6% | 5,757,931 | 4,719,185 | 22.0% | 6,114,221 | 4,262,972 | 43.4% |
| NOI DSCR | 1.97 | 2.16 | 1.81 | | 2.03 | 1.93 | | 2.16 | 1.77 | |
| NCF DSCR | 1.68 | 2.16 | 1.55 | | 2.03 | 1.67 | | 2.16 | 1.50 | |

193.    Moreover, the bottom rows of this chart show that the these inflated historical figures caused the property's historical NOI and NCF DSCRs to be substantially inflated, with all of the DSCRs based on the inflated figures coming out over 2.0 and all of the DSCRs based on the

actual historical figures coming out under 2.0.

194.    In addition, Wells Fargo changed the year in which the property was built and renovated. The old loan (reporting data through the time of the new loan) reported that it was built in 1999 and renovated in 2004, but the new loan reported that it was built in 2002 and renovated in 2015. The new loan made the property appear more valuable by describing it as having been built and renovated more recently.

**Old Loan**

| Property Information | |
|---|---|
| CREFC Prop Type | LO |
| Underwriter Prop Type | Hospitality |
| Normalized Prop Type | LO-Full Service |
| Trepp Subtype | Extended Stay |
| Year Built | 1999 |
| Year Renovated | 2004 |
| Number of Units | 331 |
| Trepp Hotel Brand | Homewood Suites |
| Trepp Hotel Flag Franchise | Hilton Worldwide |

**New Loan**

| Property Information | |
|---|---|
| CREFC Prop Type | LO |
| Underwriter Prop Type | Hospitality |
| Normalized Prop Type | LO-Full Service |
| Trepp Subtype | Full Service |
| Year Built | 2002 |
| Year Renovated | 2015 |
| Number of Units | 331 |
| Balance/ SqFt or Unit | 129,872 |
| Trepp Hotel Brand | Hilton |
| Trepp Hotel Flag Franchise | Hilton Worldwide |
| Master Lease | No |

195.    Furthermore, the new loan changed the property's name, from Hilton Hotel/Homewood Suites in the old loan to Hilton & Homewood Suites Philadelphia, making it more difficult to identify the discrepancies between the old and new loan. While these two names

sound similar, they make it difficult for a reviewer to find the prior loan for the property, most of which depend on tools like Excel that require exact matches when searching vast amounts of data. This was part of a pattern that Flynn identified where names were changed consistently in loans with inflated financial metrics. In other instances, Flynn has found other identifying information changed, such as addresses, square footage, or property use. All of these changes help the originator of the new loan hide the inflated metrics by obscuring unique identifiers that are crucial for a reviewer to be able to compare collateral performance across multiple loans for the same property. The prevalence of these changes specifically in loans with inflated performance metrics indicate that they are part of an intentional effort to hide those inflated figures.

196.   This securitization also contains the $12.9 million loan for the Pacific Palisades Bowl, which is the Wells Fargo loan for the trailer park that the *ProPublica* article highlighted as a paradigmatic example of Flynn's analysis. (*See supra* ¶ 99). Using the same methodology described above, Flynn showed that the NOI and NCF for this property for 2013 through 2015 were inflated by between 20% and 49% because Wells Fargo reduced the property's expenses by between 30.7% and 38.5% for those years:

| Pacific Palisades Bowl MHC | % of Pool | 1.84% | | WFCM 2016 C34 | | 702,787,000 | | % Inflated | 55.21% | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Lender UW | | Most Recent (MR) Period | | | 2nd Most Recent (MR) Period | | | 3rd Most Recent (MR) Period | |
| | | | Actual 2015 | | | Actual 2014 | | | Actual 2013 | |
| | Securitisation | Lender Rep't | Servicer Rep't | Difference | Lender Rep | Servicer Rep't | Differ | Lender Rep | Servicer Rep't | Differ |
| Revenue | 1,671,432 | 1,717,134 | 1,700,963 | 1.0% | 1,663,878 | 1,663,878 | 0.0% | 1,717,134 | 1,581,376 | 8.6% |
| Expenses | 553,899 | 444,954 | 641,783 | -30.7% | 458,711 | 718,787 | -36.2% | 444,954 | 723,737 | -38.5% |
| NOI / Inflation (%) | 1,117,533 | 1,272,180 | 1,059,180 | 20.1% | 1,205,167 | 945,091 | 27.5% | 1,272,180 | 857,639 | 48.3% |
| NCF Inflation (%) | 1,101,287 | 1,272,180 | 1,053,229 | 20.8% | 1,205,167 | 939,141 | 28.3% | 1,272,180 | 851,689 | 49.4% |
| NOI DSCR | 1.37 | 1.56 | 1.30 | | 1.48 | 1.16 | | 1.56 | 1.05 | |
| NCF DSCR | 1.35 | 1.56 | 1.29 | | 1.48 | 1.15 | | 1.56 | 1.04 | |

197.   These are just two examples from WFCM 2016 C34, a securitization in which at least 55% of the loans had their financial metrics inflated and Wells Fargo originated and sold 33% of the loans in the securitization.  Flynn also found substantially inflated NOI and NCF figures for

other Wells Fargo loans in this trust.

198.    For example, Flynn found that a Wells Fargo loan for the Plaza Center shopping center in Parker, Colorado had its NCF inflated by 53.45% and its NOI inflated by 33.40% for 2015, and its NCF inflated by 54.74% and its NOI inflated by 33.74% for 2014. He also found that a Wells Fargo loan for a property called Spring Mountain Plaza had its NCF inflated by 19.47% and its NOI inflated by 18.64% for 2014 (and did not have any information available for 2015).

### c.  **WFCM 2017-C38**

199.    Flynn also analyzed loans in WFCM 2017-C38. This is a billion-dollar Wells Fargo trust that Griffin also discussed in his analysis. (*See supra* ¶ 122). Wells Fargo originated approximately 31% percent of the loans in this securitization and Flynn found that at least 17 percent of the loans had their performance metrics substantially inflated.

200.    One example is a $175 million loan for a retail mall called Market Street – The Woodlands. This loan was split into three trusts, with $45 million of it sold into WFCM 2017-C38. The following table shows that the historical NCF and NOI for this property was inflated by over 32% and 28% for 2016, by approximately 26% and 22% for 2015, and by approximately 30% and 26% for 2014:

| Market Street -The Woodlands | % of Pool | 3.90% | | WFCM 2017-C38 | 1,001,296,000 | | % Inflated | 22.30% | |
|---|---|---|---|---|---|---|---|---|---|
| | Lender UW | Most Recent (MR) Period | | 2nd Most Recent (MR) Period | | | 3rd Most Recent (MR) Period | | |
| | | Actual 2016 | | Actual 2015 | | | Actual 2014 | | |
| | Securitisation | Lender Repres'tn | Servicer Rep't | Difference | Lender Repres | Servicer Rep't | Differ | Lender Repres | Servicer Rep't | Differ |
| Revenue | 24,779,479 | 24,050,575 | 20,308,337 | 18.4% | 23,041,449 | 20,088,889 | 14.7% | 22,613,560 | 19,676,850 | 14.9% |
| Expenses | 8,827,590 | 8,831,551 | 8,448,737 | 4.5% | 8,428,986 | 8,107,168 | 4.0% | 8,087,850 | 8,141,611 | -0.7% |
| NOI / Inflation (% in Red) | 15,951,889 | 15,219,024 | 11,859,600 | 28.33% | 14,612,463 | 11,981,722 | 21.96% | 14,525,710 | 11,535,239 | 25.92% |
| NCF Inflation | 14,752,888 | 15,219,024 | 11,503,212 | 32.30% | 14,612,463 | 11,625,333 | 25.70% | 14,525,710 | 11,178,851 | 29.94% |
| NOI DSCR | 2.20 | 2.10 | 1.64 | | 2.02 | 1.65 | | 2.00 | 1.59 | |
| NCF DSCR | 2.04 | 2.10 | 1.59 | | 2.02 | 1.61 | | 2.01 | 1.55 | |

201.    These figures are based on a comparison of the NOI and NCF figures reported for this property in connection with WFCM 2017-C38 as compared to what was reported by the servicer in connection with a prior loan secured by the same property, as the following tables show:

**Current Loan**

**Trepp®** Loan Detail Market Street -The Woodlands

Summary Loan Financials

| Financials | Most Recent | Full Year Historical Financials 2017 | Securitization | Secur Most Recent | Secur 2nd Most Recent | Secur 3rd Most Recent |
|---|---|---|---|---|---|---|
| As Of Date | 01/2018 - 06/2018 | 12/2017 | - | 12/2016 | 12/2015 | 12/2014 |
| Revenues | 11,555,794 | 23,364,576 | 24,779,479 | 24,050,575 | 23,041,449 | 22,613,560 |
| Expenses | 4,426,596 | 8,584,022 | 8,827,590 | 8,831,551 | 8,428,986 | 8,087,850 |
| NOI | 7,129,198 | 14,780,554 | 15,951,889 | 15,219,024 | 14,612,463 | 14,525,710 |
| NCF | 6,529,699 | 13,581,554 | 14,752,888 | 15,219,024 | 14,612,463 | 14,525,710 |
| DSCR (NOI) | 1.97 | 2.04 | 2.20 | - | - | - |
| DSCR (NCF) | 1.81 | 1.87 | 2.04 | - | - | - |
| Debt Yield (NOI) | - | - | 9.10 | - | - | - |
| Debt Yield (NCF) | - | - | 8.40 | - | - | - |
| Occupancy | 94 | 95 | 92 | - | - | - |
| Financial Ind | YN | - | - | - | - | - |
| NOI/NCF Indicator | CREFC | - | - | - | - | - |

**Past Loan**

**Trepp®** Loan Detail Market Street at the Woodlands

Summary Loan Financials

| Financials | Most Recent | Full Year Historical Financials | | | | | | | | | | Securitization |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 | |
| As Of Date | 01/2016 - 12/2016 | 12/2015 | 12/2014 | 12/2013 | 12/2012 | 12/2011 | 12/2010 | 12/2009 | 12/2008 | 12/2007 | 12/2006 | |
| Revenues | 20,308,337 | 20,088,889 | 19,676,850 | 17,248,982 | 15,131,504 | 14,676,780 | 14,358,660 | 13,653,087 | 14,223,853 | 14,247,531 | - | 10,746,611 |
| Expenses | 8,448,737 | 8,107,168 | 8,141,611 | 7,175,832 | 5,379,243 | 5,197,550 | 5,138,048 | 5,272,274 | 5,439,546 | 5,336,802 | - | 5,502,532 |
| NOI | 11,859,600 | 11,981,722 | 11,535,239 | 10,073,150 | 9,752,262 | 9,479,230 | 9,220,612 | 8,380,813 | 8,784,306 | 8,910,729 | - | 10,378,090 |
| NCF | ^11,503,212 | 11,625,333 | 11,178,851 | 9,718,762 | 9,395,874 | 9,122,842 | 8,864,224 | 8,024,425 | 8,427,918 | 8,536,521 | - | 10,021,702 |
| DSCR (NOI) | 1.53 | 1.55 | 1.49 | 1.30 | 1.26 | 1.22 | 1.33 | 1.32 | 1.38 | 1.32 | - | - |
| DSCR (NCF) | ^1.49 | 1.50 | 1.44 | 1.25 | 1.21 | 1.18 | 1.28 | 1.26 | 1.32 | 1.27 | - | 1.29 |
| Debt Yield (NOI) | - | - | - | - | - | - | - | - | - | - | - | 9.18 |
| Debt Yield (NCF) | - | - | - | - | - | - | - | - | - | - | - | 8.87 |
| Occupancy | 92 | 94 | 96 | 96 | 91 | 88 | 91 | 92 | 92 | 90 | - | 91 |
| DSCR Roll Indicator | F | F | F | F | - | - | - | - | - | - | - | - |
| Financial Ind | YN | - | - | - | - | - | - | - | - | - | - | - |
| NOI/NCF Indicator | CMSA | - | - | - | - | - | - | - | - | - | - | - |

This shows that that for 2015, Wells Fargo increased the property's revenue by approximately $3 million and for 2014 it increased the property's revenue by approximately $2.9 million, as compared to what the servicer reported for the property's revenue in connection with the old loan.

202.    This property provided a particularly useful example of how the inflated metrics in

CORRECTED CONSOLIDATED AMENDED COMPLAINT – 3:20-CV-07674-WHA

the new loan affect its LTV ratio, because the servicing reports for the prior loan contained an "implied cap rate" that the servicer reported at the time of the new loan but based on the historical figures reported in connection with the old loan. The implied cap rate for this property was 8.0:

| Appraisal/LTV | | | | | | | |
|---|---|---|---|---|---|---|---|
| Source | Appraisal Date | Appraisal Amount | Appraisal / Sq Ft | LTV | Last Updated | Implied Cap Rate (NOI) | Implied Cap Rate (NCF) |
| Most Recent | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 10/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 09/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 08/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 07/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 06/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 05/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 04/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 03/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 02/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 01/10/2018 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 12/10/2017 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 11/10/2017 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 10/10/2017 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 09/10/2017 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 08/10/2017 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 07/10/2017 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 06/10/2017 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 05/10/2017 | 0.08 | 0.08 |
| - | 05/12/2007 | 144,730,000 | 308.51 | 78.04 | 05/11/2017 | 0.08 | 0.08 |
| Securitization | 05/12/2007 | 163,220,000 | 347.93 | 69.20 | - | - | - |

203.    Using the 8% cap rate reported by the prior servicer at the time of new loan, and using the collateral's actual most recent NCF rather than the inflated figures reported in connection with the new loan, led to the collateral value decreasing from approximately $326 million (the appraised value in the new loan) to just $144 million, resulting in its most recent LTV ("MR LTV") increasing from a superbly safe 53.65% to an extremely risky 121.71%.

| | This Trust | BANK 2017-BNK5 MSC 2017-H1 | Total Loan Amt |
|---|---|---|---|
| Cap Rate (MR NCF/Appr Value) | 4.67% | | |
| Loan Amount | 45,000,000 | $  130,000,000 | $175,000,000 |
| Appraised Value | $326,190,000 | | |
| Represented MR LTV | 53.65% | | |
| Adjusted Cap Rate | 8.00% | | |
| Adjusted Value | 143,790,150 | MR NCF / Adjusted Cap Rate | |
| Adjusted MR LTV | 121.71% | | |

204.    Flynn also showed that this property's name was changed from "Market Street at the Woodlands" in the old loan to "Market Street -The Woodlands" in the new loan, making it harder to identify the old loan as a basis for comparison:



205.    This is just one example from WFCM 2017 C38, a securitization in which Wells Fargo originated and sold approximately 31% percent of the loans and Flynn found that at least 17 percent of the loans had their performance metrics substantially inflated. Flynn also found substantially inflated NOI and NCF figures for other Wells Fargo loans in this trust.

206.    For example, Flynn found that a $25.5 million loan for Banner Bank, in Boise City, Idaho, had its NCF inflated by 16.11% in 2016 and by 22.29% in 2015. Flynn also found that a $7.7 million loan for Mini Self Storage & RV, in San Leandro, California had its NCF inflated by 16.21% and its NOI inflated by 13.18% in 2015. While the servicer for the prior loan reported the property's performance only for the first half 2016, assessing those figures on an annualized basis (as is standard practice when data for only part of a year is available) showed that NCF was inflated by over 50% and NOI was inflated by over 40% in 2016.

### d.  The Pervasive Nature of Inflation of Key Financial Metrics in Commercial Loans That Wells Fargo Originated

207.    Flynn also found rampant inflation in loans that Wells Fargo originated in other securitizations. For example, WFCM 2017 RB1, a securitization in which Wells Fargo originated

and sold 27% of the loans, had at least 28% of its loans inflated. This includes a $25.8 million Wells Fargo loan for the Hotel Wilshire in Los Angeles, California, which had its NCF inflated by 12.97% for 2014, 12.06% for 2015, and 10.87% for 2016. Similarly, a $6.6 million loan for the Fairfield Inn & Suites in Bend, Oregon, had its NCF inflated by 16.43% for 2014 and 8.85% for 2015, with its NOI inflated by 8.78% for 2014.

208.    In addition, WFCM 2016 LC25, a securitization in which Wells Fargo originated and sold 29% of the loans, had 22% of its loans inflated. For example, a $20 million loan for the Rio West Business Park in Tempe, Arizona had its NCF inflated by 66.67% and its NOI inflated by 58.43% for 2015, and its NCF inflated by 72.77% and its NOI inflated by 61.69% for 2014. Another Wells Fargo loan, a $30 million loan for the Causeway Plaza in Metairie, Louisiana (near New Orleans), had its NCF inflated by 22.40% for 2015 and 24.56% for 2014.

209.    Flynn's analysis discussed in this Section covers a representative sample of loans that Wells Fargo originated in CMBS transactions. This analysis shows that the pervasive inflation of income and cash flow figures—and the resulting inflation of DSCR and deflation of LTV ratios—that he and Griffin found to be rampant in CMBS (including Wells Fargo CMBS) applies with equal force to loans that Wells Fargo originated.

### 3.    A High-Level Wells Fargo Employee Observed Unusually Risky Commercial Loans

210.    A former employee that worked in commercial banking at Wells Fargo for 24 years explained how its commercial lending business made unusually risky loans. This employee ("CW 1") worked at Wells Fargo from 1997 to September 2020. CW 1 was based in Phoenix and during the Class Period was Executive Vice President ("EVP") and Mountain Region Division Manager (from 2017 to 2019) and EVP and Commercial Banking Market Executive (from early 2019 to September 2020). Most recently, from 2019 to 2020, CW 1 reported to Neal Crapo, EVP and

1
2
3
4

Division Executive of commercial banking for Arizona, Utah, and Nevada. Crapo reported to John Manning, EVP and Heard of West Region Commercial Banking, who reported to Defendant Pelos.[32] Pelos reported to Wells Fargo's CEOs during that time. Prior to Crapo, from 2017 to 2019, CW 1 reported to Laura Oberst, EVP and Head of Business Banking.

5
6
7
8
9
10
11
12
13
14
15
16
17

211.    CW 1 described how in 2018 and 2019, CW 1 and their team in Arizona began to notice surprising deviations from Wells Fargo's normal credit practices in California. The team in the California market was able to make higher risk commercial real estate mortgages than other markets. CW 1 learned about these practices in California from Wells Fargo's Business Development Officer ("BDO") sales team. Members of the BDO team would request permission from CW 1 to make commercial loans with 80% LTV ratios. When CW 1 would reject those requests, BDOs would say, "Wait a minute: My colleagues in California are getting that done. Why can't we do that?" BDO team members would make these requests a couple of times a month, noting that these practices were continuing to take place in California. CW 1 explained that these practices were taking place in California in the Business Banking and Middle Market divisions (which were combined in late 2019).[33]

18
19
20
21

212.    California was Wells Fargo's largest market for commercial real estate loans. For example, Wells Fargo disclosed in its 2019 Annual Report that its total portfolio of these loans in California was approximately $36.5 billion, which was approximately 26% of its total portfolio.

22
23
24

213.    During CW 1's 24-year tenure at Wells Fargo, the bank's commercial mortgage policy required a 75 percent LTV ratio (meaning that borrowers had to provide a 25 percent down

25
26
27
28

---

[32] Manning oversaw western states, including California, Washington, Oregon, Arizona, Idaho and Utah.

[33] Business Banking served companies with $5 million to $20 million in annual sales and Middle Market Banking served companies with $20 million to $1 billion in annual sales. (*Supra* ¶ 43).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

payment to get the loan). But in 2018 and 2019, Wells Fargo's commercial division in California was doing commercial loans at LTV ratios of 80 percent.

214.    CW 1 attributed this deviation from Wells Fargo's underwriting standards to the fact that "there was some pressure to do that because of the competition and because the economy was so good." In California in particular, CW 1 observed, the commercial real estate market was booming and the competition between banks was intense. CW 1 explained that at the time, Wells Fargo was "really trying to grow the bank" and "there was pressure to find a way to make deals happen."

215.    The deviations in California from Wells Fargo's ordinary LTV standard surprised CW 1 and the team in Arizona. As CW 1 stated, "[w]e'd look at the face value and say, 'Huh, I wonder how they got that done.'" CW 1 made clear that by allowing borrowers to obtain a loan with only 20 percent down and a corresponding LTV ratio of 80 percent, the loan became a higher risk than Wells Fargo's typical LTV ratio of 75%.

216.    CW 1 explained further that normally, a higher credit risk rating warrants a more expensive loan (via higher interest rates) to justify that risk. This witness stated that "[i]n theory," these higher-risk loans in California "should have been priced higher." But the higher risk loans in California were using standard pricing and sometimes even lower pricing. As CW 1 noted, they were "still priced either the same," or even "more aggressively," than standard loans. Wells Fargo's pricing of these loans surprised CW 1.

217.    In addition, CW 1 also explained that Wells Fargo's pricing model was consistent across geographies and did not change for different markets. Geographic factors therefore did not explain the higher-risk loans that CW 1 observed in California.

218.    Lastly, CW 1 did not have any knowledge of how Wells Fargo determined which

loans went into securitizations and which stayed on the Company's books. The fact that an employee as senior as CW 1 did not have this type of knowledge shows that Wells Fargo did not differentiate when originating commercial loans between ones that it sold into securitizations and loans that it continued to hold in its commercial loan portfolio.

### 4.    Wells Fargo's Representations in CMBS Offering Materials

219.    Wells Fargo's standard representation in CMBS offering documents stated that the Company originated and underwrote a substantial portion of the loans in the securitization. These representations show that (1) Wells Fargo vouched for the quality of these loans and (2) these loans came from the general part of Wells Fargo's business that originated and underwrote commercial loans, without any distinction between whether these loans would be held on Wells Fargo's books or sold into a securitization.

220.    For example, the prospectus for Wells Fargo Commercial Mortgage Trust 2017-C38, an approximately $1 billion CMBS securitization that both Flynn and Griffin analyzed (*see supra* ¶¶ 122, 199–206), represented under a heading titled "The Sponsors and Mortgage Loan Sellers," that Wells Fargo Bank, National Association was one of the "originators" for the commercial loans in the securitization. Wells Fargo Bank, National Association would then sell loans that it originated into the securitization. As a "mortgage loan seller," Wells Fargo was considered one of the "sponsors" of the securitization.[34] This prospectus specifically noted that Wells Fargo's "commercial mortgage origination division" was involved in the securitization.

221.    The prospectus went on to describe Wells Fargo's process for originating and underwriting commercial mortgage loans without differentiating between how those processes

---

[34] The prospectus also noted that the information provided in this section of the prospectus was "provided by Wells Fargo Bank."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

applied to loans that were sold into securitizations and commercial loans that were not securitized. In fact, the prospectus described "Well's Fargo Bank's Commercial Mortgage Loan Underwriting" as a distinct function of "Wells Fargo Bank's commercial real estate finance group," separate from the additional review that Wells Fargo would conduct "in its capacity as the sponsor of the Wells Fargo Bank Mortgage Loans" that "it is selling to the depositor." This shows that the loans in the securitization were the same type of commercial loans that Wells Fargo originated more generally.

222.    Moreover, because Wells Fargo conducted an additional review of these loans in its capacity as the "sponsor" of the deal "to provide reasonable assurance that the disclosure related to the Wells Fargo Bank Mortgage Loans is accurate in all material respects," the loans in Wells Fargo's securitizations should have been of a higher quality, and better met the standards of the origination and underwriting divisions of Wells Fargo's general "commercial real estate finance operation" and its "commercial mortgage origination division" that originated the loans before they were subject to the additional securitization-specific review.[35]

223.    The prospectus also makes clear that the Wells Fargo deal team that worked on securitizing the commercial loans were just reviewing them, but were not "re-underwriting" the loans. Indeed, as part of its review, "[t]he Wells Fargo Bank Deal Team also consulted with Wells Fargo Bank personnel responsible for the origination of the Wells Fargo Bank Mortgage Loans to confirm that the Wells Fargo Bank Mortgage Loans were originated in compliance with the origination and underwriting criteria" used by Wells Fargo's commercial mortgage loan underwriting division. This shows even further that the loans were underwritten in accordance with

---

[35] Similarly, a third-party accounting firm would further confirm the accuracy of the data for the loans in the securitization, Wells Fargo would conduct a legal review of the loan data to "corroborat[e] the accuracy" of disclosures about the loans, and Wells Fargo would conduct "Other Review Procedures" to ensure that there were no unknown "material events."

the origination and underwriting practices of Wells Fargo's broader commercial lending business.

224.    Similarly, the prospectus explained, under the section describing "Wells Fargo Bank's Commercial Mortgage Loan Underwriting," that "Wells Fargo Bank's commercial real estate finance operation is staffed by real estate professionals. Wells Fargo Bank's loan underwriting group is an integral component of the commercial real estate finance group which also includes groups responsible for loan origination and closing mortgage loans."

225.    The prospectus also described at great length the steps that Wells Fargo's general underwriting department took to ensure the quality of loans. For example, "[u]pon receipt of an executed loan application, Wells Fargo Bank's loan underwriters commence a review of the borrower's financial condition and creditworthiness and the real property which will secure the loan."

226.    Then, under the heading "Loan Analysis," Wells Fargo explained that "[g]enerally, Wells Fargo Bank performs both a credit analysis and collateral analysis with respect to a loan applicant and the real estate that will secure the loan. In general, credit analysis of the borrower and the real estate includes a review of historical financial statements (or, in the case of acquisitions, often only current financial statements), rent rolls, certain leases, third-party credit reports, judgments, liens, bankruptcy and pending litigation searches and, if applicable, the loan payment history of the borrower."

227.    The fact that Wells Fargo specifically reviewed "historical financial statements" shows that it was aware of the substantial inflation of historical income figures that Flynn and Griffin have shown was rampant in Wells Fargo's commercial loans. Wells Fargo also represented that "[t]he collateral analysis typically includes an analysis of the following, to the extent available and applicable based on property type: historical property operating statements, rent rolls,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

operating budgets, a projection of future performance, and a review of certain tenant leases. . . . Each mortgaged property is generally inspected by a Wells Fargo Bank underwriter or qualified designee."

228.    In addition, "[p]rior to loan closing, all mortgage loans to be originated by Wells Fargo Bank must be approved by one or more officers of Wells Fargo Bank."

229.    All of these steps described in ¶¶ 219–28 above were the steps that Wells Fargo conducted as originator and underwriter in its general commercial real estate finance operations, before getting to its role as the sponsor of the securitization.

230.    Wells Fargo "concluded with reasonable assurance that the disclosure regarding the Wells Fargo Bank Mortgage Loans in this prospectus is accurate in all material respects. Wells Fargo Bank also found and concluded with reasonable assurance that the Wells Fargo Bank Mortgage Loans were originated in accordance with Wells Fargo Bank's origination procedures and underwriting criteria," except where specific exceptions were expressly noted and justified based on loan-specific characteristics.

231.    The representations discussed in this section are standard language that Wells Fargo used when describing loans that it originated and sold into CMBS. All but one of the 26 prospectuses for Wells Fargo Commercial Trust (WFCM) CMBS from 2016 through 2019 that are available on Bloomberg contain the same or substantially similar language to the representations described above from the prospectus for WFCM 2017 C-38.[36] These deals range in size from $192 million to $1.04 billion. Wells Fargo originated loans in each of these deals, up to 48.9% percent of the entire pool balance. This shows that Wells Fargo made clear that it

---

[36] Only one of these 26 prospectuses, for WFCM 2018-BX1, does not contain this language, because Wells Fargo was less involved in that deal than in the other ones.

employed its standard origination and underwriting practices in the many billions of dollars of CMBS that it was involved in during the time leading up to its catastrophic losses in 2020.

### 5.    Wells Fargo's Other Descriptions of Its Origination Practices

232.    Wells Fargo admits that it sells loans that it originates in its commercial lending business, and that it keeps on its balance sheet, into CMBS.

233.    For example, the Company stated in its 2018 Annual Report, when describing Commercial Mortgage Loan Securitizations, that "***[i]n a typical securitization, we may transfer loans we originate to these VIEs*** [*i.e.*, variable interest entities that Wells Fargo established for conducting securitizations], account for the transfers as sales, retain the right to service the loans and may hold other beneficial interests issued by the VIEs."[37]

234.    When describing its "Involvement with Special Purpose Entities," including its sale or transfer of commercial loans into these entities, Wells Fargo explained that it is ***involved in "securitization transaction[s] where we transferred assets from our balance sheet."***

235.    In addition, Wells Fargo stated, when describing "Loan Sales and Securitization Activity," that "[w]e periodically transfer consumer and CRE loans and other types of financial assets in securitization and whole loan sale transactions." In other Annual Reports during the Class Period, Wells Fargo referenced "commercial loans" more generally, not just "CRE loans."

236.    Wells Fargo made the same or substantially similar statements to those described in Paragraphs 233–35 about its sale or transfer of commercial loans from its balance sheet in every Annual Report that it issued during the Class Period. These statements make clear that Wells Fargo's default practice was to sell loans that it originated and held on its balance sheet into CMBS.

---

[37] Wells Fargo disclosed that "[d]uring 2018, 2017 and 2016, we transferred $17.9 billion, $16.7 billion and $18.3 billion, respectively, in carrying value of commercial mortgages to unconsolidated VIEs and third-party investors and recorded the transfers as sales."

While the Company sometimes serviced CMBS with loans that it did not originate, that was the exception that applied only "[i]n certain instances."

237.    In all of these statements, Wells Fargo did not differentiate in any way between its role as an originator for CMBS loans as compared to its role as an originator of commercial loans more generally. Rather, Wells Fargo took loans that it had already originated in accordance with its general practices and that it held on its balance sheet, and sold them into securitizations.

238.    For example, Wells Fargo stated in its quarterly supplement presentation that it made in connection with its earnings from the third quarter of 2019 that the amount of commercial real estate mortgages on its balance sheet was down by $1.1 billion in part because of "liquidity in the commercial mortgage-backed securities (CMBS) market." In other words, Wells Fargo was selling commercial real estate loans that it originated and kept in its portfolio into CMBS.

239.    Defendant Myers has also expressly confirmed that Wells Fargo applied the same standards to commercial loans that it originated and sold into CMBS and those that it continued to hold on its balance sheet.

240.    During a January 20, 2020 episode of the "Leading Voices in Real Estate" podcast, Myers described Wells Fargo's advancement to becoming the number one commercial real estate lender over the prior 10 years, during his tenure as Head of Commercial Real Estate. When discussing Wells Fargo's large role in the CMBS market, Myers explained that "one of the defining moments . . . of this recovery coming out of the Financial Crisis is how disciplined the debt lenders actually have been, pretty remarkable." Myers went on to confirm repeatedly Wells Fargo's "conservative approach" to risk and that the Company, as well as himself "personally [are] more cautious, more conservative" and that "you never do something that you don't understand."

241.    Defendant Myers emphasized that Wells Fargo approaches loans that it originates

that get sold into CMBS exactly the same as loans that it originates in its commercial lending business more generally:

> *We approach the business very much from a traditional commercial bank perspective, which is we are a lender first.* And even though we are originating a CMBS loan for sale, *we have to feel good that at the end that's a loan we will make and will be happy to own on our balance sheet.* Our value proposition [to] our customers is that we will be the best risk managers on the planet.

242. Myers also confirmed during this interview that Wells Fargo's commercial real estate loans that it keeps on its balance sheet and those that it sells from its balance sheet into CMBS come from the same source by explaining that the Company's commercial real estate business "originated last year about 50 billion dollars of financings. About 30 [billion] of that sits on our balance sheet; the balance gets distributed between GSE and CMBS and the like."

### 6.    Wells Fargo's "Financials Except Banks" Commercial Loans

243. Wells Fargo also had enormous exposure to the pervasive problems in commercial securitizations (including CMBS and CLOs) in another way. The single largest category of commercial loans in Wells Fargo's commercial & industrial (C&I) lending business came from loans that Wells Fargo made to alternative asset managers that, in turn, used those funds to make commercial loans that went into commercial securitizations. The Ladder Capital trust that John Flynn revealed to have contained substantial income overstatement (*see supra* ¶¶ 138–39) is an example of a large CMBS that an alternative asset manager (Ladder Capital) funded with a sizable loan that Wells Fargo recorded as a C&I loan.

244. Wells Fargo categorizes this portion of its C&I portfolio as "Financials Except Banks." For example, the slide deck for Wells Fargo's earnings call for the first quarter of 2020 showed that Wells Fargo had approximately $126 billion of Financials Except Banks loans, which was 30% of its total C&I loans outstanding.

245. During the call, Defendant Shrewsberry stated that this bucket included loans to

CLO credit managers and originators, as well as loans to other asset managers that used the funds to make commercial mortgages. He also noted that these loans to third party financial institutions were "very actively managed borrower relationships," which allowed Wells Fargo to "talk about it" and make "allowance calculations" on an ongoing basis.

246.    Similarly, on Wells Fargo's earnings call for the third quarter of 2018 (held on October 12, 2018), Shrewsberry explained that these Financials Except Banks commercial loans are made to asset managers that use the funds for CMBS and CRE CLOs (thus explaining that CLOs as Wells Fargo defined them could contain both business loans and CRE loans).

247.    In addition, at a November 6, 2018 Bank of America Merrill Lynch Future of Financials Conference, Defendant Shrewsberry explained that Wells Fargo's "$95 billion in financial institutions exposure on the corporate side" included loans to third parties involved in several categories, including "commercial real estate being an obvious one, CLO-type originations." He explained that for these loans, "[f]or the categories that have bigger individual exposures, we individually underwrite the loans that are going into a facility. . . . We don't get involved in businesses as an indirect lender in that way if we don't understand or believe that we understand the underlying collateral. And we re-margin mark-to-market regularly and maintain our cushion. So we feel good about it even at this point in the cycle."

248.    And during Wells Fargo's April 12, 2019 earnings call for the first quarter of 2019, Defendant Shrewsberry explained that the Company's over-$100 billion in commercial loans to non-depository financial institutions included loans that give these alternative asset managers "access to the capital markets. We finance them along the way. We understand the underlying loan." Shrewsberry explained that this over-$100 billion portfolio included "the CLO business," CMBS, and "other commercial assets."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 7. Wells Fargo Held Over $30 Billion of Commercial CLOs

249.    Wells Fargo had even more exposure to, and understanding of, the practices in the commercial lending industry because from the beginning of the Class Period through the end of 2019 (just before Wells Fargo started to incur the heavy losses in its commercial lending business that are at issue in this action), Wells Fargo had at least $29.7 billion in CLOs for sale on its balance sheet, with that figure reaching as high as $36.4 billion in the first and second quarters of 2018.

250.    On the Company's earnings call for the first quarter of 2020, Defendant Shrewsberry explained when discussing commercial loans, that, in addition to C&I loans that Wells Fargo made to CLO credit managers, "[o]n the CLO front, which is a big distinguishing portfolio for Wells Fargo, . . . we have $30-ish billion worth of CLO exposure disproportionately, top of the capital structure, AAA, AA that can withstand an extraordinary, almost a complete level of cumulative default with varying levels of loss given default and we're still very comfortable with that, and 80% of that portfolio is externally-rated AAA, which I think is a plus."

251.    Defendant Shrewsberry's representation of these CLOs as less risky because they were "top of the capital structure, AAA, AA," was a false assurance because the problems that Flynn and Griffin identify in commercial loans mean that the underlying financial information that supported these ratings was fraudulently misrepresented. Indeed, Griffin specifically found that the rating agencies did not account for the income inflation in the loan files (*see supra* ¶¶ 146-51) and that income overstatement was "not related to AAA or AA subordination levels."

### D. Wells Fargo's Commercial Lending Business Suffered Devastating Losses Because of These Undisclosed Risks

252.    The fraudulent practices in Wells Fargo's commercial lending business made its commercial loans much risker than Defendants represented. Defendants consistently described Wells Fargo's lending practices as prudent and "conservative" and "disciplined," and reassured

investors that the Company learned its lesson from the Financial Crisis.

253.    In reality, however, Wells Fargo's commercial lending business was plagued by the fraudulent practices that Flynn and Griffin have identified. This includes the pervasive, substantial inflation of the key performance metrics of net operating income and net cash flow. These inflated figures, in turn, led the debt service coverage (DSCR) and loan-to-value (LTV) ratios of Wells Fargo's commercial loans to appear much safer than they actually were, indicating that the borrowers had a greater ability to repay the loans than they actually did and that Wells Fargo had more protection from the collateral property than actually existed.

254.    When the coronavirus pandemic hit in 2020, the risks inherent in Wells Fargo's commercial loans emerged. As Griffin concluded, the "significant relationship between originator's income overstatement and poor loan performance is present with a stricter measure of non-performing loans and in the pre-COVID period, indicating that COVID is accelerating existing origination weaknesses." He also explained that "[a]lthough few people predicted a virus shutting down large parts of the real economy, pre-COVID underwriting quality appears to play a large role in the ability of assets to withstand distress. The performance gap is persistent and not explained by loan income volatility, property type, local economic conditions, or other loan characteristics."

255.    This is precisely what happened with Wells Fargo's commercial loans in 2020, as described in Section VI below. For example, in the first quarter of 2020, Wells Fargo announced (among other losses) that it was taking a $4 billion provision expense to account for expected credit delinquencies. The Company allocated $2.24 billion of this amount (after adjusting for its recent accounting change) for losses in its commercial loans and its commercial nonaccrual loans increased by $621 million. Wells Fargo also suffered $1.7 billion in unrealized losses on its CLO

investments during the quarter and Wells Fargo recorded a $171 million provision expense for commercial debt securities.

256.    These losses then accelerated in the second quarter of 2020. For example, Wells Fargo increased its allowance for credit losses by $8.4 billion. Over three quarters of that amount—$6.4 billion—was for losses in Wells Fargo's commercial loan portfolio (divided between its commercial real estate and commercial & industrial loans). Other types of losses and impairments in Wells Fargo's commercial loans also skyrocketed this quarter, including net charge-offs, non-performing assets, commercial criticized assets, and non-accruals. Commercial criticized assets increased to $38.2 billion, up 53% from just the prior quarter, due to a $7.2 billion increase in criticized C&I loans and a $6.1 billion increase in criticized commercial real estate loans.

257.    Wells Fargo's commercial losses then continued to increase in the third quarter of 2020, driven primarily by losses in its commercial real estate loans. The Company's criticized assets for its commercial real estate loans totaled $12.7 billion, reflecting a $2.3 billion (or 22%) increase as compared to the prior quarter. Wells Fargo also suffered a $113 million increase in commercial nonaccrual loans. Wells Fargo's losses also would have been even more severe if not for the government's short-term assistance and the Company's temporary accommodations. Defendant Shrewsberry warned that "customer accommodations we've provided since the start of the pandemic could delay the recognition of net charge-offs, delinquencies, and non-accrual status," but that "future credit performance may deteriorate as stimulus effect[s] that benefited recent credit performance come to an end."

258.    Wells Fargo's losses were so bad that Scharf ***admitted*** in the Company's July 14, 2020, earnings release for the second quarter of 2020 that "[w]e are extremely disappointed in both our second quarter results and our intent to reduce our dividend." He acknowledged that the extent

of these extraordinary losses could not be explained purely by the pandemic because "[w]hile the negative impact of the pandemic is unprecedented and many of our business drivers were negatively impacted, *our franchise should perform better, and we will make changes to improve our performance regardless of the operating environment*."

259.    In addition, Wells Fargo's losses in its commercial lending business were much more significant to its business than the losses that other banks suffered. First, as described above, commercial lending was a much bigger part of Wells Fargo's business than of other large banks. (*See supra* ¶¶ 77-78). This means that even if Wells Fargo's commercial losses were a comparable proportion of its portfolio, they still would have been much more significant to Wells Fargo because of how important they were to its business as a whole.

260.    Second, the deterioration in Wells Fargo's commercial loans far outstripped those of other banks. In the second quarter of 2020, Wells Fargo's allowance for credit losses in its commercial loan portfolio more than doubled, from 0.93% of the portfolio to 2.27%.[38] In comparison, Bank of America's allowance for credit losses in its commercial loan portfolio in the second quarter of 2020 was just 1.57% of total loans, Citigroup's was 1.7%, and J.P. Morgan's was 1.82%. This trend continued in the third quarter of 2020, when Wells Fargo's allowance for credit losses in its commercial loan portfolio increased to 2.39%. The allowance for these other three banks ranged from 1.70% for J.P. Morgan to 1.80% for Citigroup (with Bank of America's in the middle at 1.75%). Wells Fargo's overwhelming losses in its commercial lending business were therefore far worse than those of its competitors.

### E.    Defendants Profited From Their Sale of Wells Fargo Stock During the Class Period

---

[38] This includes Wells Fargo's commercial real estate loans (both real estate mortgage and real estate construction), commercial & industrial loans, and lease financing.

261.     Defendants Pelos and Shrewsberry sold Wells Fargo stock during the Class Period, when it was inflated as a result of their false and misleading statements. They therefore derived concrete and personal benefits from concealing the poor credit quality of Wells Fargo's commercial loans.

262.     Defendants Pelos and Shrewsberry collectively sold 123,871 shares of their Wells Fargo stock, for total net proceeds of approximately $6.1 million.[39]

263.     Defendants Pelos and Shrewsberry suspiciously sold their shares before Wells Fargo disclosed its massive provision expense for commercial loans on April 14, 2020, when the price of Wells Fargo started to decline.

264.     These insider sales were grossly disproportionate to the amount of sales that Defendants Pelos and Shrewsberry conducted in a comparable period of time pre-dating the Class Period, and thus were inconsistent with their insider selling history.

265.     Defendant Pelos sold 53,871 shares in open market transactions during the Class Period, including on May 24, 2018 and May 13, 2019, for net proceeds of $2,476,509.[40] By contrast, he sold just 24,708 shares in open market transactions, for net proceeds of $1,335,962, during the same time-length period immediately preceding the Class Period. Thus, Defendant Pelos sold nearly 120% more stock for over 85% higher net proceeds during the Class Period.

266.     Defendant Shrewsberry sold 70,000 shares in open market transactions on

---

[39] These net proceeds figures account for amounts that these Defendants spent to exercise stock options during the Class Period. They therefore show the Defendants' profit from their stock sales even after subtracting the amounts that the Defendants spent to acquire shares during the Class Period. Their gross proceeds from their stock sales (not accounting for these acquisitions) are even higher than the amounts described above. In addition, these Defendants sold substantially more shares in the open market than they acquired through the exercise of stock options.

[40] Defendant Pelos sold 25,567 shares on May 24, 2018 for net proceeds of approximately $1.4 million and he sold 28,304 shares on May 13, 2019 for net proceeds of approximately $1.3 million.

November 30, 2017, for net proceeds of $3,599,364. In stark contrast, he sold *no shares* in open market transactions during the same time-length period immediately preceding the Class Period.[41]

267.    In addition, all of Defendant Pelos's and Defendant Shrewsberry's Class Period stock sales took place when Wells Fargo's stock price was over $46 per share, approximately twice what it was at the end of the Class Period.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

268.    Throughout the Class Period, Defendants made materially false and misleading statements regarding Wells Fargo's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Wells Fargo systematically misrepresented the quality of loans in its commercial loan business by inflating the net income and future expected cash flows of its commercial clients to justify issuing excessive loan amounts and excessively risky loans; (ii) Wells Fargo systematically misrepresented the quality of loans in its commercial loan business by issuing loans to asset managers that, in turn, engaged in the practices described in item (i); (iii) Wells Fargo failed to follow its own, or reasonably appropriate, underwriting standards and due diligence guidelines in its issuance of commercial loans; (iv) as a result of items (i)–(iii), Wells Fargo systematically misrepresented the credit quality and likelihood of default of its commercial loans, including commercial loans that it held on its balance sheet, commercial loans that it packaged and securitized into CMBS, commercial loans that it issued to asset managers that engaged in these practices, and commercial CLOs that it held as investments; (v) as a result of items (i)–(iv), Wells Fargo materially understated the reserves, allowances, charge-offs, and other impairments needed for expected credit losses and impairments in its commercial loans; and (vi) as a result of items (i)–(v), Wells Fargo was exposed to severe

---

[41] Defendant Shrewsberry sold these 70,000 shares on November 30, 2017.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

undisclosed risks of financial, reputational and legal harm, in particular in the event of significant and sustained stress in the commercial credit markets.

**A.    The 2017 Statements**

269.    On October 13, 2017, Wells Fargo filed a Form 8-K with the SEC that included a 3Q17 Quarterly Supplement presentation discussed by Defendants Sloan and Shrewsberry during the Company's Q3 2017 Earnings Call held on the same day.

270.    This presentation included a slide titled "Balance Sheet and credit overview (linked quarter)." The slide included the following representation concerning Wells Fargo's commercial loan portfolio:

> Allowance for credit losses reflected ***strong credit quality*** in both the consumer real estate and commercial loan portfolios.

271.    The presentation also included the slides "Commercial loan trends" and "3Q17 Summary." These slides included the following representations concerning Wells Fargo's commercial loans:

> CRE mortgage down $1.8 billion due to lower originations reflecting ***continued credit discipline*** in a competitive, highly liquid financing market, as well as ongoing paydowns/payoffs on existing and acquired loans.
>
> Diversified and ***high quality*** loan portfolio. ***Maintained our risk and pricing discipline***.

272.    On November 3, 2017, Wells Fargo filed with the SEC its Form 10-Q for the third quarter of 2017. The Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certification") by Defendants Sloan and Shrewsberry.

273.    Defendants Sloan and Shrewsberry certified in their SOX Certifications that they reviewed the 10-Q and that, based on their knowledge, the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect

to the period covered by this report."

274.    The SOX Certifications also certified, based on Sloan and Shrewsberry's knowledge, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company" and that it fully complies with the requirements of the Exchange Act.

275.    In addition, the SOX Certifications certified, among other things related to the efficacy of Wells Fargo's disclosure controls and procedures for internal reporting, that Sloan and Shrewsberry designed or supervised the designing of Wells Fargo's disclosure controls and procedures required by the Exchange Act "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared" and "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

276.    The statement in paragraph 270 concerning Wells Fargo's purported strong or solid credit quality was repeated in Wells Fargo's Form 10-Q for the third quarter of 2017.

277.    The Q3 2017 10-Q also included the following representations concerning Wells Fargo's purported long-term risk focus and conservative risk discipline with its CRE portfolios:

**Credit Quality**

***Solid overall credit results continued in third quarter 2017 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.***

Our commercial real estate portfolios were in a net recovery position for the 19th consecutive quarter, reflecting our ***conservative risk discipline*** and improved

market conditions . . . .

278. The statements referenced in ¶¶ 270–71, 276–77 above were materially false and/or misleading for the reasons set forth in ¶ 268(i)–(vi), including because Wells Fargo's commercial loan portfolio was not of "strong credit quality" or "high quality," Wells Fargo did not sufficiently reserve for commercial credit losses, and Wells Fargo did not display conservative credit, risk, and pricing discipline in its commercial loan portfolio.

**B.    The 2018 Statements**

279. On January 12, 2018, Wells Fargo filed a Form 8-K with the SEC that included a 4Q17 Quarterly Supplement presentation, discussed by Defendants Sloan and Shrewsberry during the Company's Q4 2017 Earnings Call held on the same day.

280. This presentation included a slide titled "Commercial loan trends." The slide included the following representations concerning Wells Fargo's CRE loans:

Commercial Real Estate loans down $2.1 billion LQ reflecting ***continued credit discipline. . . .***

▪ CRE mortgage down $1.9 billion due to ***lower originations reflecting continued credit discipline*** in a competitive, highly liquid financing market, as well as ongoing paydowns/payoffs on existing and acquired loans.

281. The statements referenced in ¶ 280 above were materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii)–(iv), and (vi), and because Wells Fargo's commercial real estate loans did not display "continued credit discipline."

282. The January 12, 2018 Form 8-K also included a news release providing Wells Fargo's results for the quarter and year ended December 31, 2017 ("FY17"). The release quoted Defendant Sloan as stating: "The progress we made over the past year was evident in the fourth quarter in . . . loan growth particularly in commercial loans . . . ." The release further stated Wells Fargo had only $115 million in net charge-offs in its commercial portfolio during the quarter, or just 0.09% of the average loan balance.  The release also stated that Wells Fargo's allowance for

credit losses ("ACL") stood at $12.0 billion by quarter's end, or 1.25% of total loans.

283.    The statements referenced in ¶ 282 above were materially false and/or misleading for the reasons set forth in ¶ 268(v)–(vi), including because Wells Fargo materially understated the reserves and impairments needed in its commercial loan portfolio.

284.    Also on January 12, 2018, Wells Fargo held a Q4 2017 Earnings Call with investors to discuss its full year 2017 financial results, led by Defendants Sloan and Shrewsberry.  During the prepared remarks, Shrewsberry emphasized Wells Fargo's "***continued credit discipline in a very competitive market***" when discussing Wells Fargo's commercial real estate loan portfolio. Later in the call, Shrewsberry stated: "Our credit quality remained ***exceptionally strong***."

285.    Furthermore, in response to an analyst's question, Defendant Sloan represented that Wells Fargo was responsibly growing revenues through Wells Fargo's real estate capital markets business, stating in pertinent part as follows:

> We're the largest commercial real estate lender by far, and not only in total but in almost every product type. And we have the most diverse and broadest commercial real estate platform in the market. We are committed to this business long term. ***But to be committed to the real estate business long term, you need to also make important and disciplined decisions when you see that you're at a period in the cycle that doesn't last forever, but a period in the cycle where underwriting standards or pricing might be a little bit out of bounds.*** That's how you get to stay in this business through cycles because you make good decisions. ***So we want to grow this book, but we want to grow it in a way that makes the right decisions for our shareholders***.

286.    Defendant Sloan repeated Defendant Shrewsberry's representations in paragraph 284 in Wells Fargo's 2017 Annual Report issued on February 15, 2018; during its April 19, 2018 call with investors at the "CECP CEO Investor Forum"; and during the December 4, 2018 Goldman Sachs US Financial Services Conference 2018.

287.    The statements referenced in ¶¶ 284–86 above were materially false and/or misleading for the reasons set forth in ¶ 268(i)–(iv) and (vi), including because Wells Fargo's

1   commercial loan portfolio was not of "exceptionally strong" credit quality and Wells Fargo was

2   not making "disciplined decisions" with its CRE loans.

3       288.    On March 1, 2018, Wells Fargo filed with the SEC its annual Form 10-K for 2017.

4   The 2017 10-K was signed by Defendants Sloan and Shrewsberry and contained SOX

5   Certifications substantially similar to the certifications described in paragraphs 273–75. The 2017

6   10-K also incorporated Wells Fargo's 2017 Annual Report.

7       289.    The 2017 10-K contained the following description of the purported solid credit

8   quality of Wells Fargo's commercial loans:

9
10  **Credit Quality**

11  ***Credit quality remained solid in 2017, driven by continued strong performance
    in the commercial and consumer real estate portfolios***. Performance in several of
12  our commercial and consumer loan portfolios remained near historically low loss
    levels and ***reflected our long-term risk focus***. Net charge-offs of $2.9 billion were
13  0.31% of average loans, compared with $3.5 billion and 0.37%, respectively, from
    a year ago. Net losses in our commercial portfolio were $446 million, or 9 basis
14  points of average loans, in 2017, compared with $1.1 billion, or 22 basis points, in
    2016. Our commercial real estate portfolios were in a net recovery position for each
15  quarter of the last five years, ***reflecting our conservative risk discipline*** and
    improved market conditions.
16
17                                    * * *

18  The allowance for credit losses of $12.0 billion at December 31, 2017, was down
    $580 million compared with the prior year. . . .
19
    Nonperforming assets (NPAs) at the end of 2017 were down $2.7 billion, or 24%,
20  from the end of 2016. Nonaccrual loans declined $2.3 billion from the prior year
    end while foreclosed assets were down $336 million from 2016.
21
22      290.    The statements referenced in ¶ 289 above were materially false and/or misleading

23  for the reasons set forth in ¶ 268(i)–(vi), including because Wells Fargo's commercial loan

24  portfolio was not of "solid credit quality," Wells Fargo did not sufficiently reserve for credit losses,

25  and Wells Fargo did not display "long-term risk focus" and "conservative risk discipline."

26      291.    On April 13, 2018, Wells Fargo filed a Form 8-K with the SEC that included the

27

28

Company's 1Q 2018 Quarterly Supplement presentation that Defendants Sloan and Shrewsberry discussed during the Company's Q1 2018 Earnings Call held on the same day.

292.    The 1Q 2018 Quarterly Supplement included a slide concerning the Consent Order issued by the Board of Governors of the Federal Reserve System on February 2, 2018 related to Wells Fargo's governance oversight, and compliance and operational risk management program. The slide titled "Consent Order update" included the following representations concerning Wells Fargo's purported credit risk and underwriting discipline in its commercial loan portfolio:

> We've also maintained our *credit risk discipline with new originations across the loan portfolio.*
>
> • Continued *credit underwriting discipline* in commercial real estate (CRE) lending during a period of high liquidity and increased competition, resulting in four consecutive quarters of lower balances.

293.    This quarterly supplement also included a slide titled "Commercial loan trends." The slide included the following representations concerning Wells Fargo's CRE loans:

> Commercial real estate loans down $1.5 billion LQ *reflecting continued credit discipline*. CRE construction down $397 million due *to lower originations* and slower funding on new and existing loans. CRE mortgage down $1.1 billion due *to lower originations reflecting continued credit discipline* in a competitive, highly liquid financing market, as well as ongoing paydowns/payoffs on existing and acquired loans.

294.    The statements referenced in ¶¶ 292–93 above were materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii)–(iv), (vi), including because Wells Fargo did not display "credit risk discipline with new originations" with its CRE loans, and lacked credit and underwriting discipline with its CRE loans.

295.    Also, on April 13, 2018, Wells Fargo held its Q1 2018 Earnings Call to discuss its financial results for the first quarter of 2018, led by Defendants Sloan and Shrewsberry.

296.    Defendant Shrewsberry stated on this earnings call: "We've also *maintained our credit risk discipline for new originations in commercial real estate* during a period of high

liquidity and increased competition, resulting in four consecutive quarters of lower balances." Defendant Shrewsberry continued: "Commercial loans were relatively flat compared with fourth quarter with C&I loans up $1.6 billion offset *by continued declines in commercial real estate due to continued credit discipline* in a competitive, highly liquid financing market as well as ongoing pay-downs on existing and acquired loans."

297.    The statements referenced in ¶ 296 above were materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii)–(iv), (vi), including because Wells Fargo lacked "credit risk discipline for new originations in commercial real estate" or "credit discipline in a competitive" commercial real estate market.

298.    On May 4, 2018, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2018, which contained SOX Certifications by Defendants Sloan and Shrewsberry identical to the certifications described in paragraphs 273–75.

299.    This Form 10-Q for the first quarter of 2018 contained the following description of the purported high credit quality of Wells Fargo's loans:

**Credit Quality**

*Solid overall credit results continued in first quarter 2018 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.* Net charge-offs were $741 million, or 0.32% (annualized) of average loans, in first quarter 2018, compared with $805 million a year ago (0.34%). The decrease in net charge-offs in first quarter 2018, compared with a year ago, was driven by lower losses in the [C&I] loan portfolio, including in the oil and gas portfolio.

Our commercial portfolio net charge-offs were $78 million, or 6 basis points of average commercial loans, in first quarter 2018, compared with net charge-offs of $143 million, or 11 basis points, a year ago . . . . Our commercial real estate portfolios were in a net recovery position for the 21st consecutive quarter, *reflecting our conservative risk discipline* and improved market conditions. Net losses on our consumer real estate portfolios improved by $56 million, or 187%, to a net recovery of $26 million from a year ago, reflecting the benefit of the continued improvement in the housing market and our *continued focus on originating high quality loans* . . .

The allowance for credit losses as of March 31, 2018, decreased $974 million

compared with a year ago and decreased $647 million from December 31, 2017 . . .

Nonperforming assets decreased $388 million, or 4%, from December 31, 2017, the eighth consecutive quarter of decreases, with improvement across our consumer and commercial portfolios and lower foreclosed assets. Nonperforming assets were 0.88% of total loans, the lowest level since the merger with Wachovia in 2008. Nonaccrual loans decreased $317 million from the prior quarter largely due to a decrease in commercial nonaccruals.

300.    The statements referenced in ¶ 299 above were materially false and/or misleading for the reasons set forth in ¶ 268(i)–(vi), including because Wells Fargo's commercial loan portfolio was not of "high quality," Wells Fargo did not display "long-term risk focus" and "conservative risk discipline," and Wells Fargo materially understated the reserves and impairments needed in its commercial loan portfolio.

301.    On May 10, 2018, Defendant Sloan opened Wells Fargo's Investor Day with an "Opening Remarks" presentation that included a slide "Progress on our goals." The slide had a section on Wells Fargo's "Risk Management," which stated that Wells Fargo had a "*[c]ontinued disciplined focus on credit and market risk*." The presentation also included a slide "Building from a strong foundation," which emphasized Wells Fargo's "*strong credit discipline*."

302.    On the same day, during Wells Fargo's Investor Day call with investors and analysts, Defendant Pelos made the following statements concerning Wells Fargo's CRE portfolio:

We know more about commercial real estate than anybody in the United States.

So *let's highlight our risk management disciplines* and for many of you, you've seen this before, but maybe I'll give you a couple of different data points to focus on. First off, our loan portfolio is very well diversified. It's about 25% Commercial Real Estate, and about 75% C&I. And you can see it laid out by major business lines on the page here.

We're going to maintain our *strong credit discipline*, again it's largely been invisible through a very benign credit cycle.

Even more dramatic *is our performance in the Commercial Real Estate space*, and much more volatile asset class. Again Wells Fargo is the brown line, the universe of commercial banks are the blue line. *Here our performance over a 10-year period, in the past 10 years has been three times – almost 3 times as good as the*

*market. That is a dramatic difference in a very volatile asset class.*

Our **Commercial Real Estate business is another powerful franchise, we're the number one share player in this business**, we're a consistent through-the-cycle lender. Interesting chart on the bottom right. So this is our market share, and CRE, as you can see coming out of the cycle we gain share. And again, that's very classic Wells Fargo. **We tend to be a little tight going into the cycle**. By the way, people say that we're a little tight, **we don't change our standards**, it's just the market moves. **Our standards remain relatively the same.** And then, when the market starts moving in and people start loosening things, we appear tight. But we try to stay consistent, which means on the opposite side of the cycle, we look like we're a bargain, because we're in the market doing stuff. . . .

And now it's been largely going down. And the longer this recovery goes, and there's not a recession, that trend is probably going to continue. We're going to try to do our best. We're going to try to find as many good deals as we can. But this is who we are and you should be very comfortable that this is who we're going to be in the future. **We're protecting your investment because we know, think about the losses, that if you just hop in there and you change your standards, you're going experience market losses which are 3x what we have at Wells Fargo. You don't want to be there.**

303.    The statements referenced in ¶¶ 301–02 above were materially false and/or misleading for the reasons set forth in ¶ 268(i)–(iv), (vi), including because Wells Fargo lacked "disciplined focus on credit and market risk" and "strong credit discipline" with its commercial loans.

304.    On May 30, 2018, Defendant Shrewsberry participated in the Deutsche Bank Global Financial Services Investor Conference. In response to an analyst's question concerning Wells Fargo's risk-taking approach to asset quality after the Financial Crisis, he responded that Wells Fargo cleansed its portfolio and kept multiple types of risky loans "off the books," which made it "a more benign environment" and gave Wells Fargo and other big banks "a much cleaner portfolio than 10 years ago," particularly as compared to "alternative asset managers."

305.    The statements referenced in ¶ 304 above were materially false and/or misleading for the reasons set forth in ¶ 268(i)–(iv), and (vi), including because Wells Fargo did not learn its lesson from the Financial Crisis, and its practices exposed Wells Fargo to severe undisclosed risks

of financial, reputational and legal harm, in particular in the event of significant and sustained stress in the commercial credit markets.

306.    On May 31, 2018, Defendant Sloan participated in the Bernstein Strategic Decisions CEO Conference and made the following representations concerning Wells Fargo's purported caution in maintaining its CRE portfolio and managing its credit risk:

> **We've had a very strong record of managing market and credit risk**, but we haven't executed as well on managing compliance and operational risk and those have contributed to some of our recent challenges.
>
> It's constructive. It's been a little bit more public recently than I wish it had been, but it's a very constructive relationship. We all want the same thing. **We all want to make sure that, that Wells Fargo manages all of its risk as well as it can.** We've raised the bar on ourself even beyond that by reinforcing as one of our six goals that we want to have the best risk management in the industry across all measures of risk. I think, in some areas that I mentioned, **I mentioned credit risk and market risk, I think we do an excellent job there.** I think similarly in liquidity and capital and cyber and technology risk, I think we do a really good job.
>
> Now, on the wholesale side, **the commercial real estate portfolio has declined a little bit**, **just because we're a little bit more cautious about that portfolio**. Being the largest in the industry, that has an impact; doesn't mean we don't like the business. We love the business, but the reason we became the largest commercial real estate business is we've survived through cycles. **And you need to be careful out there**. I think, overall, the C&I book should continue to grow. So, that's how we think about the puts and takes.

307.    The statements referenced in ¶ 306 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo did not have "a very strong record of managing market and credit risk," was not doing an "excellent job" with market and credit risk, and was not cautious with its CRE portfolio.

308.    On July 13, 2018, Wells Fargo filed a Form 8-K with the SEC that included a 2Q18 Quarterly Supplement presentation, discussed by Defendants Sloan and Shrewsberry during the Company's Q2 2018 Earnings Call held on the same day.

309.    This presentation included a slide titled "Commercial loan trends." The slide included the following representations concerning Wells Fargo's purported credit discipline with

its commercial real estate loans:

> **Commercial real estate loans down $2.5 billion LQ reflecting continued credit discipline. . . .**
>
> - CRE mortgage down $1.6 billion due to lower originations reflecting ***continued credit discipline*** in a competitive, highly liquid financing market, as well as ongoing paydowns/payoffs on existing and acquired loans.

310.    The statements referenced in ¶ 309 above were materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii–iv), (vi), including because Wells Fargo lacked "credit discipline" with its CRE loans.

311.    On July 13, 2018, Wells Fargo held its earnings call with investors to discuss its financial results for the second quarter of 2018, led by Defendants Sloan and Shrewsberry. In his prepared remarks, Defendant Sloan highlighted Wells Fargo's "credit quality" as an example of Wells Fargo's purportedly "strong track record of managing many of [Wells Fargo's] risks." Similarly, Defendant Shrewsberry stated that Wells Fargo had conducted a "$150 million reserve release reflecting strong overall portfolio credit performance and lower balances" and emphasized Wells Fargo's "continued credit discipline" and "strong credit performance."

312.    The statements referenced in ¶ 311 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–vi), including because Wells Fargo lacked strong "credit quality" and "credit discipline" in its commercial loan portfolio, and it materially understated the reserves and impairments needed in its commercial loan portfolio.

313.    On September 14, 2018, Defendant Shrewsberry participated in the Barclays Global Financial Services Conference and made the following representations concerning Wells Fargo's purported credit and underwriting discipline with its commercial loan portfolio:

> Commercial real estate loans declined $8.7 billion from a year prior, as new business volumes have declined as ***we've maintained our credit and loan structure discipline*** in a competitive environment. Also within this portfolio, loan payoffs began to increase in the third quarter of last year, and have remained high. ***We***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***currently expect both C&I and CRE loan balances to be down from second quarter as we continue our disciplined approach to credit***, pricing and terms in a competitive lending environment. While we've noted the competitive pressures in commercial real estate for more than a year, we're increasingly experiencing more term and price competition for C&I loans and, as you'd expect, ***we've remained disciplined in our underwriting and risk appetite***.

***We have strong credit discipline***, which has enabled us to perform well through numerous credit cycles, and our charge-offs are at historic lows.

314.    The statements referenced in ¶ 313 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo lacked "strong credit discipline" with is commercial loans and was not "disciplined in [its] underwriting and risk appetite."

315.    On October 12, 2018, Wells Fargo filed a Form 8-K with the SEC that included a 3Q18 Quarterly Supplement presentation, discussed by Defendants Sloan and Shrewsberry during the Company's Q3 2018 Earnings Call held on the same day.

316.    This presentation included a slide "Loans." The slide included the following statements concerning Wells Fargo's purported credit discipline with its commercial loans:

Commercial loans down $3.1 billion LQ predominantly driven by lower commercial real estate loans reflecting ***continued credit discipline***.

317.    The presentation also included a slide "Commercial loan trends." The slide included the following representations concerning Wells Fargo's purported credit discipline with its CRE loans:

Commercial real estate loans down $2.8 billion LQ reflecting ***continued credit discipline***.

CRE mortgage down $3.6B due to ongoing paydowns/payoffs on existing and acquired loans, and lower originations reflecting ***continued credit discipline*** in a competitive, highly liquid financing market.

318.    On October 12, 2018, Defendant Shrewsberry participated in the Company's earnings call with investors for the third quarter of 2018 and made the following statements

concerning Wells Fargo's purported credit discipline with its CRE mortgage loans:

> The decline in CRE mortgage loans was due to ongoing pay-downs on existing and acquired loans, as well as lower originations, reflecting **continued credit discipline** in competitive and highly-liquid financing markets.

319.    Defendant Sloan also participated in this Q3 2018 earnings call and made the following representations concerning the purported solid credit quality of Wells Fargo's commercial customers:

> I think overall what we're seeing is that because of the economic growth here in the U.S. in particular, but around the world, **the credit quality for our customers in commercial**, corporate world, **has never been better**. Their balance sheets are strong. They've extended their maturities. **Their interest coverage is higher than it's ever been because their debt service is lower.**

320.    During the same call, Defendant Sloan later stated: "I think overall what you see on our balance sheet today is not only really good credit performance but a much stronger mix in terms of credit quality, **even if we would go into some sort of an economic downturn**."

321.    The statements referenced in ¶¶ 316–20 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo lacked "credit discipline" with its commercial loans, the "debt service" coverage of its commercial customers was not "higher than it's ever been," and Wells Fargo was not prepared for "an economic downturn."

322.    On November 6, 2018, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2018, which contained SOX Certifications by Defendants Sloan and Shrewsberry identical to the certifications described in paragraphs 273–75.

323.    This 10-Q for the third quarter of 2018 contained the following description of the purported high credit quality of Wells Fargo's loans:

**Credit Quality**
**Solid overall credit results continued in third quarter 2018 as losses remained**

***low and we continued to originate high quality loans, reflecting our long-term risk focus.*** Net charge-offs were $680 million, or 0.29% (annualized) of average loans, in third quarter 2018, compared with $717 million a year ago (0.30%) . . . .

Our commercial portfolio net charge-offs were $152 million, or 12 basis points of average commercial loans, in third quarter 2018, compared with net charge-offs of $113 million, or 9 basis points, a year ago . . . .

The allowance for credit losses as of September 30, 2018, decreased $1.2 billion compared with a year ago and decreased $1.0 billion from December 31, 2017. We had a $100 million release in the allowance for credit losses in third quarter 2018, compared with no release a year ago.

324.    The statements referenced in ¶ 323 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–vi), including because Wells Fargo's commercial loan portfolio was not of "high quality," Wells Fargo did not display "long-term risk focus" with its commercial loans, and it materially understated the reserves and impairments needed in its commercial loan portfolio.

325.    Also on November 6, 2018, Defendant Shrewsberry participated in the Bank of America Merrill Lynch Future of Financials Conference. During that call, Shrewsberry described Wells Fargo's purportedly risk-averse lending philosophy with its $95 billion loan portfolio to non-depository financial institutions, including to the asset backed finance lines of business:

[T]here's a wide range of asset categories, commercial real estate being an obvious one, CLO-type originations . . . ***We don't get involved in businesses as an indirect lender in that way if we don't understand of believe that we understand the underlying collateral***. And we re-margin mark-to-market regularly and maintain our cushion. So we feel good about it even at this point in the cycle.

326.    Defendant Shrewsberry also reassured investors at this conference that Wells Fargo's commercial credit practices were more conservative than those of alternative asset managers, because the Company had learned its lessons from the Financial Crisis. He stated that "[i]n corporate credit, there's a wide range of competitors and you could say the same for commercial real estate but every alternative asset manager has a big emphasis in credit." But Defendant Shrewsberry distinguished Wells Fargo from these alternative asset managers by

explaining that for noninvestment grade loans, "I think we're above 90% being held off the books of banks of institutional categories of leveraged loans. Some of that is regulation because we've all gotten pushed out of that business and some of it is their willingness to be aggressive this late in the cycle. *So, on the one hand, maybe that's where you want that credit, so it's not blowing up on the books of banks when the cycle turns."*

327.    The statements referenced in ¶¶ 325–26 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo's commercial lending practices (including loans that Wells Fargo made to alternative asset managers) exposed Wells Fargo to severe undisclosed risks of financial, reputational and legal harm, in particular in the event of significant and sustained stress in the commercial credit markets.

### C.    The 2019 Statements

328.    On January 15, 2019, Wells Fargo filed a Form 8-K with the SEC, that included a 4Q18 Quarterly Supplement presentation, which Defendants Sloan and Shrewsberry discussed during the Company's Q4 2018 Earnings Call held on the same day.

329.    This presentation included a slide titled "Commercial loan trends." The slide included the following representations concerning Wells Fargo's purported credit discipline with its CRE loans:

> Commercial real estate loans down $583 million LQ reflecting *continued credit discipline* in a competitive, highly liquid financing market.

330.    The statement referenced in ¶ 329 above was materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii–iv), (vi), including because Wells Fargo lacked "credit discipline" with its CRE loans.

331.    On the same day, Defendant Sloan participated in Wells Fargo's earnings call for the fourth quarter of 2018. When discussing with an analyst Wells Fargo's credit quality,

Defendant Sloan made the following representations concerning the strength of Wells Fargo's balance sheet and Wells Fargo's credit risk management after the Financial Crisis:

> *I think the entire regulatory environment post the great recession has fundamentally changed the quality of assets on the balance sheets of the entire industry. And I'd love to tell you it's idiosyncratic to Wells Fargo which, by the way, I still think it is, but in addition to that, I think the balance sheets of the banks today are stronger than they've ever been.* Not just only as it relates to credit, but certainly as it relates to liquidity, and there's no question that we take into consideration the new regulatory environment we're in, the rules and regulations whether it's CCAR or not in terms of how we think about operating the company, *but in terms of how we fundamentally manage credit, it really hasn't impacted how we fundamentally manage credit which is in a very disciplined way.*

332.    During the same call, Defendant Sloan also made the following representations concerning Wells Fargo's purported discipline with its credit risk decisions:

> But having said that, I think one of the hallmarks of the risk management of this company is that *we are very disciplined in terms of how we make credit risk decisions*, period.
>
> *We're not going to do anything that's going to put this company at risk, regardless of where we think we are in the cycle*.

333.    The statements referenced in ¶¶ 331–32 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo's commercial balance sheet was not "stronger than [it've] ever been" and Wells Fargo was not "very disciplined" in managing its credit risk decisions.

334.    Defendant Shrewsberry also participated in this earnings call for the fourth quarter of 2018. In response to an analyst's question concerning Wells Fargo's commercial loans issued to customers outside of the banking system, Defendant Shrewsberry responded:

> [W]e are a participant in financing some non-banks. This has been a topic of conversation on our calls before. And so thinking about that, we did it before the last crisis and we've done it since and *we're very cautious about how we select customers, how we underwrite the credit* they're extending and the magnitude of the haircut that we require to protect our own advances, so we're very familiar with what's going on.
>
> We're also an investor, a CLO AAA investor, and were before the last crisis and

have been today, *and we think with the way loans are being originated, the way those deals are structured and our understanding and stressing of them that that's good risk return for Wells Fargo.* With respect to the impact that it has on customers, we don't have, as customers, a lot of middle-market LBO candidates. We do have sponsors as customers and other asset managers. And as it relates to our core, the core wholesale middle-market customer, they tend not to be a borrower of those other entities. And so I think that our, as Tim said, *our willingness to stand ready to lend directly to people with whom we have a relationship, that we understand when these other sources of liquidity go away will be something that we're probably taking advantage of in the event that we hit the end of the cycle. This was certainly true 10 years ago, and it might look similar this time.*

335.    Defendant Shrewsberry also pointed to the growth in Wells Fargo's commercial loan portfolio, in particular in commercial and industrial (C&I) loans, as an example of Wells Fargo's efforts to increase lending to high-quality commercial clients, stating in pertinent part as follows:

Commercial loans grew $10 billion from a year ago and $11.5 billion from the third quarter. C&I loans have grown for five consecutive quarters and increased $12.2 billion from the third quarter. . . . *This growth was broad-based across a number of our wholesale businesses and was largely to investment-grade corporate credits and high-quality middle-market borrowers.*

\* \* \*

*[W]e recognize that this credit cycle has lasted longer than most and we remain vigilant regarding credit risk.* However, we continue to have strong credit results with a net charge-off rate of 30 basis points in the fourth quarter. For the fifth consecutive quarter all of our Commercial and Consumer Real Estate loan portfolios were in a net recovery position and nonperforming assets declined $280 million, or 4% from the third quarter, and were down 16% from a year ago.

336.    Later, when responding to an analyst's question concerning Wells Fargo's commercial loans to alternative asset managers, Defendant Shrewsberry represented:

So the loans there on their probability of default and loss given default terms are *substantially higher credit quality* than the average loan on our books overall. They do tend to be a little bit bigger and thus a little bit more concentrated. *They're actively managed* because there are loans going in and lows coming out, et cetera. But as a result *we've taken these extra precautions* and that's how they would pencil out from an agency equivalency point of view.

337.    The statements referenced in ¶¶ 334–36 above were materially false and/or

misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo's commercial loans to non-bank clients (including alternative asset managers) were not of "substantially higher credit quality" and Wells Fargo was not "cautious" and "vigilant" regarding credit risk.

338.    On February 27, 2019, Wells Fargo filed with the SEC a Form 10-K for 2018. The 2018 10-K was signed by Defendants Sloan and Shrewsberry and contained SOX Certifications substantially similar to the certifications described in paragraphs 273–75. The 2018 10-K also incorporated Wells Fargo's 2018 Annual Report.

339.    The 2018 10-K stated that *"[c]redit quality remained solid in 2018, driven by continued strong performance in the commercial and consumer real estate portfolios."*

340.    The 2018 10-K also contained the following description of the purported credit quality of Wells Fargo's commercial loans:

**Credit Quality**

***Credit quality remained solid in 2018, driven by continued strong performance in the commercial and consumer real estate portfolios.*** Performance in several of our commercial and consumer loan portfolios remained near historically low loss levels and reflected ***our long-term risk focus***. Net charge-offs were $2.7 billion, or 0.29% of average loans, in 2018, compared with $2.9 billion, or 0.31%, in 2017.

Net losses in our commercial portfolio were $429 million, or 9 basis points of average commercial loans, in 2018, compared with $446 million, or 9 basis points, in 2017, driven by decreased losses in our commercial and industrial loan portfolio . . . .

The allowance for credit losses of $10.7 billion at December 31, 2018, declined $1.3 billion from the prior year. Our provision for credit losses in 2018 was $1.7 billion, compared with $2.5 billion in 2017, reflecting a release of $1.0 billion in the allowance for credit losses, compared with a release of $400 million in 2017. The release in 2018 and 2017 was due to strong underlying credit performance. Nonperforming assets (NPAs) at the end of 2018 were $6.9 billion, down 16% from the end of 2017. Nonaccrual loans declined $1.2 billion from the prior year end while foreclosed assets were down $191 million from 2017.

341.    The statements referenced in ¶¶ 339–40 above were materially false and/or

misleading for the reasons set forth in ¶ 268(i–vi), including because Wells Fargo's commercial loan portfolio was not of "solid" credit quality, Wells Fargo did not display "long-term risk focus," and Wells Fargo materially understated the reserves and impairments needed in its commercial loan portfolio.

342.    On the Company's April 12, 2019, earnings call for the first quarter of 2019, led by Defendants Parker and Shrewsberry, Defendant Parker stated in his prepared remarks that "Wells Fargo has always excelled at management of credit and market risk."

343.    During that call, Defendant Shrewsberry discussed Wells Fargo's commercial credit portfolio, stating:

> Commercial real estate loans increased $460 million from the fourth quarter, the first linked quarter increase since the first quarter of 2017. ***Our growth in the first quarter reflected our continued credit discipline and high quality loan originations as well as less run-off of previously purchased loan portfolios.***

344.    The statements referenced in ¶¶ 342–43 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo's commercial loans were not of "high quality," Wells Fargo lacked "credit discipline," and was not "excelling" at its management of credit and market risks.

345.    On April 23, 2019, Wells Fargo held its Annual General Meeting call with investors. In his prepared remarks, Defendant Parker represented that Wells Fargo was excelling at its management of credit risk:

> Wells Fargo has always ***excelled at the management of credit and market risk***, and our goal today is to bring our compliance and operational risk capabilities to that same level of excellence.

346.    The statement referenced in ¶ 345 above was materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo had not "always excelled at the management of credit and market risk" with its commercial loan portfolio.

347.     On May 3, 2019, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2019, which contained SOX Certifications by Defendants Parker and Shrewsberry identical to the certifications described in paragraphs 273–75 (except that this one was signed by Defendant Parker instead of Defendant Sloan, who was no longer CEO).

348.     This Form 10-Q stated that "[s]olid credit quality continued in first quarter 2019, as our net charge-off rate remained low at 0.30% (annualized) of average total loans."

349.     It also contained the following description of the purported high credit quality of Wells Fargo's loans:

**Credit Quality**

***Solid overall credit results continued in first quarter 2019 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.***

350.     The statements referenced in ¶¶ 348–49 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–vi), including because Wells Fargo's loan portfolio was not of "solid" or "high" credit quality, Wells Fargo did not display "long-term risk focus" with its commercial loans, and Wells Fargo materially understated the reserves and impairments needed in its commercial loan portfolio.

351.     On July 16, 2019, Wells Fargo filed a Form 8-K with the SEC that included a 2Q19 Quarterly Supplement presentation, which Defendants Shrewsberry and Parker discussed during the Company's earnings call for the second quarter of 2019 held on the same day.

352.     This presentation included a slide titled "Commercial loan trends," which stated, "CRE construction down $790MM reflecting cyclicality of commercial real estate construction projects and ***continued credit discipline***."

353.     The same presentation also included a slide "Wholesale banking," representing that Wells Fargo's "[p]rovision for credit losses decreased $106 million LQ reflecting lower

nonaccruals and an overall improvement in credit quality."

354.    The Company's July 16, 2019 Form 8-K also included a news release providing Wells Fargo's financial results for second quarter of 2019. Defendant Shrewsberry was quoted in the release as stating: "Our credit quality remained solid with net charge-offs near historic lows."

355.    On the same day, Defendant Shrewsberry participated in the Company's earnings call for the second quarter of 2019 and made the following representations concerning Wells Fargo's purported credit discipline with its CRE loans:

> Commercial real estate loans increased $105 million from the first quarter, the second consecutive linked quarter increase, as growth in mortgage lending was partially offset by run-off of construction loans, reflecting cyclicality of commercial real estate construction projects and our ***continued credit discipline***.

356.    Later in the call, Defendant Shrewsberry stated:

> ***I think our credit risks, our market risk, et cetera, have been historically very strong and continue to be today.***

357.    The statements referenced in ¶¶ 352–56 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–vi), including because the quality of Wells Fargo's commercial loan portfolio was not "solid," Wells Fargo did not display "credit discipline," and Wells Fargo's credit and market risks were not "strong."

358.    On August 2, 2019, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2019, which contained SOX Certifications by Defendants Parker and Shrewsberry identical to the certifications described in paragraphs 273–75.

359.    This Form 10-Q stated that "[s]olid credit quality continued in second quarter 2019, as our net charge-off rate remained low at 0.28% (annualized) of average total loans."

360.    It also contained the following description of the purported high credit quality of Wells Fargo's loans:

**Credit Quality**

*Solid overall credit results continued in second quarter 2019 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.*

361. The statements referenced in ¶¶ 359–60 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–vi), including because Wells Fargo's commercial loan portfolio was not of "solid" or "high" credit quality, Wells Fargo did not "originate high quality" commercial loans, and Wells Fargo did not display "long-term risk focus" with its commercial loan portfolio.

362. On September 24, 2019, Defendant Myers moderated a panel entitled "The Future of Real Estate Finance," during the DLA Piper's 15th Global Real Estate Summit. During his prepared remarks, Defendant Myers made the following statements concerning delinquencies in Wells Fargo's commercial real estate portfolio:

> Setting the stage for the business . . . delinquencies are at an all time low in a debt space, less than 1% or about 70 basis points of delinquency, to put that in perspective, at the height of the great Financial Crisis delinquencies were about 9%, so we are operating at extremely low levels of delinquency.[42]

363. The statements referenced in ¶ 362 above were materially false and/or misleading for the reasons set forth in ¶ 268(iv–v), including because Wells Fargo's CRE portfolio was not prepared to withstand market stress.

364. On October 15, 2019, Wells Fargo filed a Form 8-K with the SEC, that included a 3Q19 Quarterly Supplement presentation, discussed by Defendants Shrewsberry and Parker during the Company's earnings call for the third quarter of 2019 held on the same day.

365. This presentation included a slide titled "Commercial loan trends." The slide included the following representations concerning Wells Fargo's purported credit discipline with

---

[42] The Future of Real Estate Finance, DLA Piper 15th Global Real Estate Summit, September 24, 2019, Chicago, IL, video *available at* https://www.youtube.com/watch?v=j9w026JG9lU.

its CRE loans:

> CRE mortgage down $1.1B reflecting liquidity in the commercial mortgage-backed securities (CMBS) market, as well as ***continued credit discipline***, which was partially offset by origination growth.

366.    The statement referenced in ¶ 365 above was materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii–iv), (vi), including because Wells Fargo lacked "credit discipline" with its CRE loans.

367.    On the same day, Defendant Shrewsberry participated in the Company's earnings call for the third quarter of 2019 and made the following representations concerning the purported strong credit quality of Wells Fargo's commercial loans:

> Commercial loans were stable linked-quarter as growth in C&I loans and lease financing was largely offset by declines in commercial real estate loans. . . .

> Commercial real estate loans declined $2.2 billion from the second quarter with declines in both commercial real estate mortgage and commercial real estate construction loans, reflecting increased market liquidity, higher refinancing activity and ***continued credit discipline***.

> We've been successfully regaining market share while maintaining ***our credit discipline***.

> We continue to have ***strong credit results*** with our net charge-off rate declining to 27 basis points in the third quarter. ***All of our commercial*** and consumer real estate portfolios were in a net recovery position in the third quarter.

> . . .

> ***We closely monitor our commercial portfolio for signs of weakness and credit quality indicators remain strong***.

> ***Our internal credit grades are at the strongest levels in two years and since third quarter of 2017, our criticized loan balances have declined 20%, with a broad-based improvement across all commercial asset classes***.

368.    In response to an analyst's question concerning Wells Fargo's CRE portfolio, Defendant Shrewsberry represented that Wells Fargo was exceedingly careful in issuing CRE loans, stating in relevant part: ***"[S]o we really have to pick our spots in order to maintain our risk reward, credit and pricing in loan terms quality."***

369.    The statements referenced in ¶¶ 367–68 above were materially false and/or misleading for the reasons set forth in ¶_268(i–vi), including because the credit quality of Wells Fargo's commercial loan portfolio was not "strong," Wells Fargo lacked "credit discipline" with its commercial portfolio, and Wells Fargo materially understated the reserves and impairments needed in its commercial loan portfolio.

370.    On November 1, 2019, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2019, 3Q19, which contained SOX Certifications by Scharf and Defendant Shrewsberry identical to the certifications described in paragraphs 273–75 (except that this one was signed by Scharf instead of Defendant Parker, who was no longer CEO).

371.    This Form 10-Q stated that "[s]olid credit quality continued in third quarter 2019, as our net charge-off rate remained low at 0.27% (annualized) of average total loans."

372.    It also contained the following description of the purported high credit quality of Wells Fargo's loans:

**Credit Quality**

***Solid overall credit results continued in third quarter 2019 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus.***

373.    The statements referenced in ¶¶ 371–72 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–vi), including because Wells Fargo's loan portfolio was not of "solid" or "high" credit quality, Wells Fargo did not display "long-term risk focus" with its commercial loan portfolio, and it materially understated the reserves and impairments needed in its commercial loan portfolio.

### D.    The 2020 Statements

374.    On January 14, 2020, Wells Fargo filed a Form 8-K with the SEC, that included a 4Q19 Quarterly Supplement presentation, which Scharf and Defendant Shrewsberry discussed

during the Company's earnings call for the fourth quarter of 2019 held on the same day.

375.    This presentation included a slide titled "Commercial loan trends" that stated: "CRE mortgage down $112MM reflecting *continued credit discipline*, which was partially offset by origination growth."

376.    The statement referenced in ¶ 375 above was materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii–iv), (vi), including because Wells Fargo lacked "credit discipline" with its CRE loans.

377.    Also on January 14, 2020, Wells Fargo held its earnings call for the fourth quarter of 2019, led by Scharf and Defendant Shrewsberry. In his prepared remarks, Defendant Shrewsberry stated that "we continue to have strong credit results with 32 basis points of net charge-offs in the fourth quarter." He continued: ***"Overall credit quality indicators in our commercial portfolio remained strong with our fourth quarter internal credit grades at their strongest levels in two years."***

378.    Later, in response to an analyst's question, Defendant Shrewsberry stated that Wells Fargo's ***"total CLO exposure is about $38 billion,"*** which he reassured investors was ***"an asset class that we feel comfortable with the risk reward."***

379.    The statements referenced in ¶¶ 377–78 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–vi), including because Wells Fargo's commercial loan portfolio was not of "strong" credit quality and Wells Fargo's CLO exposure was not an asset class that posed a favorable balance of risk and reward.

380.    On January 20, 2020, Defendant Myers participated in a podcast entitled "Leading

Voices in Real Estate with Host Matt Slepin."[43] During the podcast, Defendant Myers reflected on his 40-year career with Wells Fargo and its becoming the number one commercial real estate lender over the course of the prior 10 years, during his leadership as Wells Fargo's Head of Commercial Real Estate.

381.    Defendant Myers gave the following explanation of Wells Fargo's commercial real estate practices:

> **Myers**: Our commercial real estate finance platform, which we view as an industry leading platform . . . we are actively in the balance sheet lending business today, about 150 billion dollars of balance sheet commitments to the real estate industry, we are active in a CMBS space, we are a large mortgage servicer, we are the largest in the country, largely as a master servicer, we service 500 billion dollars worth of loans, largely for others[.] ***CMBS market [is] very robust, very liquid today. I would tell you one of the defining moments . . . of this recovery coming out of the Financial Crisis is how disciplined the debt lenders actually have been, pretty remarkable.***
>
> **Host**: And you've seen times with discipline was . . .
>
> **Myers**: . . . We had an opportunity to continue to grow the business, at which I was in the forefront of doing.
>
> **Host**: If you come from that place, you are coming from underwriting, you are coming from debt, ***or you are coming from a conservative approach to knowing how to take risk***.
>
> **Myers**: ***Absolutely, Absolutely*** . . .
>
> **Host**: Alongside that the bank is probably getting into CMBS and is probably getting in GSE lending, neither of which have the same level of risk, but have a lot of production . . .
>
> **Myers**: Yes, Yes . . .

---

[43] Leading Voices in Real Estate with Host Matt Slepin, *Mark Myers | EVP and Head of Commercial Real Estate at Wells Fargo* (Jan. 20, 2020), *available at* https://leadingvoicespodcast.com/mark-myers-real-estate/. This podcast was also broadcast publicly where podcasts are generally available, such as the Apple Podcasts app and other standard formats.

382.    Later in the interview, when discussing Wells Fargo's involvement with CMBS, Defendant Myers explained that "[t]here are risks you clearly don't take. And, by the way, you never do something that you don't understand. Never, never. . . . Again, in the environment where generally we are more conservative, more cautious. I am personally more cautious, more conservative."

383.    Then, when describing Wells Fargo's CRE lending practices after the Financial Crisis, Defendant Myers explained:

> We approach the business very much from a traditional commercial bank perspective, which is we are a lender first*. And even though we are originating a CMBS loan for sale, we have to feel good that at the end that's a loan we will make and will be happy to own on our balance sheet.*
> Our value proposition, our customers is that *we will be the best risk managers on the planet. We will guide in control and manage . . . your dollars.*

384.    Finally, when discussing the state of the industry, Defendant Myers stated that "[t]he industry . . . is reasonably *well-disciplined. Some people may choose to lose their way; it hasn't happened yet, thankfully.*"

385.    The statements referenced in ¶¶ 381–84 above were materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii–iv), (vi), including because Wells Fargo's was not "disciplined," "cautious," or "conservative" with its CRE loans.

386.    On February 27, 2020, Wells Fargo issued its 2019 Annual Report, which was incorporated into the Company's 2020 10-K that was signed by Scharf and Defendant Shrewsberry. Wells Fargo emphasized that "*[c]redit quality remained solid in 2019, as losses remained low and we continued to originate high-quality loans, reflecting our long-term risk focus.*"

387.    The statement referenced in ¶ 386 above was materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo's commercial loans were

not of "high quality," the quality of Wells Fargo's commercial loan portfolio was not "solid," Wells Fargo did not display "long-term risk focus" with its commercial loans, and Wells Fargo materially understated the reserves and impairments needed in its commercial loan portfolio.

388.    On February 27, 2020, Defendant Shrewsberry participated in the Credit Suisse 21st Annual Financial Services Forum and made the following representations concerning Wells Fargo's purported credit discipline and caution with its commercial loan portfolio:

> Since 2016, commercial loans have increased $9.2 billion as growth in C&I loans was partially offset by declines in commercial real estate loans **reflecting continued credit discipline**.
>
> Commercial real estate, we've probably been a little bit more **cautious** than others.

389.    The statements referenced in ¶ 388 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo lacked "credit discipline" and was not "more cautious than others" with its commercial loans.

390.    On February 27, 2020, Defendant Kara McShane, who replaced Defendant Myers as the Head of Wells Fargo's Commercial Real Estate, made the following statements concerning Wells Fargo's purported disciplined approach with its CRE loans in an interview with *Commercial Property Executive*:[44]

> We have deep expertise across our various CRE disciplines, and we have enjoyed market-leading positions across many businesses. A key reason is our long-standing relationships built on trust and certainty of execution. **Our clients have come to rely on our disciplined approach, which enables us to lend throughout market cycles.**
>
> CRE is a large and important business for Wells Fargo. It's one of our core competencies and will remain an important part of the Wells Fargo franchise in 2020 and beyond**. We believe our CRE platform is "best-in-class," which aligns well with our new CEO Charlie Scharf's priority of serving our clients with the highest operational and ethical standards**.

---

[44] Alexandra Both, *A Conversation with Wells Fargo's New Head of CRE*, Commercial Property Executive (Feb. 27, 2020), https://www.commercialsearch.com/news/a-conversation-with-wells-fargos-new-head-of-cre/.

*Wells Fargo CRE has long maintained a prudent and disciplined approach to risk and credit, as evidenced by the solid credit quality of our portfolio and the historical performance of our business.*

391.    The statements referenced in ¶ 390 above were materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii–iv), (vi), including because Wells Fargo's CRE loans were not of "solid credit quality," Wells Fargo's CRE platform was not "best in class," and Wells Fargo did not display "a prudent and disciplined approach" with its CRE loans.

392.    Then, even as Wells Fargo began to reveal the devastating losses from its commercial lending business, it reassured investors about its ability to withstand the market stress in 2020 because of its strong credit discipline in its commercial lending business.

393.    On May 5, 2020, Wells Fargo filed a Form 10-Q with the SEC for the first quarter of 2020 that contained SOX Certifications by Scharf and Defendant Shrewsberry identical to the certifications described in paragraphs 273–75.

394.    This Form 10-Q stated:

**Credit Quality**

**COMMERCIAL CREDIT QUALITY INDICATORS** We manage a consistent process ***for assessing commercial loan credit quality***. Generally, ***commercial loans are subject to individual risk assessment using our internal borrower and collateral quality ratings, which is our primary credit quality indicator.*** Our ratings are aligned to federal banking regulators' definitions of pass and criticized categories with the criticized category including special mention, substandard, doubtful, and loss categories.

395.    The statements in paragraph 394 concerning Wells Fargo's purported due diligence and individual risk assessment of its commercial loans were repeated in Wells Fargo's Form 10-Q for the second quarter of 2020, filed with the SEC on August 4, 2020. The August 4, 2020 Form 10-Q SOX Certifications by Scharf and Defendant Shrewsberry identical to the certifications described in paragraphs 273–75.

396.    The statements referenced in ¶¶ 394–95 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), including because Wells Fargo was not properly "assessing commercial loan credit quality" and it materially understated the reserves and impairments needed in its commercial loan portfolio.

397.    On June 10, 2020, Defendant Shrewsberry participated in the 2020 Morgan Stanley Virtual US Financials Conference and made the following representations concerning Wells Fargo's CRE portfolio:

> On commercial real estate, we have a big book. We're probably $150 billion all in of commercial real estate, including construction. You can't really see this from the outside, but *on an LTV basis, oh, gosh, 90% -- more than 90% of that book has less than 70% loan-to-value based on our own underwriting of that*.

398.    The statements referenced in ¶ 397 above were materially false and/or misleading for the reasons set forth in ¶ 268(i), (iii–iv), (vi), including because Wells Fargo failed to follow its underwriting standards for LTV ratios.

399.    During the same 2020 Morgan Stanley Virtual US Financials Conference, in response to an analyst's question concerning Wells Fargo's "credit playbook" for a recession, Defendant Shrewsberry responded:

> We changed some of our products and some of our risk tolerances.
>
> There are other measures that are less advertised just in terms of tolerances for the risky end of the spectrum when we're lending for layered risks in areas where you may have more than one thing that's -- *that is high risk in a particular credit situation. We'll back away from that a little bit to make sure that we're prepared for what might happen*, whether it's the unemployment, home price appreciation, *commercial real estate value direction*, the leverage in corporate credit, et cetera.

400.    Later in the call, in response to an analyst's question about Wells Fargo's anticipated reserve build in its commercial loan portfolio, Defendant Shrewsberry stated:

> As we go book by book, and, I guess, even from the outside, you can see that in our C&I categories, we have -- we talk a lot about the book of loans that we have to nondepository financial institutions, which I would describe as entirely secured or

almost entirely secured. . . . [I]t's usually – it's receivable secured. . . . And then *we'll have an attachment point that creates credit enhancement up to a level that we can withstand anything like the shocks that we're talking about*. . . . *[C]ompared to the average fully leveraged C&I loan, you'd describe it as a safer category of lending.* And that's a big category for us. . . .

We also have a big book of commercial loans. . . . [W]e will have losses in those portfolios. On commercial real estate, we have a big book. We're probably $150 billion all in of commercial real estate, including construction. You can't really see this from the outside, but *on an LTV basis, oh, gosh, 90% -- more than 90% of that book has less than 70% loan-to-value based on our own underwriting of that*. So there's a lot of room. . . . So we'll have losses. We'll have people who just can't make it. *But the way we underwrite it, the way we service it, the customers we select, in general, for our commercial real estate business, we expect to perform well through the cycle*.

401.    The statements referenced in ¶¶ 399–400 above were materially false and/or misleading for the reasons set forth in ¶ 268(i–iv), (vi), including because Wells Fargo's risk tolerances were not "prepared for what might happen," Wells Fargo's C&I loans were not able to "withstand anything like the shocks that we're talking about," and Wells Fargo's commercial real estate business failed to follow its underwriting standards for LTV ratios.

402.    On July 14, 2020, Defendant Shrewsberry participated in the Company's earnings call for the second quarter of 2020 and made the following representations concerning the purported high credit quality of Wells Fargo's CRE portfolio:

Turning to our commercial real estate portfolio . . . we are the nation's largest commercial real estate lender and our portfolio is well diversified both by property type and geography. Our *commercial real estate loans are subjected to rigorous underwriting standards* and are well structured.

403.    The statements referenced in ¶ 402 above were materially false and/or misleading for the reasons set forth in ¶ 268(iii), including because Wells Fargo was not subjecting its CRE loans to "rigorous underwriting standards."

## VI.    THE TRUTH BEGINS TO EMERGE

404.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the economic loss suffered by Lead Plaintiff and the Class.

405.    Throughout the Class Period, the price of Wells Fargo securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

406.    The price of Wells Fargo's securities significantly declined when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Wells Fargo's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

407.    In particular, the corrective disclosures described below revealed that despite Defendants' many misrepresentations concerning the purportedly strong credit quality of Wells Fargo's commercial loans, their poor credit quality caused Wells Fargo to experience a stunning deterioration in its commercial credit portfolio.

### A.    Disclosures From the First Quarter of 2020

408.    Before the market opened, on April 14, 2020, Wells Fargo announced its results for the quarter ended March 31, 2020 ("1Q20"). The 1Q20 release revealed an astonishing deterioration in Wells Fargo's commercial credit portfolio.  Wells Fargo stated that it was taking a massive $4 billion provision expense (compared with a $845 million provision expense in the first quarter of 2019) to account for expected credit delinquencies, which included $940 million in net charge-offs on loans and debt securities and a $3.1 billion reserve build. Moreover, Wells Fargo's total allowance for credit losses (ACL) at period-end increased 15% to $12.0 billion, despite a $1.3 billion decline as a result of an accounting change due to the adoption of the current expected credit loss, or "CECL," model. Additionally, total credit losses were $909 million during

the quarter, up $140 million compared to the prior quarter.

409. Wells Fargo also revealed the following details about its losses in its commercial lending business:

- Out of the Company's $4 billion provision for expected credit delinquencies, Wells Fargo allocated $2.24 billion for losses on commercial loans (after adjusting for its recent accounting change).

- Net charge-offs as a percentage of average loans in the commercial portfolio more than doubled year over year to 0.25%, based on an increased $121 million in net charge-offs for commercial loans.

- Nonperforming assets increased $759 million, or 13%, over the prior quarter, predominantly on higher commercial nonaccruals, while commercial nonaccrual loans increased by $621 million.

- Wells Fargo took a $171 million provision expense for commercial debt securities.

410. Also, on April 14, 2020, during market hours, Wells Fargo held an earnings call with analysts and investors to discuss its 1Q20 financial results. The accompanying slide deck disclosed that the credit quality of Wells Fargo's commercial and industrial (C&I) loan portfolio deteriorated because Wells Fargo's commercial and industrial losses were "up 9 bps." In addition, Wells Fargo's nonperforming assets went up "$759 million predominantly on higher commercial nonaccruals."

411. The market reacted very negatively to Wells Fargo's disclosure of the terrible performance of its commercial loans. On April 14, 2020 *The Wall Street Journal* published an article "Wells Fargo Profit Drops 89% as it Girds for Soured Loans; Bank sets aside $3.83 billion to cover potential losses on loans to borrowers hurt by coronavirus." The article reported that Wells Fargo's results "missed analyst expectations" and that "[t]he bank has begun setting aside money to cover losses on loans to customers that were hurt by the coronavirus and may not be able to pay their mortgages on commercial loans. Wells Fargo said it has set aside $3.83 billion to cover

potential loan losses, up more than $3 billion from the previous quarter."

412.    On the same day, several market analysts reacted swiftly to the news. For example, Morningstar Equity Research published a report discussing Wells Fargo's "tough first quarter." The report stated:

> Wells Fargo reported difficult first-quarter results. . . . This was expected on some level, given the impact of the COVID-19 pandemic on the global economy, however, it would have been impossible to predict the exact amount of reserves the bank was going to book in preparation for the upcoming downturn. This was one of the main "unknowns" going into earnings, and the bank ended up booking $4 billion in reserves during the quarter. For context, Wells Fargo recorded less than $3 billion in reserves for all of 2019. . . . In addition to higher reserves, Wells Fargo also saw almost $1 billion in securities impairments, and losses and revaluations within the mortgage portfolio caused mortgage-related income to come in below our original expectations.

413.    Similarly, on April 14, 2020, UBS issued a report entitled "Mixed first take on 1Q20 results." UBS stated that "WFC reported EPS of $0.01, below our operating EPS estimate of $0.45 and the FactSet consensus $0.57. A large driver of the lower than expected EPS were material reserve builds. Provisions for credit losses amounted to $4.0 bn, well above our $2.7 bn estimate. WFC built credit loss reserves of $3.1 bn, vs. our $1.9 bn estimate (net of $0.23/share)."

414.    The price of Wells Fargo stock fell 3.98%, or $1.25 per share, on April 14, 2020, to close at $30.18 per share (from a closing price of $31.43 per share on April 13, 2020).

415.    After Wells Fargo's devastating disclosure on April 14, 2020, including on its earnings call during market hours, its stock continued to plunge over the next two trading days as market analysts continued to process its results. On April 15, 2020 *The Wall Street Journal* published an article "Big Banks' Profits Plunge As Losses on Loans Loom." The article reported that "Wells Fargo said it set aside and additional roughly $3 billion in the quarter for potentially bad loans, both in the consumer and commercial divisions. That raised its total provision to $3.83 billion."

416.    Similarly, J.P. Morgan reported on April 15, 2020 that "Wells Fargo added $1.9 bil in reserves for commercial loans[.]" The report also noted that Wells Fargo's criticized loans increased by $4 billion or about 4.3% of commercial loans. Additionally, the report noted that Wells Fargo's "[c]redit quality saw some deterioration," including its non-performing loans "and criticized loans up sharply." The report also highlighted Wells Fargo's "jump in C&I losses (0.37% v. 0.19% in 4Q19)[.]"

417.    The price of Wells Fargo stock continued to plummet, falling 5.77%, or $1.74 per share, to close at $28.44 per share on April 15, 2020 (from a closing price of $30.18 per share on April 14, 2020).

418.    Then, on April 16, 2020, *The Boston Globe* published an article "Banks brace for loan defaults by US, global customers" in which it noted that Wells Fargo "reported even steeper drops in profit" as compared to Bank of America and Citigroup, as Wells Fargo "also set aside large sums to cover loan losses."

419.    The price of Wells Fargo stock continued to fall as the market continued to process the scope of Wells Fargo's losses and that it performed worse than its peers.  The Company's stock price fell $5.45%, or $1.55 per share, to close at $26.89 per share on April 16, 2020 (from a closing price of $28.44 per share on April 15, 2020).

420.    In total, Wells Fargo's stock price fell by $4.54 per share, or 14.4%, over the course of the three trading days from April 14, 2020 through April 16, 2020.

421.    On May 5, 2020, during market hours, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 1Q20, which stated that the fair value of Wells Fargo's CLO investments held-for-sale had fallen to $26.9 billion by the quarter's end, a 9% decline from the end of FY19, and that Wells Fargo had suffered $1.7 billion in unrealized losses on its CLO investments during

the quarter. The quarterly report specifically explained that:

- Commercial portfolio net loan charge-offs were $324 million, or 25 basis points (annualized) of average commercial loans, in first quarter 2020, compared with net loan charge-offs of $145 million, or 11 basis points (annualized), a year ago,

- Commercial nonaccrual loans increased to $2.9 billion at March 31, 2020, compared with $2.3 billion at December 31, 2019.

- Wells Fargo internally classified $20.5 billion of its commercial and industrial loan and lease financing portfolio as "criticized," compared with $16.6 billion at December 31, 2019.

- CRE nonaccrual loans totaled 0.67% of the CRE outstanding balance at March 31, 2020, compared with 0.43% at December 31, 2019.

- On March 31, 2020, Wells Fargo had $4.1 billion of criticized CRE mortgage loans, compared with $3.8 billion at December 31, 2019, and $222 million of criticized CRE construction loans, compared with $187 million at December 31, 2019.

422.    On May 5, 2020, *PYMTNS.com* published an article "Today in Payments: Analysts Say Wells Fargo Road to Recovery Will Be Tough; N26 Notches $100M Amid Pandemic Uncertainty." The article reported that "[a]nalysts at UBS Securities lowered Wells Fargo's rating and earnings forecast, saying the bank will have a tougher time bouncing back from the pandemic — more so than other financial institutions."

423.    On this news, the price of Wells Fargo stock fell 3.77%, or $1.03 per share, to close at $26.32 per share on May 5, 2020 (from a closing price of $27.35 per share on May 4, 2020).

424.    The price of Wells Fargo stock continued to fall sharply the following day, dropping 2.69%, or $0.71 per share, to close at $25.61 per share on May 6, 2020 (from a closing price of $26.32 per share on May 5, 2020).

425.    In total, Wells Fargo's stock fell by $1.74 per share, or 6.36%, over the course of two trading days from May 5, 2020 (when Wells Fargo filed its quarterly report during market hours) to May 6, 2020.

**B.      Disclosures From the Second Quarter of 2020**

426.      Wells Fargo's announcements from the first quarter of 2020 did not fully reveal the extent of the weakness of Wells Fargo's commercial loan portfolio because Defendants reassured investors about Wells Fargo's ability to withstand the market stress. For example, in addition to the false and misleading statements from this time period described above—and the fact that Defendants still did not reveal their misrepresentation of the credit quality of Wells Fargo's commercial loans—on the Company's earnings call for the first quarter of 2020, held on April 14, 2020, Scharf stated, "I think we feel like the portfolios that we have are stronger than they were at other downturns as I think they certainly are in many banks out there. . . . And again what we know is, we're strong and the industry is strong to be able to handle this."

427.      The market was therefore surprised as that weakness was further revealed, and continued to materialize, when Wells Fargo announced even steeper losses that accelerated during the second quarter of 2020.

428.      On June 10, 2020, during market hours, Defendant Shrewsberry presented at the Morgan Stanley Virtual US Financials Conference. During the conference, Defendant Shrewsberry revealed that Wells Fargo's second quarter reserve build would be even "bigger than the first quarter," as a result of continued deterioration in Wells Fargo's credit portfolio.

429.      On the same day, *Bloomberg Law* published an article "Wells Fargo Dips on Forecast for Higher Loan-Loss Provisions." The article reported that "Wells Fargo & Co. shares fell as much as 8.3% after the bank's chief financial officer predicted higher loan-loss provisions in the current quarter and a sharp drop in interest income this year. . . . He also said the bank will set aside more for bad loans this quarter than the first quarter's $4 billion." The article further noted that Wells Fargo's provision forecast "differed from the optimism expressed" by Wells Fargo's peers. For example, Morgan Stanley's CEO announced that his firm would post a smaller

loan-loss provision than in the first quarter.

430.    Similarly, on June 10, 2020, *Dow Jones Institutional News* published an article "Financial Services Roundup: Market Talk." The article reported that "Wells Fargo expects to set aside more money to cover the cost of bad loans for this quarter. John Shrewsberry, CFO of Wells Fargo, says it's not yet clear how big the troubled lender's reserve build will be for 2Q, but he expects it will be bigger than the first, when the bank set aside $3.1B. . . . Shrewsberry says the bank has been asking some of its employees who originate loans to work on resolutions for borrowers whose loans could go bad."

431.    The price of Wells Fargo stock fell 8.95%, or $2.92 per share, to close at $29.71 per share on June 10, 2020 (from a closing price of $32.63 per share on June 9, 2020).

432.    Then, on June 11, *Bloomberg Law* published an article "Wells Fargo, BofA Extend Plunge After Wednesday 'Slaughter.'" The article reported that "[b]ig bank stocks tumbled into a third session in early Thursday trading, with Wells Fargo compounding losses after its chief financial officer predicted sinking net interest income and higher reserves at Morgan Stanley's financial conference on Wednesday." The article stated that "WFC sank as much as 8.9%, bringing 3-day losses to as much as 19%." The article also quoted a Vital Knowledge's analyst: "'[t]he banks were slaughtered on Wednesday' after WFC's update." In other words, Wells Fargo's losses were so severe that they even caused the price of other banks to fall.

433.    The price of Wells Fargo stock fell 9.83%, or $2.92 per share, to close at $26.79 per share on June 11, 2020 (from a closing price of $29.71 per share on June 10, 2020).

434.    In total, Wells Fargo's stock price fell by $5.84 per share, or 17.9%, over the course of the two trading days from June 10, 2020 to June 11, 2020.

435.    Then, on July 14, 2020, before the market opened, Wells Fargo announced its

results for the quarter ended June 30, 2020 ("2Q20"). The 2Q20 release stated that Wells Fargo was taking a stunning $9.5 billion provision expense to account for expected credit delinquencies – more than double the massive provision Wells Fargo had taken in 1Q20. The accompanying slide deck also stated that Wells Fargo's total allowance for credit losses ("ACL") increased to $20.4 billion by period-end, or 2.19% of total loans, nearly double Wells Fargo's ACL at the end of FY19.

436. The 2Q20 release and the accompanying slide deck specifically explained that:

- Wells Fargo's $9.5 billion provision expense included $1.1 billion in net charge-offs on loans and debt securities, mostly occurring in Wells Fargo's commercial loan portfolio, and an $8.4 billion increase in ACL.

- Wells Fargo had suffered a $2.4 billion loss during the quarter, or $0.66 per share, largely as a result of deterioration in its commercial credit portfolio.

- $6.4 billion of the $8.4 billion total ACL increase was in commercial loans, mainly in the commercial real estate and commercial and industrial portfolios.

- Wells Fargo raised its ACL for the commercial loans from $5.279 billion in the first quarter to $11.669 billion in the second quarter of 2020.

- Net charge-offs as a percentage of average loans in the commercial portfolio skyrocketed to 0.44%, compared to just 0.13% in the comparable prior-year period.

- Nonperforming assets similarly spiked 22% compared to 1Q20 to $7.8 billion, predominantly due to a $1.4 billion increase in commercial nonaccrual loans.

- Commercial losses increased $278 million partially driven by higher losses in commercial real estate.

437. Also, on July 14, 2020, during market hours, Wells Fargo held an earnings call to discuss its 2Q20 financial results. The Defendants stated in the accompanying slide deck that:

- Wells Fargo had commercial criticized assets of $38.2 billion, up an astounding 53% sequentially, due to a $7.2 billion increase in criticized C&I loans and a $6.1 billion increase in criticized CRE loans, which had increased 140%.

- Nonaccruals in the "Financials except banks" subcategory of C&I loans, which included loans to CLO providers, more than doubled to $219 million, while CRE

loans in nonaccrual increased 30% sequentially to $1.3 billion.

- For the "Real estate and construction" category, the nonaccrual loans also increased $241 million from the first quarter.

- Wells Fargo's C&I and lease financing nonaccrual loans went up $1.1 billion, or 59%, from the prior quarter, to $3.0 billion.

438.    On July 14, 2020, *The Wall Street Journal* published an article "Wells Fargo Swings to First Loss in More Than a Decade." The article reported that "Wells Fargo &Co. posted its first quarterly loss in more than a decade and socked away nearly $10 billion to prepare for a wave of loan defaults. . . . The bank set aside the most in its commercial banking unit, where it expects losses to rise in its hotel, restaurant and retail portfolios. It is also seeing higher charge-offs in its oil and gas and commercial real-estate portfolios. That unit provisioned $6.03 billion on top of the $2.29 billion it socked away in the first quarter."

439.    Similarly, on July 14, 2020, *The New York Times* published an article "Wells Fargo reports first quarterly loss in more than a decade." The article reported that "[i]n a sign of more trouble ahead, the bank added $8.4 billion to its reserve for loan losses, more than twice what it set aside last quarter. It said it would, for the first time since the Great Recession, cut its dividend this quarter, dropping its payments to investors to 10 cents a share, down from the 51 cents it has paid for the last few quarters." The article further explained: "Wells Fargo is bracing for coming losses on its commercial loans, especially in real estate, where it set aside $6.4 billion." The article also quoted Scharf, who was "extremely disappointed" with the bank's performance.

440.    Furthermore, on July 14, 2020, *CNN Wire Service* reported that Wells Fargo "lost 66 cents per share, more than three times as much as feared. It's Wells Fargo's first loss since late 2008 during the height of the financial crisis." The article further explained that most of Wells Fargo's $8.4 billion increase in allowance for credit losses from the prior quarter "was driven by

commercial and residential real estate loans." The article concluded that "[i]t was Wells Fargo's highest quarterly provision for bad loans in the bank's history, topping even the fourth quarter of 2008." In addition, the article quoted an Edward Jones analyst who described Wells Fargo's numbers as "awful."

441.    On the same day, several analysts stated that Wells Fargo's reserve build for the second quarter of 2020 significantly exceeded their forecasts. Credit Suisse stated that Wells Fargo's reserve build for credit losses was "$8.4bn vs. our forecast of $5.1bn." Similarly, Deutsche Bank reported that "2Q results of a loss of $0.66 (vs. consensus of +$0.10) were weaker than expected given much larger than expected loan loss reserve build (of $8.4b vs. $3.1b in 1Q)[.]" Furthermore, UBS, in a report entitled Wells Fargo's "[s]izeable operating loss in 2Q20," stated that "[a]fter a sizeable reserve build this quarter (of $8.4b) the ACL ratio increased to 2.19% up from 1.19% at 3/31/20."

442.    The price of Wells Fargo stock declined on this news, falling 4.57%, or $1.16 per share, to a closing price of $24.25 per share on July 14, 2020 (from a closing price of $25.41 per share on July 13, 2020).

C.    **Disclosures From the Third Quarter of 2020**

443.    The market was still not fully apprised of the extent of the weakness in Wells Fargo's commercial loans. On October 14, 2020, before the market opened, Wells Fargo announced its results for the quarter ended September 30, 2020 ("3Q20"). The 3Q20 release stated that Wells Fargo had recognized another provision expense of $769 million and that non-accrual loans had increased $2.5 billion, or 45%, to $8 billion during the quarter. The 3Q20 release specifically explained that:

- Commercial nonaccrual loans increased by $113 million from the second quarter of 2020, driven by increases in the commercial real estate mortgage and lease financing portfolios.

- The release also revealed that the ACL for commercial loans increased from $6.245 billion in the fourth quarter of 2019 to $11.542 billion in the third quarter of 2020.

- Wells Fargo's commercial nonaccrual loans increased from $2.312 billion in the third quarter of 2019 to $4.398 billion in the third quarter of 2020.

- Wells Fargo's commercial loans 90 days or more past due and still accruing increased from $34 million in the third quarter of 2019 to $108 million in the third quarter of 2020.

444.    Also, on October 14, 2020, before the market opened, Wells Fargo held an earnings call to discuss its 3Q20 financial results. During the call, Defendant Shrewsberry stated: "[w]e increased our qualitative reserves, reflecting a variety of factors, including our exposure to significantly impacted industries, the limited transaction activity and wide variability in market valuations for property types in our commercial real estate portfolio, and the elevated default risk for borrowers as payment deferral programs end." Shrewsberry warned that further deterioration had largely been forestalled as a result of short-term customer accommodations by the Company and government assistance, stating that "customer accommodations we've provided since the start of the pandemic could delay the recognition of net charge-offs, delinquencies, and non-accrual status." He continued: "[T]here is increased uncertainty in economic forecasts that vary widely and future credit performance may deteriorate as stimulus effects that benefited recent credit performance come to an end."

445.    The accompanying slide deck specified that:

- Wells Fargo's commercial nonaccruals increased $113 million on higher commercial real estate nonaccruals (which increased by $126 million).

- Wells Fargo's criticized assets for its commercial real estate loans were $12.7 billion, up $2.3 billion, or 22%, as compared to the prior quarter.

446.    On October 14, 2020, *AFP International Text Wire* published an article "Goldman Sachs profits surge despite pandemic." The article reported that, in contrast to Goldman Sachs's

success, Wells Fargo's "[r]evenues fell 14.3 percent to $18.9 billion. . . . A Wells Fargo presentation showed a lower sum of overdue loans in the commercial and industrial segments, but a jump in overdue loans for commercial real estate clients." The article further reported that shares of Wells Fargo "dropped 6.0 percent to $23.25."

447.    Similarly, *Investors Business Daily* published an article on October 14, 2020, titled "Goldman Sachs Earnings Crush Views After Bank of America, Wells Fargo Disappoint." The article reported that "Wells Fargo stock sank 6% to 23.25. Wells Fargo is the weakest of the bank stocks reporting Wednesday[.]"

448.    On the same day, analysts commented on Wells Fargo's disappointing Q3 results for its commercial loans. CFRA reported that "[c]ommercial non-accrual loans increased $113 million in Q3 2020 compared to $1.4 billion in Q2 2020. These nonperforming assets were mostly for commercial real estate mortgage and lease finance portfolios."

449.    As *Dow Jones Institutional News* reported the following day (October 15, 2020), Wells Fargo's "3Q20 results . . . continue to lag expectations and may result in more acute ratings pressure in the near term."

450.    The price of Wells Fargo stock continued to plummet following the announcements of its third quarter 2020 results.  The stock price fell 6.02%, or $1.49 per share, to close at $23.25 per share on October 14, 2020 (from a closing price of $24.74 per share on October 13, 2020).

451.    In total, over the course of 2020, Wells Fargo suffered devastating losses in its commercial lending business. By the end of the second quarter, the Company had $11.669 billion in allowances for credit losses in its commercial loan portfolio, which was 2.27% of the Company's $513 billion of commercial loans outstanding. In addition, Wells Fargo had $38.2 billion in commercial criticized assets (which was 7.4% of its commercial loan portfolio), a $1.4

billion increase in commercial nonaccrual loans, and $1.1 billion in net charge-offs on loans and debt securities mostly in its commercial loan portfolio (with net charge-offs as a percentage of average loans in the commercial portfolio skyrocketing to 0.44%). The deterioration in the Company's commercial loans then continued in the third quarter—and would have been even worse if not for the government's and the Company's short-term assistance to borrowers—when its allowance for credit losses in its commercial loan portfolio increased to 2.39% of the total commercial portfolio, the Company had a $2.3 billion (or 22%) increase in its criticized commercial real estate loans (bringing the total amount of criticized commercial real estate loans to $12.7 billion), and its commercial nonaccrual loans increased by $113 million.

452.    As a result of Defendants' wrongful acts and omissions, and the decline in the price of Wells Fargo securities detailed herein, Lead Plaintiff and other members of the Class (as defined below) have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

453.    Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described in ¶¶ 47–260 above for the reasons described in the Substantive Allegations section of this amended complaint.

454.    The Defendants Sloan, Parker, and Shrewsberry's actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which certified that the SEC filings, among other things, "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Before vouching for the accuracy of the statements made in Wells Fargo's SEC filings, the

certifying Defendants were obligated to familiarize themselves with the contents of the filings and the underlying operations of Wells Fargo described therein.

455.    Defendants Shrewsberry and Pelos's scienter is also established by their financial motive, as demonstrated by their total net proceeds of approximately $6.1 million from their sales of Wells Fargo stock during the Class Period.

456.    Defendants' scienter is also established by the many factors that Professor John Griffin and John Flynn found to show that the pervasive and substantial inflation of income and cash flow figures in Wells Fargo's commercial loans was intentional.

457.    Indeed, Griffin concluded that this poor underwriting quality was the result of intentionally deceptive practices by commercial loan originators because "[h]igher prices for loans with income overstatement, additional risk assessments by credit rating agencies, and inflations of past financials *point to originators knowingly inflating underwritten income*." He also observed "persistent firm practices" within each specific originator that was "driven by cultural features of the originating banks."

458.    In addition, Griffin's co-author explained that "'our tests demonstrate that this really doesn't seem to be a pattern that's driven by coincidence. . . . It's hard to argue that these originators are just naive,' making innocent mistakes."

459.    Flynn similarly determined that the pervasive nature of the inflation of key financial metrics and the indications that Wells Fargo took steps to hide those misrepresentations in loan documents, indicated that these fraudulent practices were intentional.

460.    Defendant Pelos's scienter is further established by the description of CW 1, who reported to Neal Crapo, who reported to John Manning (EVP and Heard of West Region Commercial Banking), who reported to Pelos. CW 1 described hearing from the Business

Development Officer Sales team that Wells Fargo deviated from its standard LTV ratio for commercial loans in California without any justification, because of the intense competition in that market.

461.    Defendants' scienter is also established by Wells Fargo's goal of making its commercial lending business the largest in the country. CW 1 explained that Wells Fargo made commercial loans in California that did not meet its underwriting standards because there was "pressure to do that because of the competition and because the economy was so good," particularly in California where there was intense competition between banks. This was a problem for Wells Fargo because, as the witness explained, it was "really trying to grow the bank" and "there was pressure to find a way to make deals happen."

462.    CW 2 and CW 3 also attested to the pressure they felt to make commercial loans.

463.    Defendants also boasted about Wells Fargo's status.  Defendant Sloan stated that "[w]e're the largest commercial real estate lender by far, and not only in total but in almost every product type."

464.    In addition, Defendant Myers discussed during a January 20, 2020 interview how Wells Fargo grew into the number one commercial real estate lender over the course of the prior 10 years, during his leadership as Wells Fargo's Head of Commercial Real Estate.

465.    Defendants' scienter is also supported by the level of review that Wells Fargo represented that it conducted during the origination and underwriting process for commercial loans. This included the review of historical financial statements for the property at issue, among many other steps that would have alerted the Company's origination and underwriting groups to the pervasive misstatements in loan documents.

466.    Defendants' scienter is also established by their specific assurances that they were

aware of the nature of Wells Fargo's commercial loans. These statements went further than misrepresenting the quality of these loans, because Defendants attested specifically to their *awareness* of the nature of these loans. For example, Defendant Shrewsberry noted that Financials Except Banks loans to third party financial institutions were "very actively managed borrower relationships," because "[w]e don't get involved in businesses as an indirect lender in that way if we don't understand or believe that we understand the underlying collateral." Shrewsberry also explained, on a separate occasion when discussing the Company's over-$100 billion in commercial loans to non-depository financial institutions, that "[w]e understand the underlying loan."

467.    Similarly, Defendant Myers firmly explains that "[t]here are risks you clearly don't take. And, by the way, *you never do something that you don't understand*. Never, never . . . . Again, in the environment where generally we are more conservative, more cautious. *I am personally more cautious, more conservative*."

468.    Defendant Myers also expressly confirmed that Wells Fargo applied the same standards to commercial loans that it originated and sold into CMBS and those that it continued to hold on its balance sheet. Myers represented that Wells Fargo approaches the CMBS business *"very much from a traditional commercial bank perspective, which is we are a lender first.* And even though we are originating a CMBS loan for sale, *we have to feel good that at the end that's a loan we will make and will be happy to own on our balance sheet."*

469.    Defendants also repeatedly assured investors that Wells Fargo had learned its lessons from the Financial Crisis and was not subject to the types of risks that led to that collapse. For example, Defendant Sloan even expressly assured investors that Wells Fargo's balance sheet had "a much stronger mix in terms of credit quality, even if we would go into some sort of an economic downturn."

470.    In addition, the Individual Defendants were Wells Fargo's most senior executives or the executives specifically responsible for its commercial lending and commercial real estate businesses. Defendant Shrewsberry served as Wells Fargo's CFO during the entire Class Period. Defendants Parker and Sloan were Wells Fargo's CEOs.

471.    Defendants Myers and McShane were Wells Fargo's Heads of Commercial Real Estate. They both had extensive experience in Wells Fargo's commercial real estate business for many years, with Myers serving in that position from 2011 to February 2020, during which time he oversaw Wells Fargo's growth as the largest commercial real estate lender in the country.

472.    Defendant Pelos was responsible for Wells Fargo's commercial lending business as a whole. He was in charge of Wells Fargo's Wholesale Banking (which included Wells Fargo's commercial lending business) from November 2016 until February 2020, was CEO of Commercial Banking from February 2020 to the present, and held various senior positions in Wells Fargo's corporate and commercial banking groups since 1998.

473.    Defendants Pelos, Myers, and McShane were therefore in charge of the specific groups at Wells Fargo that engaged in the pervasive inflation of key financial metrics in Wells Fargo's commercial loans and that made loans to asset managers that also engaged in these practices.

474.    The Individual Defendants' scienter is also established because the alleged misstatements and omissions at issue here concerned Wells Fargo's core operations, including its commercial lending business. Indeed, Wells Fargo was the largest commercial lender in the country during the Class Period and its commercial lending business was disproportionately important to it as compared to its peers. Defendants, by virtue of their roles in senior management and involvement in Company's core operations, would have had knowledge of the true nature of

the Company's core businesses during the Class Period. In addition, Defendants had access to reports and communications describing these operations.

475. Wells Fargo itself had scienter as to the false and misleading nature of the statements described above based on the knowledge of the Individual Defendants. In addition, because the false and misleading statements at issue here relate to the Company's central commercial lending business, the Company's scienter can be inferred because these statements would have been approved by corporate officials that knew they were false or misleading.

## VIII.    NO SAFE HARBOR

476. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

477. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer or top management of Wells Fargo who knew that the statements were false when made.

## IX.    CLASS ACTION ALLEGATIONS

478. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

acquired Wells Fargo common shares traded on the NYSE during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures or the materialization of the undisclosed risk. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

479.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Wells Fargo securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Wells Fargo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

480.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

481.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

482.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the credit quality of Wells Fargo's commercial loans;

- whether Defendants caused Wells Fargo to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Wells Fargo securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

483.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS

484.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Wells Fargo securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Lead Plaintiff and members of the Class purchased and/or sold Wells Fargo common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed or materialized, without knowledge of the omitted or misrepresented facts.

485.    Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

486.    Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information.

## XI.    <u>COUNT I</u>

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 <br> <u>Against All Defendants</u>

487.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

488.    This Count is asserted against Wells Fargo and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

489.    During the Class Period, Wells Fargo and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

490.    Wells Fargo and the Individual Defendants violated §10(b) of the 1934 Act and

Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Wells Fargo common shares during the Class Period.

491. Wells Fargo and the Individual Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of Wells Fargo were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts concerning Wells Fargo, their control over, and/or receipt and/or modification of Wells Fargo's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Wells Fargo, participated in the fraudulent scheme alleged herein.

492. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Wells Fargo personnel to members of the investing public, including Lead Plaintiff and the Class.

493. As a result of the foregoing, the market price of Wells Fargo common shares was

artificially inflated during the Class Period. In ignorance of the falsity of Wells Fargo's and the Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Wells Fargo common shares during the Class Period in purchasing Wells Fargo common shares at prices that were artificially inflated as a result of Wells Fargo's and the Individual Defendants' false and misleading statements.

494.    Had Lead Plaintiff and the other members of the Class been aware that the market price of Wells Fargo securities had been artificially and falsely inflated by Wells Fargo and the Individual Defendants' misleading statements and by the material adverse information which Wells Fargo and the Individual Defendants did not disclose, they would not have purchased Wells Fargo's common shares at the artificially inflated prices that they did, or at all.

495.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

496.    By reason of the foregoing, Wells Fargo and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Wells Fargo common shares during the Class Period.

## XII.    COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against The Individual Defendants

497.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

498.    During the Class Period, the Individual Defendants participated in the operation and management of Wells Fargo, and conducted and participated, directly and indirectly, in the

conduct of Wells Fargo's commercial loan business. Because of their senior positions, they knew of the adverse non-public information regarding the poor credit quality of Wells Fargo's commercial loans.

499.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information concerning Wells Fargo's business, and to correct promptly any public statements issued by Wells Fargo which had become materially false or misleading.

500.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, statements, press releases and public filings which Wells Fargo disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Wells Fargo to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Wells Fargo within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Wells Fargo common shares.

501.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Wells Fargo.

## XIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### XIV.    DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

DATED: January 12, 2022                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
POMERANTZ LLP
Jeremy A. Lieberman
(admitted *pro hac vice*)
Michael Grunfeld
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mgrunfeld@pomlaw.com

*Lead Counsel for Lead Plaintiff the Employees'*
*Retirement System of the State of Hawaii and*
*Lead Counsel for the Class*